**No. 23-1811**

# United States Court of Appeals for the Federal Circuit

DEERE & COMPANY,
*Plaintiff-Appellant*,
v.
AGCO CORP. AND PRECISION PLANTING, INC.,
*Defendants-Appellees.*

Appeal from the United States District Court for the District of Delaware, Judge Colm F. Connolly, Nos. 1:18-CV-827, 1:18-CV-828

**APPELLANT'S OPENING BRIEF**
**(Corrected)**

John C. O'Quinn
Nathan S. Mammen
William H. Burgess
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, DC 20004
(202) 389-5000

**U.S. Patent No. 8,813,663, claim 1 (Appx186)**

**1**. A seeding machine, comprising:

a seed meter having a metering disk with a plurality of apertures in a circular array adapted to adhere seeds to the metering disk to move the seeds along a seed path as the metering disk rotates;

a seed delivery system associated with said seed meter, said seed delivery system including:

a housing for seed from said metering disk, the housing having a lower opening through which seed is discharged;

a single endless member within said housing disposed around a first drive pulley and a second idler pulley, said endless member engaging seed from the seed meter and moving the seed to said lower opening where seed is discharged from said housing; and

a loading wheel engaging seeds adhered to the metering disk and moving along the seed path and guiding the seed into the single endless member whereby the single endless member moves the seed to the lower opening.

# CERTIFICATE OF INTEREST

1. **Represented Entities (Fed. Cir. R. 47.4(a)(1)):**

Deere & Company

2. **Real Party in Interest (Fed. Cir. R. 47.4(a)(2)):** N/A

3. **Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)):** N/A

4. **Legal Representatives (Fed. Cir. R. 47.4(a)(4)):**

Covington & Burling LLP: Jay I. Alexander, Pratik Agarwal (former), Kevin B. Collins, Nicholas L. Evoy, R. Jason Fowler, Megan L. Hare, Michael R. Morey, Rajesh D. Paul, Richard L. Rainey, Daniel E. Valencia

Young, Conaway, Stargatt & Taylor LLP: Adam W. Poff, Pilar G. Kraman

5. **Related Cases (Fed. Cir. R. 47.5(a)).** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)? **No.**

6. **Organizational Victims and Bankruptcy Cases (Fed. R. App. P. 26.1(b)-(c)):** N/A

## TABLE OF CONTENTS

Statement of Related Cases ........ viii

Jurisdictional Statement ........ viii

Introduction ........ 1

Statement of the Issues ........ 4

Statement of the Case ........ 5

A. Deere Invents, Patents, and Commercializes a Novel Arrangement for Planting Seeds with a Row Crop Planter, that Overcomes a Tradeoff Between Speed and Accuracy ........ 5

1. Technical Background and Prior-Art 5 mph Limit for Planting Row Crops Without Sacrificing Yield ........ 5

2. Deere Invents a System that Can Plant at Double Traditional Speeds Without Sacrificing Seeding Accuracy and Crop Yield. ........ 9

3. Deere Patents and Commercializes its Invention in the ’663 and ’955 Patents and ExactEmerge Product. ........ 10

B. After Trying and Failing to Develop an Independent Solution, AGCO-Precision Sees Deere’s Patents and Develops the Accused SpeedTube and vSet2 Meter. ........ 13

1. AGCO-Precision’s Prior Failed Designs and Development of SpeedTube ........ 13

2. Operation of AGCO-Precision’s Accused Product ........ 15

C. The District Court Construes “*Seed Delivery System*” As A System That “*Removes Seed … by Capturing* the Seed” with “No Disclaimer of … Drop by Gravity.” ........ 19

D. The District Court Rejects AGCO-Precision Motion for Reconsideration of the “No Disclaimer” Part of the Construction. ........ 22

E. The District Court Denies Summary Judgment of Infringement Based on the Parties’ Competing

Interpretations of the Court's "Remove[] … by Capture" Construction. .......... 23

F. At Trial, the Parties Advance Competing Interpretations of the Court's Construction, Mid-Trial Rulings Limit Deere's Evidence and Revise the Construction, and the Jury Finds Non-Infringement. .......... 25

1. Over AGCO-Precision's Objection, the Court Permits Deere to Quote the "No Disclaimer" Part of the Construction in Opening Statements. .......... 26

2. The Court Suggests its Construction May Require the "Feeder Wheels" Rather than the "System" to "Capture" Seeds. .......... 27

3. The Court Bars Deere from Cross-Examining a Witness About Evidence Contradicting His Testimony Interpreting the "Remove[] … by Capture" Construction. .......... 31

4. The District Court *Sua Sponte* Bars Deere from Mentioning the "No Disclaimer" Part of its Construction to the Jury .......... 32

5. The District Court Removes the "No Disclaimer" Part of its Construction from Jury Instructions; the Jury Returns a Noninfringement Verdict. .......... 33

G. The District Court Denies Deere's Motions for JMOL and/or New Trial. .......... 35

1. Pre-Verdict JMOL Motions .......... 35

2. Post-Verdict JMOL and New Trial Motions .......... 36

Summary of the Argument .......... 39

Standard of Review .......... 42

Argument .......... 43

I. A New Trial Is Required on Infringement. .......... 43

A. The Non-Infringement Verdict is Against the Weight of the Evidence, Because AGCO-Precision's SpeedTube Removes Seeds by Capture. .......... 44

1. The District Court Did Not Weigh the Evidence Independently Under the New-Trial Standard. .......... 45

2. The Parties Disputed the Meaning of the Court's Construction of "Seed Delivery System." ..................... 46

3. Even Accepting AGCO-Precision's Focus on the Feeder Wheels, the Verdict is Against the Weight of the Evidence Because AGCO-Precision's Feeder Wheels Remove Seeds by Capture. .............................. 48

4. Under the District Court's Original Construction, the Verdict is Also Against the Weight of the Evidence Because AGCO-Precision's Seed Delivery *System* Removes Seeds by Capture. ............................. 52

B. The District Court's Ruling Excluding AGCO-Precision's '037 Patent Was Prejudicial Error, Further Warranting a New Trial. ........................................................................ 55

C. The District Court's Mid-Trial Claim Construction Rulings Were Erroneous, Caused Jury Confusion, and Prevented Deere from Trying its Case Properly, Further Warranting a New Trial. ...................................................... 58

1. The District Court Erred by Removing the "No Disclaimer" Clause from its Construction. .................. 59

2. The District Court's Mid-Trial Revisions to the Claim Construction Invited Jury Confusion and Prevented Deere from Trying its Case Properly. ........ 63

3. Given the Removal of the "No Disclaimer" Language, the District Court Should Have Further Defined the "Seed Delivery System" Term to Make Clear That the *System*—Not Just Wheels—May Do the Capturing. ............................................................ 67

II. Alternatively, the Court Should Reverse the District Court's Denial of JMOL on Infringement. ................................................. 72

A. JMOL is Preserved. ............................................................. 73

B. No Reasonable Jury Could Find Non-Infringement. ............ 77

Conclusion ............................................................................................ 80

# TABLE OF AUTHORITIES

## Cases

*01 Communique Laboratory, Inc. v. Logmein, Inc.*, 687 F.3d 1292 (Fed. Cir. 2012) ........ 60

*A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700 (Fed. Cir. 1983) ........ 52

*Acosta v. Honda Motor Co.*, 717 F.2d 828 (3d Cir. 1983) ........ 74

*Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365 (Fed. Cir. 2012) ........ 71

*AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239 (Fed. Cir. 2001) ........ 62

*Amgen Inc. v. Sanofi*, 227 F.Supp.3d 333 (D. Del. 2017) ........ 76

*Amgen Inc. v. Sanofi*, 872 F.3d 1367 (Fed. Cir. 2017) ........ 57, 76

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) ........ 54

*Bell Commc'ns Rsch., Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615 (Fed. Cir. 1995) ........ 49

*Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325 (Fed. Cir. 2013) ........ 49

*Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361 (Fed. Cir. 2005) ........ 77

*CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225 (Fed. Cir. 2005) ........ 51

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168 (Fed. Cir. 2005) ........ 47, 65

*Dupree v. Younger*, 598 U.S. 729 (2023) ........ 74

*Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098 (Fed. Cir. 2003) ........ 74

*Eaton Corp. v. Rockwell Int'l Corp.*,
323 F.3d 1332 (Fed. Cir. 2003) .......... 44

*Embrex, Inc. v. Serv. Eng'g Corp.*,
216 F.3d 1343 (Fed. Cir. 2000) .......... 50

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
137 F.3d 1475 (Fed. Cir. 1998) .......... 68

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) .......... 42, 43

*Function Media, L.L.C. v. Google Inc.*,
708 F.3d 1310 (Fed. Cir. 2013) .......... 71

*Gaus v. Conair Corp.*, 363 F.3d 1284 (Fed. Cir. 2004) .......... 74

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014) .......... 66

*Glass v. Philadelphia Elec. Co.*, 34 F.3d 188 (3d Cir. 1994) .......... 57

*Greenleaf v. Garlock, Inc.*, 174 F.3d 352 (3d Cir. 1999) .......... 44

*Habecker v. Clark Equip. Co.*, 942 F.2d 210 (3d Cir. 1991) .......... 43

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016) .......... 75

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
340 F.3d 1314 (Fed. Cir. 2003) .......... 49

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
572 U.S. 559 (2014) .......... 43

*In re Nintendo Co.*, 544 F.App'x 934 (Fed. Cir. 2013) .......... 45

*In re Papst Licensing Litig.*, 778 F.3d 1255 (Fed. Cir. 2015) .......... 71

*Leader Techs., Inc. v. Facebook, Inc.*,
678 F.3d 1300 (Fed. Cir. 2012) .......... 44

*Lind v. Schenley Indus., Inc.*
278 F.2d 79 (3d Cir. 1960) (en banc) .......... 44, 47

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996)...............47

*McKenna v. City of Philadelphia*, 582 F.3d 447 (3d Cir. 2009)..............42

*McQueeney v. Wilmington Trust Co.*,
779 F.2d 916 (3d Cir. 1985)..............................................................57

*Moba, B.V. v. Diamond Automation, Inc.*,
325 F.3d 1306 (Fed. Cir. 2003)........................................50, 72, 77, 78

*Network-1 Techs., Inc. v. Hewlett-Packard Co.*,
981 F.3d 1015 (Fed. Cir. 2020)..........................................................68

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)..................38, 61, 63, 66, 67, 70, 71, 72

*Omega Patents, LLC v. CalAmp Corp.*,
920 F.3d 1337 (Fed. Cir. 2019)..........................................................67

*Organic Seed Growers & Trade Ass'n v. Monsanto Co.*,
718 F.3d 1350 (Fed. Cir. 2013)....................................................50, 55

*Petree v. Victor Fluid Power, Inc.*, 887 F.2d 34 (3d Cir. 1989)...............57

*Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306 (Fed. Cir. 2008)...................68

*Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*,
599 F.3d 1308 (Fed. Cir. 2010)..........................................................66

*Scott v. Harris*, 550 U.S. 372 (2007)................................................46, 54

*Shamrock Techs., Inc. v. Med. Sterilization, Inc.*,
903 F.2d 789 (Fed. Cir. 1990)............................................................49

*SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*,
820 F.3d 419 (Fed. Cir. 2016)............................................................77

*SmithKline Beecham Corp. v. Apotex Corp.*,
403 F.3d 1331 (Fed. Cir. 2005)..........................................................50

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
550 F.3d 1356 (Fed. Cir. 2008)..........................................................65

*SunTiger, Inc. v. Sci. Rsch. Funding Grp.*,
189 F.3d 1327 (Fed. Cir. 1999) .......... 49

*TomTom, Inc. v. Adolph*, 790 F.3d 1315 (Fed. Cir. 2015) .......... 60

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) .......... 45

*United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021) .......... 62

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) .......... 68

**Rules**

Fed. R. Civ. P. 50 .......... 73, 74, 76

Fed. R. Civ. P. 50(a) .......... 73

Fed. R. Civ. P. 50(b) .......... 36, 37, 73

Fed. R. Civ. P. 59 .......... 36, 39

Fed. R. Civ. P. 59(a)(1) .......... 44

Fed. R. Evid. 403 .......... 32, 56

**Other Authorities**

11 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE
§ 2806 (3d ed. Apr. 2023) .......... 44

9B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE
§ 2533 (3d ed. Apr. 2023) .......... 73

Br. of Pl.-Appellees, *Amgen Inc. v. Sanofi*,
Fed. Cir. No. 17-1480, 2017 WL 1251183 (Mar. 24, 2017) .......... 76

## STATEMENT OF RELATED CASES

No other appeal from the proceedings below was previously before this or any other appellate court. Appellant's counsel are unaware of other pending proceedings that would directly affect or be directly affected by the Court's decision in this appeal.

The patents at issue here—U.S. Nos. 8,813,663 and 9,699,955—were previously the subject of *Precision Planting, LLC v. Deere & Company*, Appeal Nos. 21-1581 and 21-1590 (consolidated). There, Precision Planting appealed decisions of the Patent Trial and Appeal Board upholding the validity of the '663 and '955 patents. This Court affirmed under Rule 36. 2021 WL 5144369 (Nov. 5, 2021) (Reyna, Clevenger, Hughes, JJ.). The '663 patent is also involved in *John Deere Shared Services, Inc. v. Kinze Manufacturing, Inc.*, No. 4:20-CV-00389-RGE-HCA (S.D. Iowa).

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338(a). The district court denied Deere's motion for new trial and JMOL on March 28, 2023, Appx2-69, and entered final judgment on March 31, 2023, Appx1. Deere filed a timely notice of appeal on April 24, 2023. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## INTRODUCTION

Infringement should have been resolved in Deere's favor at summary judgment, after claim construction. Operation of Defendants' accused system was factually *undisputed*, Defendants contested infringement for only a single term ("seed delivery system"), and the court's claim construction should have dictated a finding of infringement. Instead, the case proceeded to a trial where Defendants made arguments about what the claims mean, and the district court issued mid-trial orders that muddied the claim construction, confused the jury, and prevented Deere from properly trying its case.

In *Markman* proceedings, Defendants' claim construction argument had two parts: **(1)** Deere's claims required the "system" to "remove[] seeds from the seed meter by *capturing* the seed," and **(2)** Deere had *disclaimed* a system that permits any "drop by gravity" after the seeds leave the seed meter. The district court accepted the first argument but rejected the second. It construed the claims to require removal "*by capturing*," but added there had been "*no disclaimer* of a … system … that allows for seeds to drop by gravity between the seed meter and discharge." Appx125. That construction should have resolved infringement. In Defendants' own

words, their system removes seeds by "grabbing," "plucking," "picking," "taking," or "pulling" seeds the way a "baseball pitching machine" grips the ball before throwing it. In fact, Defendants' patent says their system "*captures*" the seed from the meter. And although Defendants' system *then* "projects" the seed toward other components, the district court's *Markman* order rejected the argument that a "drop by gravity" is outside the claims.

After the *Markman* order issued, however, Defendants continued to argue that drop by gravity was outside Deere's claims. They asked the district court to reconsider the "no disclaimer" portion of its construction, then twice asked the court to withhold that part of the construction from the jury (which the court ultimately did). Then, Defendants argued to the jury that if the seed experiences any "free" motion (uncontacted by any component of the system) *after* it is removed from the seed meter, that means the seed is not "captured" under the court's construction.

The district court denied summary judgment—not because of any factual dispute, but because the parties disputed the *meaning of the court's claim construction*. According to Defendants, their "grabbing," "plucking," "picking" "taking," or "pulling" was not "capturing" because it happened quickly (milliseconds). But infringement is infringement, however

quickly it happens. The court's claim construction has no temporal requirement, nor would any such requirement make sense in a machine designed to plant 30 seeds per second and *increase speed* over prior art. The court, however, allowed the case to proceed to a trial in which Defendants argued different interpretations of the court's construction to the jury.

The trial quickly devolved into further disputes over the meaning of the court's claim construction. The district court permitted Deere to quote the full construction in opening statements, but later forbade Deere from mentioning the "no disclaimer" portion, and the court ultimately cropped that portion of its construction from the jury instructions. The court also precluded Deere from cross-examining a defense witness about his direct testimony on the meaning of "seed delivery system." And the court suggested to the parties mid-trial that specific *components* of the "system" (rather than the claimed "system" as a whole) must do the "capturing." Claim construction is supposed to resolve the meaning of the claims, and trial is supposed to permit the jury to resolve disputed facts. Neither happened here. The district court's rulings at trial invited confusion, delegated claim construction to the jury, and tied Deere's hands.

At a minimum, Deere is entitled to a new trial on infringement—both based on the weight of the evidence and, separately, from the erroneous construction of "seed delivery system" given to the jury in final instructions. Further, this Court can find infringement as a matter of law based on the undisputed facts. The district court's post-trial orders fail to apply proper legal standards (including not analyzing whether the verdict was against the weight of the evidence), and fail to recognize claim construction errors. This Court should reverse the noninfringement judgment and remand for further proceedings on the remaining issues.

## STATEMENT OF THE ISSUES

**1.** Whether Deere is entitled to a new trial for infringement where: **(a)** the noninfringement verdict is against the weight of the evidence; **(b)** the district court excluded key evidence; and **(c)** the court's mid-trial orders left "seed delivery system" improperly defined for the jury by altering the construction mid-trial and failing to define the "capture" term within the construction.

**2.** Whether Deere is entitled to judgment as a matter of law of infringement where the operation of AGCO-Precision's accused product is factually undisputed, the parties' dispute turns on differing views of the

court's construction of a single term, and Deere has preserved the argument that no reasonable jury could find noninfringement under that construction.

## STATEMENT OF THE CASE

### A. Deere Invents, Patents, and Commercializes a Novel Arrangement for Planting Seeds with a Row Crop Planter, that Overcomes a Tradeoff Between Speed and Accuracy.

#### 1. Technical Background and Prior-Art 5 mph Limit for Planting Row Crops Without Sacrificing Yield

Deere's patent nos. 8,813,663 (Appx171-186) and 9,699,955 (Appx187-203) describe and claim a new arrangement for delivering seeds to the soil in a row crop planter. Deere's invention saves farmers time and increases crop yield. Yield is the amount of a crop (e.g., corn) each acre produces during a growing season, and can make "the difference between a farmer making money or losing money for the year." Appx40207(5-9); Appx40365(8-17).

Farmers typically plant "row crops," like corn or soybeans, using a row crop planter pulled by a tractor. Appx40362(1-16). The planter (below) may have a dozen or more parallel row units mounted to a bar. Appx40365-40366(365:18-366:7).




Appx50189. As shown below (Appx50190), each row unit typically has a meter for isolating individual seeds, and a tube through which seeds fall to the furrow in the ground. Appx40366(8-15).



Farmers have a small window of time to plant each spring—typically two to three weeks. Appx40210(12-20); Appx40258-40259(258:20-259:25); Appx40364(3-10). Because of weather or equipment breakdowns, farmers usually cannot plant during every day of the window. Appx40364-40365(364:11-365:2). They plant as much as possible on "good day[s]." Appx40365(3-7).

Before Deere's invention, farmers faced a limit on their ability to increase crop yield by planting faster. Appx40368-40369(368:17-369:15); Appx50022; Appx50047-50051. Planting faster—*i.e.*, driving the tractor and planter faster across the field—covers more acres on good days within the planting window. But planting faster also decreases seed placement accuracy. Appx40209-40210(209:25-210:3); Appx40365(8-17). The spacing of planted seeds matters critically to yield. Appx40206-40207(206:24-207:9). Too close together, and the plants compete for water and sunlight; too far apart, and there are fewer total plants and thus less crop to harvest. Appx40207(1-4). Five miles per hour was the "typically accepted" speed limit for planting row crops.[1] If a farmer tried to plant faster, the

[1] Appx40209(8-12); Appx40259(11-25); Appx40368(6-16); *see also* Appx50047-50051; Appx40370(3-13).

seeds would bounce and bunch as they fell to the ground, land with inconsistent spacing, and ultimately decrease yield. Appx40259(11-25).

That problem came from traditional planters' hollow tubes through which seeds would fall. Appx40209(13-20). As a planter moves through the field, the row unit moves up and down over uneven terrain, Appx40366-40368(366:22-368:5). At higher speeds, that movement makes the seeds bunch or bounce in the tube as they fall, corrupting spacing, as shown below. *Id.*






Appx50192-50193

#### 2. Deere Invents a System that Can Plant at Double Traditional Speeds Without Sacrificing Seeding Accuracy and Crop Yield.

Deere's project to develop a high-speed, high accuracy planter was one of Deere's largest investments in the company's history. Appx40564(7-14). In 1999, Deere formed a team to design faster planters. Appx40210(4-20). The team held brainstorming sessions with senior engineers. Appx40211-40216; Appx50004-50009. The goal was to permit

planting corn at 9 mph, which many viewed as "crazy." Appx40212(14-23); Appx40213(2-7); Appx50004; Appx50007.

After many failed experiments, inspiration struck in May 2008 when inventor Elijah Garner was celebrating his wedding anniversary in Hawaii. The motion of a vertical blind in his hotel room blowing in the breeze sparked the idea of using a belt that grabs the seed from the meter, controls its movement down to the soil, and places it in a trench. Appx40260-40263(260:9-263:7); Appx50076(video)[2]. Beginning with that idea, Garner added a loading wheel to control the transfer of seeds from the meter to the delivery belt. Appx40266-40267(266:23-267:4). Garner's idea ultimately succeeded. The new system broke the barrier between speed and accuracy, and planted up to 13 mph while preserving seed spacing accuracy. Appx40267-40268(267:24-268:21).

#### 3. Deere Patents and Commercializes its Invention in the '663 and '955 Patents and ExactEmerge Product.

The '663 and '955 patents are among the patents covering Deere's solution to high speed and high accuracy planting. Those patents teach a two-part solution that provides **(1)** reliable seed transfer from the seed me-

---

[2] Cited videos are in the Rule 30(i) supplemental media appendix.

ter to the seed delivery system, and **(2)** controlled seed descent to the soil. Appx40372-40374(372:12-373:6, 374:8-13). The patents explain that the invention "provides a seed delivery system that removes the seed from the seed meter by capturing the seed" and "then moves the seed down to a lower discharge point." Appx183(2:23-26). The delivery system "accelerates the seed rearward to a horizontal velocity approximately equal to the forward travel speed of the seeding machine such that the seed, when discharged, as a low or zero horizontal velocity relative to the ground." Appx183(2:26-30). "The combination of controlled descent and discharge at a substantially zero horizontal speed relative to the ground reduces seed spacing variability." Appx183(2:36-38).

Claim 1 of the '663 Patent recites the following (Appx186):

> **1**. A seeding machine, comprising:
>
> a seed meter having a metering disk with a plurality of apertures in a circular array adapted to adhere seeds to the metering disk to move the seeds along a seed path as the metering disk rotates;
>
> a seed delivery system associated with said seed meter, said seed delivery system including:
>
> > a housing for seed from said metering disk, the housing having a lower opening through which seed is discharged;

> a single endless member within said housing disposed around a first drive pulley and a second idler pulley, said endless member engaging seed from the seed meter and moving the seed to said lower opening where seed is discharged from said housing; and
>
> a loading wheel engaging seeds adhered to the metering disk and moving along the seed path and guiding the seed into the single endless member whereby the single endless member moves the seed to the lower opening.

Claim 20 of the '955 patent claims a method of delivering a seed from a seed meter to the furrow using a system with similar features. Appx203.

Deere developed a commercial version of its patented invention that it markets and sells as ExactEmerge. Appx40269(7-9); Appx40445(6-15); Appx40447-40449(447:12-449:10); Appx50015; Appx50001(video). ExactEmerge can plant at 10 mph or more, Appx40449(11-14), and is commercially successful. Appx40630-40631(630:24-631:17).

### B. After Trying and Failing to Develop an Independent Solution, AGCO-Precision Sees Deere's Patents and Develops the Accused SpeedTube and vSet2 Meter.

#### 1. AGCO-Precision's Prior Failed Designs and Development of SpeedTube

AGCO-Precision[3] competes with Deere, and tried since the early 2000s to solve the tradeoff between higher speed and accurate planting Appx40466-40469(466:19-469:6); Appx50077-50090 (AGCO-Precision patent). AGCO-Precision's initial, 2002, design used an extended flighted belt to guide seeds to the ground rather than dropping them from any height. Appx40469-40470(469:13-470:6). AGCO-Precision abandoned that design because it "didn't work." Appx50002 (video, 00:12-00:35); Appx40471-40473(471:17-473:1). Among other things, the design lacked any loading mechanism to guide seed into the belt. Appx40470(7-10).

AGCO-Precision also tried shooting seeds to the ground with compressed air. Appx40473-40474(473:6-474:1); Appx50288. That effort failed, and AGCO-Precision abandoned it in February 2011. Appx40474(2-17); Appx50289.

[3] Defendants AGCO Corporation and Precision Planting LLC are parent and subsidiary, respectively. The parties agreed below to refer to both collectively as "AGCO-Precision." Appx4218; Appx40095(10-12). This brief follows that convention.

The same month that AGCO-Precision abandoned its compressed-air idea, an AGCO-Precision lead engineer looked at the then-recently-published Deere patent application for the '663 patent's parent (Appx50101-50117), including Figure 3 showing Deere's loading wheel (Appx50104). *See* Appx40474-40476(474:21-476:20); Appx50092; Appx50099. Only three months after seeing Deere's patent application, AGCO-Precision proposed using a flighted belt "with loading assist wheel." Appx50071; Appx40481-40482(481:14-482:7). And by December 2011—ten months after seeing Deere's application—AGCO-Precision built and tested a system similar to Deere's, with a loading wheel. Appx40481-40482(481:4-482:13); Appx50073-50076. AGCO named the system SpeedTube.

The accused product is the SpeedTube-vSet2 combination of seed meter and seed delivery system (shown below).




AGCO-Precision's system competes with Deere's. It can plant at 10 mph or more, Appx40450(7-11). AGCO-Precision advertised that farmers using the SpeedTube would no longer "have to sacrifice accurate seed placement to get your crops planted within the perfect planting window … [b]ecause SpeedTube™ lets you control seed spacing while planting twice as fast." Appx50052.

### 2. Operation of AGCO-Precision's Accused Product

Importantly, the parties did not dispute factually how AGCO-Precision's accused product operates. The seed meter has a disk (purple "vacuum disk," below), with apertures around its periphery. A vacuum

adheres the seeds to the apertures. As the disk rotates, "feeder wheels" (orange "loading wheels" immediately below; also shown further below), "grab" each individual seed "from the seed disk and deposit it onto a flight-ed belt" (blue "endless belt" immediately below; also shown further below). Appx50053; Appx50066 (video animation); Appx40380-40381(380:2-381:13). Each seed is then transported in the flighted belt's cells, to the seed discharge outlet, where it is placed in the furrow in the ground. Appx40383-40384(383:3-384:7).




Appx3252




Appx50334; Appx40989(4-14).

AGCO-Precision's videos of its products in operation show the same function of the feeder wheels removing seeds from the meter disk. As shown below (left), the apertures pass the seeds between the feeder wheels, which grab the seeds from the apertures. The below-right image similarly shows seeds adhered to the apertures and passing through the system.



Appx50066(at 00:09)



Appx50120(at 00:01)

Further, AGCO-Precision's documents, witnesses, and discovery responses consistently described its system as *controlling the seed's movement throughout*, including the feeder wheels "grabbing," "plucking" or "taking" the seed from the disk to move it to the belt. AGCO-Precision documents stated "SpeedTube *controls* the seed *all the way* from the meter disk to the furrow." Appx50053. The "[f]eeder wheels at the top *grab* the seed from the disk, placing it onto the belt, and safely delivering it to the bottom of the trench." Appx50061; *see* Appx40838-40839(838:12-839:23); Appx50055 (AGCO-Precision press release); Appx50232 (quoting *id.*). The lead engineer for SpeedTube stated the "feeder wheels … *pluck* the seed off the disk while it's still being held under vacuum, and then they place the

seed right into the belt itself." Appx40413-40415(413:19-415:2); *see also* Appx50003 (AGCO-Precision video at 4:13-4:33); Appx40416-40417 (same). AGCO-Precision's interrogatory responses likewise stated the feeder wheels "*take* seeds while held on the seed meter disk and accelerate[] them toward the flights of the flighted belt." Appx40418-40419(418:14-419:4); *see also* Appx50230; Appx3749.

AGCO-Precision literature explained that "[e]ach seed is *captured* by two rotating and pliable 'fingers' on the conveyor that create a kind of protected seed chamber" and "[t]here is no free fall in a tube to potentially knock the seed off-target." Appx50118.

### C. The District Court Construes "*Seed Delivery System*" As A System That "*Removes Seed … by Capturing* the Seed" with "No Disclaimer of … Drop by Gravity."

Deere reached the conclusion that AGCO-Precision's system infringed its patents, and sued in Delaware district court. In pretrial *Markman* proceedings the court decided the meaning of the "seed delivery system" claim term, and related "method of delivering seeds" term.

Deere argued that "seed delivery system" needed no construction, but if construction were necessary, the term means an "[a]ssembly of components that delivers seeds." Appx2479-2481. AGCO-Precision argued that

"seed delivery system" should be construed as a system "that *removes seeds from the seed meter by capturing the seed* and then delivers it to a discharge position." Appx2479. AGCO-Precision also made a disclaimer argument: the seed delivery system "does not allow for seeds to drop by gravity between the seed meter and discharge." Appx2479-2480; Appx2495-2498; *see also* Appx2010-2011.

The court announced its decision and reasons orally, and directed Deere to prepare a proposed order. Appx38215(6-7). For "seed delivery system," the court adopted AGCO-Precision's "remov[a]l … by capturing" construction, but rejected AGCO-Precision's disclaimer argument. Appx38151(20-23). The court "agree[d]… that the system … necessarily involves *capturing of the seed*." Appx38152(6-9). But the court rejected AGCO-Precision's argument for "disclaimer as far as the zero gravity." Appx38165-38166(165:20-166:3).

Deere submitted a proposed order on behalf of both parties, consistent with the court's oral rulings, which the court adopted without modification. Appx3123-3127 (proposed order); Appx123-127 (signed order). The construction of "seed delivery" system is below (Appx125).

### III. "SEED DELIVERY SYSTEM" TERMS

| TERM | PATENT(S) / CLAIM(S) | COURT'S CONSTRUCTION |
|---|---|---|
| **"seed delivery system" /**<br><br>**"delivery system" /**<br><br>**"seed delivery apparatus" /**<br><br>**"method of delivering a seed"** | '663 Patent: Claims 1 and 6<br><br>'199 Patent: Claims 1 and 5<br><br>'429 Patent: Claims 19 and 20<br><br>'955 Patent: Claims 19, 20<br><br>'924 Patent: Claims 12, 15<br><br>'906 Patent: Claims 4 and 6<br><br>'031 Patent: Claims 8 and 16<br><br>'173 Patent: Claim 6<br><br>'998 Patent: Claim 3<br><br>'799 Patent: Claim 2<br><br>'502 Patent: Claims 14, 19 and 22 | For '663, '199, '429, '955, '924, '906, '031, '173 patents:<br>**"apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position"**<br><br>No disclaimer of a seed delivery apparatus / system / method that allows for seeds to drop by gravity between the seed meter and discharge.<br><br>For '799, '998, '502 patents:<br>**Plain and ordinary meaning.**<br><br>No disclaimer of a seed delivery apparatus / system / method that includes a belt with flights. |

Although the *Markman* order explicitly rejected AGCO-Precision's argument that Deere disclaimed a system that "allows for seeds to drop by gravity between the seed meter and discharge," AGCO-Precision continued to raise and repackage that argument, as discussed below. First, it asked the district court to reconsider its rejection of AGCO-Precision's disclaimer

argument. Then it tried, successfully, to keep the "no-disclaimer" portion of the construction from the jury. Finally, AGCO-Precision argued throughout trial that any "free-fall" or "free" motion of a seed within its system, at any time, was outside the district court's construction.

### D. The District Court Rejects AGCO-Precision Motion for Reconsideration of the "No Disclaimer" Part of the Construction.

Following claim construction, the district court stayed proceedings while AGCO-Precision pursued *inter partes* reviews of Deere's patents. Appx3134-3137. Deere prevailed at the PTAB, this Court affirmed under Rule 36, *Precision Planting, LLC v. Deere & Co.*, 2021 WL 5144369 (Fed. Cir. Nov. 5, 2021), and district court proceedings resumed.

AGCO-Precision then moved to revisit the district court's claim construction "h[olding] that there was no disclaimer of a 'gravity drop.'" Appx3146, because, according to AGCO-Precision, Deere took "the opposite position" at the PTAB. Appx3142-3143; Appx3145-3147. The district court rejected that argument as incredible: "I do not think it reasonable or fair to accuse Deere of adopting in the IPR proceedings 'fundamentally inconsistent positions' that were 'diametrically opposed' to the positions Deere took during claim construction before me." Appx3235. "[G]oing

forward," the court stated it would "view with skepticism arguments and representations by" AGCO-Precision. *Id.*

### E. The District Court Denies Summary Judgment of Infringement Based on the Parties' Competing Interpretations of the Court's "Remove[] … by Capture" Construction.

Deere moved for summary judgment that the SpeedTube-vSet2 infringed claim 1 of the '663 patent. Appx3236-3237. Deere argued that SpeedTube-vSet2 met the "seed delivery system" term as the court construed it. SpeedTube-vSet2's operation was factually undisputed, *see supra* §B.2, and met the court's construction of "remov[ing] seed from the seed meter by capturing the seed." AGCO-Precision's interrogatory responses and documents confirmed the undisputed facts. Appx3263. AGCO-Precision's U.S. Patent No. 8,985,037 (Appx3753-3813), further supported infringement. Appx3267. AGCO-Precision described that patent as "showing the novel idea for the feeder wheels" used in the SpeedTube product. Appx40897-40899(897:7-899:14); Appx3750. The '037 patent stated that the seed is "*captured* between the loading wheels" at the point where the seed is released from the meter disk. Appx3808(12:40-41).

Deere also explained that AGCO-Precision was effectively re-arguing disclaimer for the third time when AGCO-Precision contended it did not

infringe because its wheels "project" seed. Appx3272-3277; *see also* Appx3943 (AGCO-Precision opposition). The court had already ruled that "gravity drop" did not preclude infringement where the seed is otherwise "captured." Appx3273-3274. AGCO-Precision was trying to circumvent that ruling by repackaging the rejected claim construction argument as a non-infringement position—*i.e.* that any "free" movement of the seed within the system negated infringement. Appx3275-3276 (collecting examples). Importantly, this was not a factual dispute about how AGCO-Precision's system functioned. As explained (§B.2, *supra*), AGCO-Precision's system's wheels undisputedly "grab," "pluck," "pick," "take," or "pull" seeds from the meter, and *then* transport them to the flighted belt by a motion AGCO-Precision calls "projecting." And AGCO-Precision's witnesses and documents consistently describe its system as "controlling" movement of the seed throughout.

Nonetheless, the district court denied summary judgment, stating "Defendants dispute the conclusion to be drawn from their interrogatory response," and "Defendants cite additional record evidence from which a rational juror could plausibly conclude that a seed is removed *by projection as opposed to by capture*." Appx3981-3982.

### F. At Trial, the Parties Advance Competing Interpretations of the Court's Construction, Mid-Trial Rulings Limit Deere's Evidence and Revise the Construction, and the Jury Finds Non-Infringement.

The parties' joint pre-trial order repeated the Court's construction of "seed delivery system," including the "no disclaimer" language (Appx3989):

| Term | Patents/Claims | Court's Construction |
|---|---|---|
| "seed delivery system" / "delivery system" / "seed delivery apparatus" / "method of delivering a seed" | '663 Patent: Claim 1<br>'031 Patent: Claim 8<br>'955 Patent: Claim 20 | "apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position"<br>No disclaimer of a seed delivery apparatus / system / method that allows for seeds to drop by gravity between the seed meter and the discharge. |

Nonetheless, AGCO-Precision continued throughout pretrial and trial to argue in different ways that "gravity drop" or "free fall" precluded infringement—both by trying to remove "no disclaimer" from the construction and by trying to read a no-gravity-drop requirement into the court's use of the word "capture" in its construction. This capture-versus-gravity-drop argument surfaced during motions in limine in the following colloquy.

> THE COURT: Hold on a second. I mean, am I right the issue is going to be whether you have capture if you have free-fall?
>
> [DEERE'S COUNSEL]: Remove by capture. That is the issue.

> THE COURT: Right, right. And whether free-fall is consistent with capture. Am I missing something?
>
> [DEERE'S COUNSEL]: For free-fall, your construction allows for free-fall, allows gravity. You ruled there was no disclaimer of that, so no. …
>
> THE COURT: … If your expert in describing the accused combination of the vSet SpeedTube says that it's captured, … and in explaining why it's captured he gives an argument inconsistent or a description inconsistent with funnel handoff with free-fall to belt, I think he gets cross-examined with this fairly.

Appx39041(162:15-163:15).

#### 1. Over AGCO-Precision's Objection, the Court Permits Deere to Quote the "No Disclaimer" Part of the Construction in Opening Statements.

Before trial began, AGCO-Precision objected to Deere's opening presentation, which referenced the court's full construction of "seed delivery system." AGCO-Precision contended "'no disclaimer'… *isn't part of the definition of the term*" and permitting Deere to quote that part of the court's construction "would confuse the jury." Appx40024-40026(24:17-26:20); *see also* Appx50149 (Deere opening slide). Deere responded that the disclaimer language was relevant and necessary because ACGO-Precision would argue its system's "funneled hand-off with free-fall to belt" technique was not infringement. Appx40027-40029(27:20-29:12); *see* Appx3937-3938 (AGCO-Precision brief making that argument). The court

overruled AGCO-Precision's objection. Appx40031(2-5); *see* Appx40145(12-24(Deere's opening)); Appx50149. And as predicted, AGCO-Precision argued in opening statements that "funneled handoff with free-fall to belt" was not infringement. Appx40194(13-22); Appx50320.

### 2. The Court Suggests its Construction May Require the "Feeder Wheels" Rather than the "System" to "Capture" Seeds.

Deere's technical expert Dr. Glancey testified that AGCO-Precision's feeder wheels "grab[]" and "capture[]" seed from the metering disk, Appx40380(14-15), and "propel it downward into the flights of the belt." Appx40383-40384(383:5-384:7). But as Glancey began explaining how the SpeedTube met the court's construction of "seed delivery system," AGCO-Precision's counsel objected, asserting again "*disclaimer language is not part of your claim construction*." Appx40389-40390(389:2-390:4). The court overruled the objection, stating "it's a fair reading given the way the order is structured to say that the note 'no disclaimer' is part of the construction of the term." Appx40391-40392(391:3-392:1).

Dr. Glancey then explained and illustrated how the SpeedTube met the court's construction of "seed delivery system":




Appx40402-40405(402:1-404:5); Appx50222-50226. Glancey explained that **(1)** SpeedTube captures seeds when the loading wheels remove the seed

from the disk (2, above), and **(2)** the seed "is captured *and remains under control throughout* the entire delivery system." Appx40402-40403(402:12-403:18); Appx40514(10-12) ("the delivery system … has *complete control* of the seed, and the feeder wheels are part of the delivery system.").

In opening statements, AGCO-Precision's counsel described the feeder wheels as operating like a baseball pitching machine. Appx40177(11-17). Glancey explained that the pitching-machine analogy confirms infringement: the machine's wheels grip the baseball before projecting it toward the batter, *i.e.*, "capturing and releasing" the ball. Appx40516(5-12).




At a sidebar during Glancey's cross-examination, the district judge raised an issue of *what* must do the "capturing" under its construction.

The court stated "the issue is whether it's [seed is] captured *by the loading wheel or the wheels*." Appx40538(19-20).

The court's construction of "*seed delivery system*" included "*apparatus/system/method* that removes the seed from the seed meter by *capturing* the seed and then delivers it to a discharge position," without any further requirement that particular components perform the "capturing." Appx125; *supra* §C. Deere's counsel thus explained "removal by capture is, … *it's the system, not the wheel.* That's what your construction is." Appx40541(12-17). Deere's counsel added "it is *the system* that removes it by capture," and "[t]he system includes a belt, a housing, and the fingers." Appx40542(21-23). Thus, regardless of AGCO-Precision's purported dispute with whether the feeder wheels' operation is properly called "capturing," AGCO-Precision's *system* controls the motion of the seed all the way from the seed meter to the furrow, and therefore infringes.

But the court disagreed, stating for the *first* time that it is not the system that must capture, but *the feeder wheels*. The court stated it thought the jury was "going to focus on that— those two initial wheels," Appx40545(16-18), and also suggested the jury could find noninfringement if AGCO-Precision's feeder wheels captured seeds too quickly.

Appx40545(12-15) ("[The jury] may say that the – it happened so fast through the two loading wheels and this – through the nip and that that this – this is the capture."). The court declined "to add further clarification." Appx40545(9-10).

#### 3. The Court Bars Deere from Cross-Examining a Witness About Evidence Contradicting His Testimony Interpreting the "Remove[] … by Capture" Construction.

On direct examination, AGCO-Precision's lead engineer Radtke testified that SpeedTube's feeder wheels do not "remove the seeds from the meter by capturing them," but "do the opposite of that, which is to project and accelerate them." Appx40874(3-6). He testified that the feeder wheels do not remove by capture because there is "a period between the feeder wheels and the flighted belt where the seeds are essentially in *free-flight* before they're eventually received by the belt." Appx40874(13-21).

On cross-examination, Deere sought to confront Radtke with the inconsistency between that testimony and the description in AGCO's '037 patent (Appx3753-3813), on which Radtke was the named inventor. Appx40896-40899(896:22-899:14). As discussed above, §E, *supra*, AGCO-Precision's interrogatory responses stated the '037 patent "show[ed] the novel idea for the feeder wheels," Appx3750, and the patent itself stated

seeds are "*captured* between the loading wheels." Appx3808(12:40-41). The court barred Deere's cross-examination about the '037 patent under Rule 403. Appx40897-40902(897:18-902:13).

#### 4. The District Court *Sua Sponte* Bars Deere from Mentioning the "No Disclaimer" Part of its Construction to the Jury.

AGCO-Precision's technical expert Dr. Fleming testified on direct that AGCO-Precision's feeder wheels contact and engage the seed for 3 to 6 milliseconds, accelerating the seed before projecting it to the flighted belt. Appx40996(11-16); Appx40999-41000(999:11-1000:6); Appx50339.

Dr. Fleming testified that was not infringement because the seed moved "free[ly]" to the flighted belt, with no component touching it,[4] and that he "*defin[ed] 'capture'* to be controlling all of the aspects of the motion of the seed." Appx41001(2-6).

Before Deere could cross-examine, the court *sua sponte* re-raised the "no disclaimer" portion of its construction, and announced "on cross and

[4] Appx40998(14-18)("Q: In SpeedTube, what component is in contact with the seed after it's projected by the feeder wheels, but before it hits the flighted belt? A. There's nothing in contact with it. It's actually just floating free."); Appx41004(13-16)("Q. In SpeedTube, when is seed removed from the seed meter: Before or after it ends up in the flighted belt? A. It's removed from the meter before it ends up in the flighted belt.").

going forward, I'm not going to allow Deere to put in front of the jury again that I have construed the claim to say no disclaimer." Appx41030(10-13); *see also* Appx41028-41031. The court added that *if* the jury happened to ask during deliberations, the court would provide its full construction:

> I do think that if the jury asked a question during its deliberations along this line: Can there be free-fall? Or rather: Does the patent say there cannot be a free-fall? In other words if they raise what is effectively a claim construction question, I can answer it.

Appx41034-41035(1034:24-1035:5).

#### 5. The District Court Removes the "No Disclaimer" Part of its Construction from Jury Instructions; the Jury Returns a Noninfringement Verdict.

Claim construction arose again in connection with final jury instructions. Deere proposed to repeat the district court's pretrial construction of "seed delivery system" verbatim, including "no disclaimer of a seed delivery system that allows for seeds to drop by gravity between the seed meter and discharge." Appx4251; *see* Appx125. The court rejected that proposal. Appx41140-41141(1140:13-1141:1).

AGCO-Precision proposed an instruction that "[f]or purposes of determining whether the 'seed delivery system' and 'method of delivering a seed' limitations are satisfied by SpeedTube, it is irrelevant whether seed is 'captured' in the flighted belt." Appx4252. The court declined, but

added "here's the key. My construction was: 'A system that removes seed from the seed meter by capturing.' That's what it says, 'and then delivery.'" Appx41141(13-17). Deere explained it had "argued consistently that the removal happens at the meter, and it's captured the entire way down." Appx41142(5-7). The court responded that AGCO-Precision "could argue it doesn't have to be captured all the way down. And if they do and the jury says—if the jury comes back and says: Does it have to be captured after the removal? I'd say, no. Claim construction, it does not." Appx41142(8-13). The court then warned Deere: "if there's a suggestion in Deere's closing that that removal is when the seed is confined within a cell in the belt, I think you're opening up a door for clarification of construction or something." Appx41143(10-14).

The jury received final instructions that only partially quoted the court's pretrial *Markman* order, but cropped the "no disclaimer" portion of the construction. Appx41278(3-16); Appx94. As with its mid-trial ruling barring Deere from conveying the "no disclaimer" construction to the jury, the court added that it would provide that information to the jury if (but only if) the jury happened to ask:

> "[I]f a question arose from the jury… asking, for instance, you know, well, is there a disclaimer of a seed-delivery system? If

> they ask that question, then we're into claim construction, and I feel obligated to answer."

Appx41140-41141(1140:17-1141:1).

In closing, AGCO-Precision argued SpeedTube did not capture seed because of what happened *after* the feeder wheels grabbed the seed from the meter: "And far from being captured, the seed's actually in flight, flying through the air, uncontacted by any component of the SpeedTube as it's transferred down to the flighted belt." Appx41225(5-8).

The jury returned a verdict of non-infringement. Appx41314(9-21); Appx72-73.

### G. The District Court Denies Deere's Motions for JMOL and/or New Trial.

#### 1. Pre-Verdict JMOL Motions

At the conclusion of testimony, the parties and court discussed JMOL motions. Deere's counsel explained it "intend[ed] to move for JMOL on the issue of validity" and "wanted to resolve that before we know whether we're going to recall Dr. Glancey" to testify in rebuttal. Appx41108(2-5). The court responded, "I see.… I'm going to let invalidity go to the jury." Appx41108(6-7). In response to Deere's counsel's question about filing a Rule 50(a) motion, the court said "[i]f you feel like you have to, you can confer, yes." Appx41108(11-14). AGCO-Precision's counsel then said "[a]nd

on the other side, … we intend to move for JMOL on all—essentially all of their issues, direct infringement—", when the court interrupted and said "*[d]irect infringement is going to the jury*." Appx41108(15-19).

### 2. Post-Verdict JMOL and New Trial Motions

After trial, Deere moved for judgment as a matter of law under Rule 50(b), and for a new trial under Rule 59. Appx4302-4307. Deere's JMOL motion argued no reasonable jury could find non-infringement. Appx4314. Deere's new trial motion argued the non-infringement verdict was against the weight of the evidence, Appx4318; Appx4321, and also that a new trial was necessary to prevent a miscarriage of justice. Deere contended that the court's changing claim constructions prejudiced Deere, resulted in an erroneous construction by removing the "no disclaimer" language, and improperly left it to the jury to determine the meaning of "capture." Appx4321-4334. Deere argued that a new trial was required because the court prevented Deere from introducing AGCO-Precision's '037 patent, which AGCO-Precision identified as related to its feeder wheels and in which the wheels are described as "captur[ing]" seed. Appx4341-4346.

The court denied Deere's motions. Appx2-69. The court denied JMOL, concluding Deere "waived its right to seek JMOL of infringement

under Rule 50(b)" because "Deere failed to make a Rule 50(a) JMOL of infringement motion." Appx39. Deere had contended no formal JMOL motion was required in view of the court's statement that "[d]irect infringement is going to the jury." The court rejected that argument because Deere had the burden of proof of infringement. Appx39-40. The court also concluded substantial evidence supported the jury's infringement verdict because AGCO-Precision's witnesses testified that the feeder wheels "accelerate" and "project" seeds and that "[t]he entire acceleration and projection takes between .003 and .006 seconds." Appx41-42.

The court also denied Deere's motion for a new trial. The court denied that it gave iterative or conflicting constructions of "seed delivery system" terms. Appx44 ("In point of fact, I gave only one construction of the seed delivery terms at trial. And that construction was *verbatim* the construction of the seed delivery system terms I made before trial."); Appx50 ("In sum, my construction of the seed delivery system terms remained consistent throughout trial."). The court denied that "no disclaimer of gravity drop" was ever part of its construction. Appx45-49. The court also denied that it added a requirement, mid-trial, that the loading wheel perform seed removal, and reasoned that it would not have mattered anyway.

Appx49. Finally, the court concluded that "even if [its] construction had not remained fixed, Deere has failed to explain how it suffered prejudice that warrants a new trial," noting Deere had not been prevented from *arguing* that gravity drop did not negate noninfringement. Appx51.

The court also disagreed with Deere's contention that a new trial was warranted because the court failed to resolve a fundamental claim construction dispute about the meaning of "capture." Appx52. According to the court, Deere forfeited an "*O2 Micro* issue regarding the scope of the seed delivery system terms or of 'capture'" by not proposing "capture" be construed or seeking further construction in the face of the court's adverse suggestions. Appx53. And without elaborating on its reasoning during trial, the court rejected Deere's argument that preventing cross-examining about the '037 patent warranted a new trial. Appx61-63.

The court did not separately address Deere's argument that a new trial was warranted because the verdict was against the great weight of the evidence. The court entered final judgment, Appx1, and Deere appealed.

## SUMMARY OF THE ARGUMENT

The Court reverse the district court's order denying Deere's motion for a new trial on infringement or for JMOL of infringement.

**I.A.** The non-infringement verdict is against the weight of the evidence, which warrants a new trial under Rule 59. The district court never analyzed the trial record under that standard. Applying the construction of "seed delivery system" in the court's *Markman* order to the undisputed facts shown at trial, AGCO-Precision infringes. AGCO-Precision's system's feeder wheels undisputedly remove the seed from the meter by physically "grabbing" or engaging it, *and* the whole system undisputedly controls the seed's movement from the meter. Either is infringement under the court's construction.

AGCO-Precision's "non-infringement" arguments were legally erroneous attempts to change the court's claim construction. AGCO-Precision should not have avoided infringement by arguing that its device's feeder wheels capture the seed too *quickly*. Precedent confirms that "momentary" infringement is still infringement, the court's construction has no temporal requirement, and "quick" capture is consistent with the claimed invention, which permits planting tens of seeds per second. Nor should AGCO-

Precision have avoided infringement by arguing that its system's feeder wheels "project" the seed through the air within the device *after* removing it from the seed meter. Adding elements or steps does not avoid infringement. And the court's *Markman* order **(a)** requires that *system* "capture" the seed, without limiting "capture" to the feeder wheels, and **(b)** rejects AGCO-Precision's argument that Deere disclaimed systems employing "gravity drop."

**B.** A new trial is further warranted because the court erroneously barred Deere from using AGCO-Precision's '037 patent in cross-examination of AGCO-Precision's key witness. The patent was directly relevant to infringement because AGCO-Precision touted it as showing the idea for its system's feeder wheels, it states the feeder wheels "capture" the seed, and it directly contradicted AGCO-Precision's key witness's direct testimony. The district court's ruling is unsupported and prejudicial to Deere.

**C.** Finally, the district court's mid-trial claim construction rulings further warrant a new trial.

*First*, the court erroneously withheld its full construction of "seed delivery system" from the jury. Its *Markman* order included "no disclaimer

of … drop by gravity." After reaffirming that construction in pretrial proceedings and before opening statements, the court erroneously reversed course mid-trial by barring Deere from repeating that construction and excising it from the final jury instructions. Claim construction cannot serve its purpose when it is withheld from the jury.

*Second*, the court's mid-trial orders invited jury confusion and prejudiced Deere. The court reaffirmed the correctness of its "no disclaimer" construction, even stating that it would answer questions from the jury if they happened to ask. But by permitting Deere to quote that construction in opening statements, then forbidding Deere to do so thereafter, then removing the construction from jury instructions, the court invited confusion about the meaning of the claims. The court's orders also permitted AGCO-Precision's expert to give claim construction testimony to the jury and argue that "projection" or "free" motion did not infringe, while handcuffing Deere from responding.

*Finally*, the court's orders failed to fulfill its duty to resolve claim construction disputes. By withholding the "no disclaimer" construction from the jury, the court introduced *more* ambiguity into its "capture" construction and permitted AGCO-Precision to make "non-infringement" ar-

guments that read nonexistent requirements into that word. The court acknowledged that its orders left the jury to "grapple" with the meaning of "capture," which is not the jury's role. The court's orders left the only disputed claim term undefined for the jury and permitted AGCO-Precision to avoid infringement by making legally erroneous claim construction arguments.

**II.** Alternatively, the Court can reverse the district court's order denying JMOL of infringement and remand for further proceedings on any remaining issues. AGCO-Precision's system's operation was factually undisputed, and no reasonable factfinder could conclude that it does not infringe. The district court's reasons for concluding otherwise are unsound, and Deere's actions at summary judgment and trial were sufficient to preserve to preserve its request for JMOL.

## STANDARD OF REVIEW

This Court reviews denial of a motion for new trial or JMOL under the law of the Third Circuit. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1202 (Fed. Cir. 2010). Denial of JMOL is reviewed *de novo*. *Id.* (citing *McKenna v. City of Philadelphia*, 582 F.3d 447, 460 (3d Cir. 2009).

Denial of a new trial is generally reviewed for abuse of discretion, but reviewed *de novo* where the district court's ruling is based on misapplication of law. *Id.* A district court abuses its discretion "if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014). When evidence is erroneously excluded, a new trial is warranted unless it is "highly probable that the jury would have reached the same verdict" without the evidentiary error. *Habecker v. Clark Equip. Co.*, 942 F.2d 210, 216 (3d Cir. 1991).

## ARGUMENT

### I. A New Trial Is Required on Infringement.

The district court erred in denying Deere's motion for a new trial. The court should have concluded that the verdict was against the weight of the evidence, but it did not conduct that analysis. The court's rulings excluding key evidence prevented Deere from trying its case properly. And its rulings withholding part of its construction from the jury and leaving the meaning of "capture" ambiguous confused the jury, and resulted in an unfair trial about competing views of the court's claim construction. For

any or all of those reasons, the order denying Deere's new trial motion should be reversed.

### A. The Non-Infringement Verdict is Against the Weight of the Evidence, Because AGCO-Precision's SpeedTube Removes Seeds by Capture.

Under Rule 59(a)(1), the court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Appropriate reasons include where "the verdict is against the weight of the evidence." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1336 (Fed. Cir. 2003) (citing *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 365 (3d Cir. 1999)). The court must not "view the evidence in the light most favorable to the verdict winner, but instead exercises its own judgment in assessing the evidence." *Leader Techs., Inc. v. Facebook, Inc.*, 678 F.3d 1300, 1305 (Fed. Cir. 2012); 11 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2806 (3d ed. Apr. 2023). The Third Circuit instructs that the "verdict should be scrutinized more closely" for "subject matter not lying within the ordinary knowledge of jurors," such as patent matters. *Lind v. Schenley Indus., Inc.* 278 F.2d 79, 90-91 (3d Cir. 1960) (en banc).

#### 1. The District Court Did Not Weigh the Evidence Independently Under the New-Trial Standard.

Deere argued the verdict was against the weight of the evidence because AGCO-Precision's accused system operation was factually undisputed, and the undisputed evidence establishes infringement. Appx4319-4321. But the district court never considered whether the verdict was against the weight of the evidence. It addressed the evidence only under the *JMOL* standard. Appx41-43. And when it considered Deere's request for a new trial, it considered only Deere's objections to rulings during trial, not Deere's argument that the verdict was against the weight of the evidence. Appx43.

That was error. "Failure to exercise discretion is not exercising discretion; it is making a legal mistake." *In re Nintendo Co.*, 544 F.App'x 934, 940 (Fed. Cir. 2013). Where a district court "did not present any analysis apart from its analysis of the JMOL infringement issues," the district court's decision on a new trial motion is not a separate exercise of discretion from its JMOL decision. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1310 (Fed. Cir. 2011).

### 2. The Parties Disputed the Meaning of the Court's Construction of "Seed Delivery System."

The court was required to weigh the evidence independently in assessing the jury's non-infringement verdict. Infringement compares the accused product to the construed claims. Again, the accused SpeedTube's operation was factually undisputed and shown with evidence including AGCO-Precision videos. As the seed meter disk rotates, the loading wheels contact and engage seed on each side, "grab[bing] the seed from the seed disk," and "deposit[ing] it onto a flighted belt."[5] *See Scott v. Harris*, 550 U.S. 372, 379-81 (2007) (explaining a reasonable jury could not believe testimony that contradicted videotape evidence).

The parties' dispute concerned only the *meaning* of the court's construction—*i.e.*, what the court meant by "removes … by capturing." The district court acknowledged this repeatedly. For example, its ruling denying summary judgment suggested that a jury could find "projection" was different from "capture." In ruling on jury instructions, the court predicted the jury was "going to grapple with" what capture means. Appx40538(15-

[5] Appx50052-50053; Appx50066 (video animation); Appx40380-40381(380:2-381:13); Appx40383-40384(383:3-384:7); Appx40871(4-10); Appx40896(13-17); *see also* Appx50003 (AGCO-Precision video at 4:13-4:33: "feeder wheels … pluck the seed off the disk").

23). And with multiple rulings limiting Deere's presentation, the court raised the prospect that the jury would ask questions about claim construction during deliberations. Appx41034-41035(1034:24-1035:5); Appx41140-41141(1140:17-1141:1); Appx41142(8-13).

Third Circuit precedent required the court to "scrutinize[]" the verdict "more closely," because it turned on subject matter outside the competence of lay jurors. *Lind*, 278 F.2d at 90-91. As the Supreme Court and this Court have explained, claim construction is particularly ill-suited for juries. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-89 (1996) ("Patent construction in particular 'is a special occupation, requiring, like all others, special training and practice.'"); *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) ("The risk of confusing the jury is high when experts opine on claim construction before the jury…"). Had the court conducted the proper analysis, it would necessarily have concluded that the non-infringement verdict was against the weight of the evidence.

### 3. Even Accepting AGCO-Precision's Focus on the Feeder Wheels, the Verdict is Against the Weight of the Evidence Because AGCO-Precision's Feeder Wheels Remove Seeds by Capture.

Even accepting AGCO-Precision's argument (and the court's suggestions at sidebar) that the court's construction requires the system's "feeder wheels" to remove the seed by capture, *e.g.*, Appx40538(19-20); Appx40541-40542(541:18-542:5); Appx40545(9-10), the verdict is against the weight of the evidence. AGCO-Precision purported to dispute whether its feeder wheels "capture the seed when they remove it from the seed meter." Appx49-50. But its "evidence" of non-infringement concerned only **(1)** the *duration* of the capture within its system, and **(2)** what happens *next*, *after capture* by the wheels. Accordingly, AGCO-Precision's technical expert emphasized the "very short period of time" that the feeder wheels were in contact with the seed, Appx40996(11-16), and that "[t]here's nothing in contact with" the seed "*after it's projected by the feeder wheels*, but before it hits the flighted belt." Appx40998(14-18). AGCO-Precision analogized the feeder wheels to a baseball pitching machine. Appx40516(5-12); Appx40177(11-17(Defendants' opening)); *see* Appx41225(5-8(closing)). The courts should have recognized that none of this is evidence of non-infringement.

*First*, a seed is "captured" whether it moves through the feeder wheels quickly or slowly. "[I]nfringement is infringement," regardless of how quickly or slowly it occurs. *E.g.*, *Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 792 (Fed. Cir. 1990). AGCO-Precision's feeder wheels undisputedly engage and hold on to the seed to remove it from the seed meter disk. AGCO-Precision's analogy to baseball pitching machine's wheels only confirms infringement: the pitching machine cannot propel and accelerate a ball unless the ball is captured—even for a split second—between the wheels. So too with seed in SpeedTube's feeder wheels. While AGCO-Precision carefully avoided saying "capture," its argument was essentially that its system only "captures" the seed briefly. But under longstanding precedent, momentary, fleeting, temporary, "sometimes" or "part-time" infringement is still infringement, unless the claims require otherwise.[6] For similar reasons, "[t]his court has not tolerated the notion

[6] *See, e.g.*, *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (affirming JMOL of infringement, observing "[i]t is well settled that an accused device that 'sometimes, but not always, embodies a claim[] nonetheless infringes.'"); *Bell Commc'ns Rsch., Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995) (vacating summary judgment of noninfringement, citing cases); *SunTiger, Inc. v. Sci. Rsch. Funding Grp.*, 189 F.3d 1327, 1336 (Fed. Cir. 1999) (observing "part-time infringement is nonetheless infringement."); *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003) (applying same principle to invalidity).

that a little infringement—de minimis infringement—is acceptable infringement or not infringement."[7] "Capture" for a few milliseconds is "capture." Indeed, even though the district court erroneously barred Deere from presenting it to the jury, *see* §I.B., *infra*, AGCO-Precision's own patent, "showing the … idea for the feeder wheels," Appx3750, describes the seed as "captured" between those wheels. Appx3808(12:40-41). And that is the point: the undisputed operation of the feeder wheels in the accused system is *sufficient* to compel a finding of infringement based on the court's claim construction.

Neither the "seed delivery system" claim term nor the district court's construction has any minimum time that the loading wheels must hold the seed when removing it "by capture." As in *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1315 (Fed. Cir. 2003), "[t]he claims simply do not require a specific temporal limitation." Nor would any such limitation make sense in this context. The central benefit of Deere's invention is to increase planting *speed* while maintaining accuracy. Seeds' movements

[7] *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1352-53 (Fed. Cir. 2000) (Rader, J., concurring); *see also, e.g.*, *Organic Seed Growers & Trade Ass'n v. Monsanto Co.*, 718 F.3d 1350, 1356 (Fed. Cir. 2013) (quoting *Embrex*); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1339-40 (Fed. Cir. 2005) ("trace amounts" of a patented compound is still infringement).

between components normally happen on the order of milliseconds. A planter driven at 10 mph plants approximately *30 seeds per second*, or one every 33 *milliseconds*. Appx40384(8-25). It makes no sense to conclude that "capturing" does not count if it happens too quickly. *Cf. CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005) ("[T]his court, like the district court, must derive the meaning of the[] disputed claim terms from their usage and context.").

Moreover, the construction states that the system "removes seeds from the seed meter by capturing the seed *and then delivers it* to a discharge position." Appx125. "Capturing the seed" is a discrete act, not a state that must be maintained for some amount of time. The system need only "remove seeds from the seed meter by capturing the seed," with no further requirement that the seed remain "captured" afterward. The court seemingly recognized this during a sidebar, commenting "It's 'removal by capture.' It's not that it remains captured. It could let go." Appx40541(19-21). But it nonetheless permitted AGCO-Precision to argue otherwise.

*Second*, for similar reasons, what happens *after* initial capture is irrelevant to whether AGCO-Precision's feeder wheels "capture" under the

court's construction. For claims using "comprising," one does not avoid infringement by adding elements to an accused product. *See A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed. Cir. 1983). The court's construction only requires *removal* from the seed meter by capture. And AGCO-Precision's system undisputedly meets the remainder of the construction because it "then delivers [seed] to a discharge position." *After* the feeder wheels grab (or pluck) the seed from the meter disk (*i.e.*, remove it by capturing it), they *then* accelerate or project the seed within the delivery system toward the belt. The undisputed evidence shows that the feeder wheels engage and hold on to the seed to remove it from the seed meter disk. Both wheels must engage the seed and hold it between them in order to "project" or "accelerate" it. That AGCO-Precision's system "projects" the seed *after* capturing it is not evidence of noninfringement.

#### 4. Under the District Court's Original Construction, the Verdict is Also Against the Weight of the Evidence Because AGCO-Precision's Seed Delivery *System* Removes Seeds by Capture.

The foregoing is sufficient to vacate and remand for a new trial. But if more is needed, the non-infringement verdict is also against the weight of the evidence because AGCO-Precision's seed delivery *system as a whole* removes seeds by capturing—regardless of how AGCO-Precision would

characterize its feeder wheels' action within the system. The district court suggested mid-trial that its construction requires the *feeder wheels* to remove seeds by capturing, *see* Appx40545(9-18), and permitted AGCO-Precision to argue as much to the jury. That was error. The construction in the Court's *Markman* order—shown to the jury in opening statements—required only that the *system* remove seeds by capturing, even if the seeds drop due to gravity at some point in the system. Appx125.

The claimed "seed delivery *system*" is explicitly broader than feeder wheels. *See* Appx186 (claim 1, reciting parts including feeder wheels, endless member, and housing). There is no dispute that AGCO-Precision's *system* captures seeds. As soon as the feeder wheels engage the seed, the seed is removed from the meter disk and contained in the SpeedTube's seed delivery system. Critically, the seed cannot fall to the ground as with the hollow tubes used before Deere's invention. Appx40380-40381(380:2-381:13). Witnesses and documents consistently explained that AGCO-Precision's *system* controls the seed's movement until the seed reaches the ground.[8] AGCO-Precision's *system* thus "captures" the seed under any def-

[8] *See* Appx40871(4-13); Appx41077-41078(1077:19-1078:10); Appx50061; Appx40838-40839(838:12-839:23); Appx50052-50058; Appx40383-40384(383:5-384:7).

inition in the record. *See* Appx40396-40397(396:20-397:6); Appx40399(6-14); Appx50069 (Concise Oxford English Dictionary, defining "capture" as "take into one's possession or control by force); Appx41001(2-6) ("I was defining 'capture' to be controlling all of the aspects of the motion of the seed").

Again, the factual evidence of the SpeedTube's operation is undisputed and includes AGCO-Precision's high-speed video. Appx50120. In the video, when the feeder wheels engage the seed, the seed is captured between the feeder wheels, pulled off the seed meter disk, and then immediately propelled into a cell of the flighted belt where it is locked in the cell until discharge. *Id.* Testimony that SpeedTube does not "capture" seeds cannot overcome undisputed evidence of how it actually works. *Scott*, 550 U.S. at 380-81 (court of appeals "should not have relied on" a "version of events … so utterly discredited by the [videotape] record that no reasonable jury could have believed [it]"); *cf. Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) (findings cannot be "insulate[d] … from review by denominating them credibility determinations").

### B. The District Court's Ruling Excluding AGCO-Precision's '037 Patent Was Prejudicial Error, Further Warranting a New Trial.

A new trial is also required because the district court erred in preventing Deere from using AGCO-Precision's '037 patent on cross-examination. As discussed above, AGCO-Precision's interrogatory responses stated it was one of two patents "showing the novel idea for the feeder wheels" in AGCO-Precision's accused product, Appx3750, and the '037 patent states explicitly that "the *seed* is preferably *captured* between the loading wheels." Appx3808(12:40-41).

The '037 patent is directly relevant to the only infringement dispute in this case—whether AGCO-Precision's product "captures" seeds at the point of removal. Appx49-50. After AGCO-Precision's lead engineer (and lead inventor on the '037 patent) testified on direct that AGCO-Precision's feeder wheels do *not* "remove the seeds from the meter by capturing them," Appx40874(3-6), Deere naturally sought to cross-examine him with his patent's diametrically-opposite statements that AGCO-Precision's feeder wheels *do* capture the seeds.

The district court's ruling excluding the '037 patent and preventing Deere's cross-examination is unsupportable. The Court excluded the evi-

dence under Rule 403, but provided terse reasoning, emphasizing that the ’037 patent was “not asserted in this case”:

> THE COURT: All right. I'm not going to allow you to pursue this line of questioning. The sentence in question cited by Deere says, quote, “Precision Planting obtained patents showing the novel idea for the feeder wheels,” unquote.
>
> That’s not the same thing as the feeder wheels that are actually used in the accused products, and I’m not going to allow under Rule 403, us to get into a mini trial. This patent not asserted in this case covers the accused products and uses language that it would be fair to conclude addresses the exact same issues in and language used in the asserted patents.

Appx40902(2-13).

AGCO-Precision, however, had been permitted to introduce during the same witness’s direct testimony “other patents related to [his] work in developing SpeedTube,” including a patent “describ[ing] aspects of the vSet meter.” Appx40871-40872(871:16-872:10). Those patents were likewise “not asserted in this case.” But unlike the ’037 patent, those patents had no direct relevance to the parties’ dispute over the meaning of the district court’s claim construction. The court never explained why *other*, less relevant AGCO-Precision patents were fair game for direct, but Deere could not use the ’037 patent on cross-examination. And there is no reasonable explanation. The district court barely acknowledged the ’037 patent’s probative value (which AGCO-Precision admitted), and did not elab-

orate on its reasons for excluding it. That "failure to articulate its balance between probative value" and reason for exclusion is error. *Glass v. Philadelphia Elec. Co.*, 34 F.3d 188, 191-92 (3d Cir. 1994).

It cannot be denied that this "evidence was critical." *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985). AGCO-Precision's sole defense to infringement was its view that SpeedTube's loading wheels did not capture seed from the meter. Radtke, AGCO-Precision's lead engineer, testified the wheels were designed *not* to capture seed. Yet his own '037 patent states the very opposite. The district court erred in preventing Deere from cross-examining AGCO-Precision's key witness about it. *See Petree v. Victor Fluid Power, Inc.*, 887 F.2d 34, 42 (3d Cir. 1989) (requiring new trial because "it would be potentially devastating cross-examination had the plaintiff been able to confront [defendant's "star witness"] with [defendant's] pre-injury warning, which totally contradicted his testimony"); *Glass*, 34 F.3d at 194; *cf. Amgen Inc. Sanofi*, 872 F.3d 1367, 1375 (Fed. Cir. 2017) (reversing district court's denial of new trial because court erred in excluding relevant evidence).

### C. The District Court's Mid-Trial Claim Construction Rulings Were Erroneous, Caused Jury Confusion, and Prevented Deere from Trying its Case Properly, Further Warranting a New Trial.

A new trial is also required because the district court's mid-trial revisions to its construction prejudiced Deere and failed to give the jury clear guidance. In opening statements, the court permitted Deere to quote the court's full construction to the jury and to rely on it to show infringement. By closing statements, however, the court had **(1)** removed the "no disclaimer" clause from its construction, **(2)** prevented Deere from mentioning the "no disclaimer" clause to the jury, **(3)** ruled that its construction required "capture" by the "*feeder wheels*" rather than the system as a whole, and **(4)** permitted AGCO-Precision to argue to the that the feeder wheels do not "capture" if "it happened so fast." Appx40545(12-15). And although the court barred Deere from presenting certain information to the jury, it said that *it* would provide that information if the jury happened to ask the right questions during deliberations. The court's rulings sent mixed messages to the jury and deprived Deere of a fair trial under a proper construction.

### 1. The District Court Erred by Removing the "No Disclaimer" Clause from its Construction.

The district court erred by ruling mid-trial that Deere could not mention the "no disclaimer" part of the construction to the jury, and by excising that portion from final jury instructions. That error of law alone requires a new trial with proper jury instructions. The court's *Markman* order explicitly stated there was "[n]o disclaimer of a seed delivery apparatus/system/method that allows for seeds to drop by gravity between the seed meter and discharge." Appx125. The court reaffirmed that ruling two years later when it denied AGCO-Precision's motion for reconsideration, and yet again when it overruled AGCO-Precision's objection to Deere's opening statements. Indeed, the district court has never suggested that its no-disclaimer ruling was *substantively* incorrect. To the contrary, making clear that the claims encompass systems even where seeds drop by gravity for a small distance between the seed meter and discharge served to properly define the scope of the claims. To be sure, the patents discuss shortcomings of prior-art systems that do not have controlled handoff and controlled delivery. But the patents do not thereby clearly disavow *any* gravity drop within the system. Yet the district court permitted AGCO-Precision to argue as much. The court's subsequent reasons for withhold-

ing the no-disclaimer portion of its construction from the jury are unsound as a matter of law.

*First*, the court stated, incorrectly, that it "didn't think a Court's statement that there is no disclaimer constitutes claim construction." Appx40392-40393(392:23-393:1). This Court has consistently held that rejection of a disclaimer argument *can* be part of a claim construction. In *01 Communique Laboratory, Inc. v. Logmein, Inc.*, this Court reversed a district court's conclusion that the claim term "'location facility' … must be contained on a single physical computer," based on a "perceived disclaimer." 687 F.3d 1292, 1295 (Fed. Cir. 2012). This Court further construed the term explicitly to reject any disclaimer, stating "[t]he locator server computer may comprise one or more computers." *Id.* at 1299-1300. Likewise, in *TomTom, Inc. v. Adolph* the district court construed the claim phrase "destination tracking system of at least one mobile unit" to exclude maps, based on a finding of disclaimer. 790 F.3d 1315, 1324 (Fed. Cir. 2015). This Court concluded the district court erred in finding disclaimer, and it rewrote the construction by replacing the disclaimer-based "does not contain" maps with a non-disclaimer "does not require" maps. *Id.* at 1325.

Claim construction exists to clarify and explain the claim for the fact-finder to apply. Explicitly defining a claim to *not* be limited in scope by a purported disclaimer is particularly important when, as here, the non-infringement position rests entirely on trying to limit the scope of the claim. Whether the claims *disclaim* gravity drop *is* a ruling about the scope of a claim—*i.e.*, claim construction.

The court is thus wrong to state that the constructions in the final jury instructions are "identical to the respective constructions of the seed delivery system terms set forth in the *Markman* order." Appx28. The final instructions excise the "no disclaimer" part of the construction. *Compare* Appx28 (showing final jury instructions), *with* Appx125 (*Markman* order).

*Second*, the court erroneously suggested that it would confuse the jury to instruct them that there was no disclaimer of gravity drop within the system. Deere was entitled to have the jury informed about the full scope of the claim. "When the parties present a fundamental dispute regarding the scope of a claim term, it is *the court's duty* to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *see id* at 1360 ("[T]he court, *not the jury*, must resolve that dispute."). Pre-

trial claim construction is "critical … in part because the claim construction becomes *the basis of the jury instructions*, should the case go to trial." *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001). If the court's concern was that the specific words "no disclaimer" might confuse a lay jury, the court might have proposed a plain-English paraphrase, or given a clarifying instruction on the meaning of "disclaimer." In other words, if the court believes part of its construction might confuse the jury, the answer is to clarify it, not to withhold it entirely from the jury.

Further, the court's reasoning is at odds with the court's offers to provide the full construction, but only *if* the jury asked questions during deliberation. *E.g.*, Appx40134-40135(1034:24-1035:5); Appx41140-41142(1140:17-1141:1, 1142:8-13). Deere should not have to await a question from the jury before the jury is instructed about the full claim construction. And the court's offers seemingly reaffirm, for at least the third time, that Deere had not disclaimed gravity-drop. There is no substantive reason to withhold that ruling from the jury. Offering the full construction only if the jury happened to ask the right questions "is not the solution. It is the problem." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1981 (2021).

*Third*, the court erroneously concluded Deere failed to show prejudice because Deere remained "'free to *argue*' the claims did not preclude a free fall or gravity drop of the seed." Appx49. Allowing a party to *argue* a claim construction issue does not fulfill "the court's duty to resolve" a construction dispute. *O2 Micro*, 521 F.3d at 1362. And in all events, a party's arguments do not have the imprimatur of the court, whose exclusive duty is to construe claims and instruct the jury on the law.

As explained below, the district court compounded the prejudice from eliminating the no disclaimer of gravity drop from its construction by subsequently failing to define "capture."

#### 2. The District Court's Mid-Trial Revisions to the Claim Construction Invited Jury Confusion and Prevented Deere from Trying its Case Properly.

The trial began with an explicit construction that a system that employs "gravity drop" can still "remove[] seed from the seed meter by capturing the seed." The district court's subsequent rulings, however, invited jury confusion and prejudiced Deere's ability to present its case.

*First*, the court removed the "no disclaimer" clarification from its construction during the trial, after opening statements. This made ambiguous for the jury what had previously been clear, and required Deere to

confront new arguments from AGCO-Precision that Deere reasonably believed had been resolved before trial. At the beginning of trial, "gravity drop" was not evidence of non-infringement, and the jury was told as much when Deere quoted the district court's construction. But by closing arguments, AGCO-Precision was explicitly arguing non-infringement because "the seed's … flying through the air, uncontacted by any component … as it's transferred down to the flighted belt," Appx41225(5-8),[9] and Deere was muzzled from invoking the court's "no disclaimer" construction in response.

And during trial the court's rulings thwarted Deere's cross-examination of AGCO-Precision's technical expert. On direct, AGCO-Precision's expert testified that he "was *defining 'capture'* to be controlling all of the aspects of the motion of the seed," Appx41001(2-6), and that SpeedTube did not infringe because seed was "just floating free" after contact with the feeder wheels ended. Appx40998(14-18). That testimony was at least in tension—if not outright inconsistent—with the court's "no

[9] *See* Appx40874(13-21) ("we have a period between the feeder wheels and flighted belt where the seeds are essentially in free-flight"); Appx40998(14-18) ("There's nothing in contact with [the seed]" after it leaves the feeder wheels. "It's actually just floating free.").

disclaimer" construction. But before Deere began cross-examination, the district court announced that Deere could no longer tell the jury—or elicit from a witness—that the court had construed the claim to not exclude gravity drop. Appx41030(10-13). That ruling permitted AGCO-Precision's expert, in essence, to construe the claims for the jury,[10] and prevented Deere from responding effectively—either of which is reason enough for a new trial. *E.g., Sundance, Inc. v. DeMonte Fabricating Ltd.,* 550 F.3d 1356, 1364 n.6 (Fed. Cir. 2008) ("allowing a witness to testify *before the jury* on claim construction would be improper" (original emphasis)); *CytoLogix.,* 424 F.3d at 1172 ("The risk of confusing the jury is high when experts opine on claim construction before the jury").

*Second*, while refusing to instruct the jury that gravity drop was not disclaimed, the court exacerbated the confusion by leaving it ambiguous for the jury what it meant for the system to "capture." The court forthrightly acknowledged that the jury would need to decide the meaning of the court's construction. In the court's words, "[t]he jury is going to grapple with, when those two loading wheels hit that seed, are they capturing

[10] *E.g.*, Appx41001(2-6) ("I was defining 'capture' to be controlling all of the aspects of the motion of the seed.").

it." Appx40538(15-16). There was no factual dispute over how the loading wheels operated (*i.e.*, what happens "when those two loading wheels hit that seed"). The jury's "grappling" concerned only the meaning of "capture." "Capture" is not a claim term, nor is it a term of art. It is the court's construction, which partially adopted AGCO-Precision's arguments. When Deere tried to clarify that the construction required the *system* remove by capture—not specifically the loading wheel—the district court apparently disagreed, focusing solely on whether seed was captured when it went through the loading wheels. Appx40541-40544(541:12-544:22). And even though the court acknowledged it "d[id]n't know how the jury [was] going to look" at the meaning of removal by capturing, the district court declined "to add further clarification." Appx40545(8-15). That is legally improper under *O2 Micro* (*see* I.C.3, *infra*), and also demonstrates the confusion the jury had to "grapple with," which warrants a new trial.

To be sure, a dispute sometimes "evolve[s]" after claim construction "to a point where … further construction is necessary," *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014), and trial sometimes reveals latent ambiguities in a court's claim construction that the court must resolve. *E.g.*, *O2 Micro*, 521 F.3d at 1360; *Pressure Prods.*

*Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1315-16 (Fed. Cir. 2010). Here, however, the district court's rulings did not resolve latent ambiguities or add clarity to an earlier construction. They did the opposite. The clarity of the court's pretrial construction deteriorated during trial as the court permitted AGCO-Precision to continue to resist the *Markman* order by repackaging their argument that any "gravity drop" or "free" seed motion is noninfringement. The court's rulings sent mixed messages to the jury about what "capture" meant and whether it permitted "gravity drop" or "free" motion, and muzzled Deere from responding to AGCO-Precision's arguments at critical junctures.

#### 3. Given the Removal of the "No Disclaimer" Language, the District Court Should Have Further Defined the "Seed Delivery System" Term to Make Clear That the *System*—Not Just Wheels—May Do the Capturing.

A new trial is appropriate where "[i]n the absence of guidance in the form of proper claim construction, the jury lacked a yardstick by which to measure the arguments and evidence on this issue." *Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1347 (Fed. Cir. 2019). In *O2 Micro*, the court's failure to construe a disputed term required a new trial. 521 F.3d at 1363 n.4. In other cases, the court has routinely held that an incorrect

claim construction is grounds for a new trial. *See Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022, 1025-26 (Fed. Cir. 2020); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1307-08 (Fed. Cir. 2007); *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1478-79 (Fed. Cir. 1998). A new trial is equally warranted here because the district court's mid-trial rulings left the disputed "seed delivery system" term insufficiently defined for the jury.

The claim recites a "seed delivery system" that includes "a loading wheel" and "a single endless member" like a belt. Appx186(cl.1). The district court construed "seed delivery *system*" to be a "*system* … that removes seed from the seed meter by capturing and then delivers it to a discharge position." Appx125. On its face, the construction requires only that *system*—not any particular component—to "capture." That is how Deere understood it. Appx40541(12-13) ("[Deere's] position on the removal by capture is, first of all, it's the system not the wheel."). The "no disclaimer" part of the construction makes that clearer still, by stating that Deere did not disclaim a system "that *allows for seeds to drop by gravity between the seed meter and discharge*." Appx125. In other words, an infringing system

*must* "remove the seed from the seed meter by capturing the seed," it *may* thereafter "allow[] for seeds to drop by gravity between the seed meter and discharge," and the latter is not inconsistent with the former.

Consistent with that construction, Deere's technical expert testified how AGCO-Precision's SpeedTube system *as a whole* captures the seed when the feeder wheels remove the seed from the seed meter disk and direct it to the flighted belt. Appx40402-40403(402:1-403:18). "Once it's captured by those loading wheels, that seed is captured and remains under control throughout the entire delivery system, throughout that entire SpeedTube." Appx40403(2-4).

AGCO-Precision's technical expert, however, did *not* address whether the SpeedTube system removes seeds by capturing them. He focused only on feeder wheels and argued AGCO-Precision did not infringe because—in his view—AGCO-Precision's feeder wheels did not "capture." Appx40995-40996(995:6-996:16); *see also* Appx40874(3-5) (Q. "[D]o the feeder wheels remove the seed from the meter by capturing them? A. No, they don't.). AGCO-Precision's expert then pointed to the small space between the feeder wheels and flighted belt where he described the seed as "floating

free," as purportedly showing the seed was not captured by the feeder wheels. Appx40998(14-18).

The parties thus disputed whether the court's "capture" construction applied to the system as a whole, or just the feeder wheels. The district court was apprised of this dispute, but did not "add further clarification," leaving the parties to argue different interpretations of the construction to the jury. Appx40541-40545(541:1-545:18); Appx41141-41142(1141:6-1142:13).

As explained, the "no disclaimer" portion of the court's claim construction reinforced that the "system" is what must capture, because the same system that "removes seed from the seed meter by capturing the seed" can also "allow[] for seeds to drop by gravity." By removing that clarification from the construction, the court created an ambiguity and left the jury to sort through the competing interpretations of the claim. That error necessitates a new trial—with a proper construction clarifying that the *system* must do the capturing. *See O2 Micro*, 521 F.3d at 1362.

The district court wrongly concluded that Deere failed to preserve this argument. Appx52-53. But the disputed meaning of "capture" in the court's construction "was brought to the district court's attention during

trial and the court heard arguments from both sides." *Function Media, L.L.C. v. Google Inc.*, 708 F.3d 1310, 1325 (Fed. Cir. 2013). No more was needed. In all events, Deere opposed the district court's construction of "seed delivery system" as including "capture" in the first instance. Appx2479. Deere was not required to renew at trial its objection to sub-components of the district court's construction to preserve error. *O2 Micro*, 521 F.3d at 1359; *In re Papst Licensing Litig.*, 778 F.3d 1255, 1266 (Fed. Cir. 2015) ("In the district court, Papst opposed the construction it now opposes, and it was not required to state its opposition twice."). In other words, Deere did not have to object yet again to the court's confusing use of "capture," which is not a *claim* term—it appears only in the district court's *construction* of the claim term "seed delivery system." The court should have clarified its own words given the acknowledged dispute. *Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1373 (Fed. Cir. 2012) ("[I]n those cases in which the correct construction of a claim term necessitates a derivative construction of a non-claim term, a court may perform the derivative construction in order to elucidate the claim's meaning."). And the district court's (erroneous) view, expressed mid-trial, that the wheels rather than the system as a whole must do the

capturing, *see* Appx40545(9-18), would have made any further request for clarification by Deere futile. *O2 Micro*, 521 F.3d at 1359. This Court should clarify that infringement occurs if the *system as a whole* controls the motion of the seed as it is removed from the seed meter. There is no requirement that specific components must do the capturing without any involvement by gravity.

## II. Alternatively, the Court Should Reverse the District Court's Denial of JMOL on Infringement.

Although a new trial on infringement is the narrowest ground to resolve this appeal, this Court does not need to remand for a new trial on infringement, however, because the evidence only supports a judgment that AGCO-Precision's SpeedTube has the claimed "seed delivery system" and therefore SpeedTube infringes the asserted claims of the '663 and '955 patents. *See Moba*, 325 F.3d at 1315-16 (reversing denial of JMOL to patentee).

The district court concluded that Deere waived its ability to seek JMOL post-trial because it failed to file a pre-verdict JMOL motion of infringement. But the record shows that AGCO-Precision was clearly apprised of the basis for Deere's argument that AGCO-Precision's evidence failed to show non-infringement, and the district court's statement that

"[d]irect infringement is going to the jury" made clear that a separate JMOL motion from Deere was not necessary. The court therefore erred in concluding Deere waived post-trial JMOL of infringement, and also erred in assessing the evidence.

### A. JMOL is Preserved.

The district court concluded Deere forfeited its right to seek JMOL of infringement because "Deere failed to make a Rule 50(a) JMOL of infringement motion." Appx39. Although the court denied AGCO-Precision's Rule 50(a) JMOL motion of no infringement by stating unambiguously that "[d]irect infringement is going to the jury," Appx41108(18-19), the court concluded that Deere should have made a Rule 50(a) motion because Deere had the burden of proof of infringement. Appx39-40.

That ruling is contrary to precedent and improperly elevates form over substance. It is hornbook law that "it is not essential that there be a formal motion" under Rule 50(a) to preserve the right to seek JMOL under Rule 50(b). 9B WRIGHT & MILLER §2533. Rule 50 is not jurisdictional or a rigid formality. Rather, as the Third Circuit has explained, it is "essentially a *notice* provision," meant to alert the non-moving party to "possibly technical defects in proof which might otherwise make his case legally in-

sufficient." *Acosta v. Honda Motor Co.*, 717 F.2d 828, 831-32 (3d Cir. 1983).

This Court has held that "courts may excuse a party's failure to comply with the technical requirements of Rule 50," *e.g.*, filing a formal motion, "if the party clearly challenged the sufficiency of the evidence on the disputed issue at some point during trial, thereby alerting the opposing party as to the grounds on which the evidence is allegedly insufficient." *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1106 (Fed. Cir. 2003). When the assertion of insufficiency in the non-moving party's evidence relates to a "central issue in [the] case," a "terse—even cryptic—statement" may suffice. *Gaus v. Conair Corp.*, 363 F.3d 1284, 1287 (Fed. Cir. 2004). The Supreme Court has likewise recently held that a post-trial motion under Rule 50 is not required to preserve the ability to appeal a purely legal issue resolved in an order denying summary judgment. *Dupree v. Younger*, 598 U.S. 729, 731 (2023).

AGCO-Precision did not lack notice of Deere's grounds for contending that infringement was compelled and that AGCO-Precision's non-infringement case was untenable. The entire course of trial—*and* most of pretrial, including claim construction, summary judgment, and AGCO-

Precision's motion to reconsider claim construction—focused heavily on whether AGCO-Precision's SpeedTube met the construction of "seed delivery system" by removing seeds from the seed meter by "capture." That was not just the "central" issue; it was the *only* issue.

Before trial even started, AGCO-Precision was aware this was the central issue. Based on AGCO-Precision's argument, the district court denied Deere's motion for summary judgment of infringement only because of the parties dispute over whether SpeedTube's feeder wheels remove by capture. Appx3981-3982. On cross-examination, AGCO-Precision's expert confirmed "the removal by capture is where we have our main disagreement." Appx41066(21-22). And the district court identified whether SpeedTube removes by capture as the key evidentiary question that the jury would "grapple with." Appx40538(15-16).

The district court's distinction between "[r]ebutting infringement" and "proving infringement," Appx40, does not change AGCO-Precision's notice of the grounds on which Deere ultimately sought JMOL. Infringement is subject to the preponderance-of-the-evidence standard. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 107 (2016). "The only infringe-

ment dispute at trial was whether the loading wheels capture the seed when they remove it from the seed meter." Appx49-50.

For similar reasons, compliance with Rule 50 does not vary depending on which party had the burden of proof. In *Amgen Inc. v. Sanofi*, the defendants, who had the burden of proof for invalidity, "did not formally move for JMOL" of invalidity. 227 F.Supp.3d 333, 340 (D. Del. 2017). Nonetheless, the district court held that defendants preserved JMOL because "the crux of the invalidity dispute" during trial was defendants' allegations of lack of written description and invalidity and therefore "plaintiffs were apprised during trial of defendants' allegations of insufficient evidence of written description and enablement." *Id.* The court ultimately ruled against defendants on the merits. Defendants appealed, and although the plaintiff argued that the district court's preservation ruling was erroneous, Br. of Pl.-Appellees, *Amgen Inc. v. Sanofi*, Fed. Cir. No. 17-1480, 2017 WL 1251183, at *55 (Mar. 24, 2017), this Court did not reach the issue because it remanded for a new trial on other grounds. 872 F.3d at 1379. Here, as in *Amgen*, the "crux of the [infringement] dispute" during trial was the meaning of the district court's "remove[] … by capture" construction, and AGCO-Precision was "apprised during trial" of Deere's

allegations that AGCO-Precision's non-infringement arguments were legally deficient. There was no failure of notice. The district court's non-preservation ruling is erroneous.

### B. No Reasonable Jury Could Find Non-Infringement.

Under the district court's construction—with or without the "no disclaimer" clause, and with or without the court's mid-trial suggestion that the feeder wheels must perform the "capturing"—the SpeedTube removes seed from the meter by capturing it. Because this was "the only infringement dispute at trial," Appx49-51, no reasonable jury could find non-infringement and this Court should therefore reverse the denial of Deere's JMOL motion. *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1372 (Fed. Cir. 2005); *Moba*, 325 F.3d at 1315-16; *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 425 (Fed. Cir. 2016) ("Where an infringement verdict relies on an incorrect claim construction, and no reasonable jury could have found infringement under the proper claim construction, this court may reverse the district court's determination with respect to JMOL without remand.").

The undisputed evidence, including video evidence, shows that seed is removed from the meter when the SpeedTube's two feeder wheels con-

tact seed between them. Appx40996(11-16); Appx40999-41000(999:11-1000:6); Appx50339. At that point the seed cannot move except where the feeder wheels direct it and is therefore captured. That is how AGCO-Precision described its products (at least before trial). SpeedTube "controls" the seed because the wheels "grab" the seed from the meter—"pluck[ing]" it off the disk and placing it in the flighted belt. *See* §B.2, *supra*. And AGCO-Precision presented no *evidence* that would counter infringement, relying instead on erroneous claim construction arguments. It is irrelevant that the seed is held between the feeder wheels for milliseconds, as neither the claims nor the *Markman* order has any temporal requirement for how long seed must be held. *Moba*, 325 F.3d at 1315. Whether seed is "project[ed] and accelerate[d]" to the flighted belt *after* being captured between the feeder wheels, Appx40874(3-6), is irrelevant to infringement. The seed was captured when removed and remains captured. As the district court held (whether or not a part of its *construction*), the claims do not exclude gravity drop. And once the seed is contacted and held by the feeder wheels, it is captured in the SpeedTube and remains captured in the system until discharged.

AGCO-Precision's trial analogy comparing its SpeedTube to a baseball pitching machine explains this point. When the ball is engaged between the two rotating wheels, it is captured—it actually *has* to be captured in order for the machine to work. The wheels hold the ball between them and then accelerate the ball toward the batter.




So too with SpeedTube. The seed is held between the feeder wheels and then accelerated toward the flighted belt. Because no reasonable jury could find that the SpeedTube feeder wheels do not capture, Deere is entitled to JMOL of infringement.

## CONCLUSION

For the foregoing reasons, the Court should vacate or reverse the judgment below.

August 25, 2023
February 22, 2024 (corrected)

Respectfully submitted,

*/s/ John C. O'Quinn*

John C. O'Quinn
Nathan S. Mammen
William H. Burgess
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, DC 20004
(202) 389-5000

# ADDENDUM

Judgment
(Dkt. 538, Mar. 31, 2023) ........................................................ Appx1

Opinion Denying JMOL and New Trial Motions
(Dkt. 536, Mar. 28, 2023) ........................................................ Appx2

Order
(Dkt. 537, Mar. 28, 2023) ........................................................ Appx69

Jury Verdict
(Dkt. 467, July 8, 2023) ........................................................ Appx70

Final Jury Instructions
(Dkt. 535, July 8, 2023) ........................................................ Appx80

Claim Construction Order
(Dkt. 191, Dec. 17, 2019) ........................................................ Appx123

U.S. Patent No. 8,813,663 (PTX-1) .............................................. Appx171

U.S. Patent No. 9,699,955 (PTX-2) .............................................. Appx187

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEERE & COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>AGCO CORPORATION and<br>PRECISION PLANTING LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. No. 18-827-CFC<br>CONSOLIDATED |

**FINAL JUDGMENT FOLLOWING POST TRIAL MOTION PRACTICE**

For reasons stated in the jury verdict of July 8, 2022 and the Court's Opinion and Order of March, 28, 2023;

IT IS ORDERED AND ADJUDGED that judgment of non-infringement be and is hereby entered in favor of Defendants AGCO Corporation and Precision Planting LLC and against Plaintiff Deere & Company.

______________________________
Chief Judge

Dated: 3/31/2023

______________________________
(By) Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEERE & COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>AGCO CORPORATION and PRECISION PLANTING LLC,<br><br>Defendants. | Civil Action No. 18-827-CFC<br>CONSOLIDATED |

Adam W. Poff, Pilar Gabrielle Kraman, YOUNG CONAWAY STARGATT & TAYLOR,LLP, Wilmington, Delaware; Richard L. Rainey, Kevin B. Collins, R. Jason Fowler, Jay I. Alexander, Daniel E. Valencia, Nicholas L. Evoy, Rajesh D. Paul, Pratik Agarwal, COVINGTON & BURLING LLP, Washington, District of Columbia, Michael R. Morey, COVINGTON & BURLING LLP, Palo Alto, California, Megan L. Hare, COVINGTON & BURLING LLP, New York, New York; Nathan S. Mammen, KIRKLAND & ELLIS LLP, Washington, District of Columbia

*Counsel for Plaintiff*

Jack B. Blumenfeld, Jeremy A. Tigan, Anthony D. Raucci, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Michael J. Summersgill, Mark G. Matuschak, Jordan L. Hirsch, Michaela P. Sewall, Harry D. Hanson, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts; Mary V. Sooter, WILMER CUTLER PICKERING HALE AND DORR LLP, Denver, Colorado; Heath A. Brooks, R. Gregory Israelsen, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, District of Columbia

*Counsel for Defendants*

# OPINION

March 28, 2023
Wilmington, Delaware

COLM F. CONNOLLY
CHIEF JUDGE

After a four-day trial, a jury found that Plaintiff Deere & Co. failed to prove that Defendants AGCO Corp. and Precision Planting LLC (collectively, Precision) infringed claim 1 of U.S. Patent No. 8,813,663 (the #663 patent) and claim 20 of U.S. Patent No. 9,699,955 (the #955 patent). Consistent with the jury instructions and verdict form, the jury did not return a verdict on the validity of the asserted claims or damages. D.I. 466. I therefore entered judgment of noninfringement in Precision's favor. D.I. 474.

Pending before me is Deere's Motion Under [Federal] Rules [of Civil Procedure] 50, 52, 54, 59, And 60 For Judgment As A Matter Of Law, For A New Trial, And/Or To Reconsider, Correct, Or Amend Judgment. D.I. 482. Deere seeks by its motion vacatur of the verdict form and the judgment of noninfringement and entry of a judgment as a matter of law (JMOL) of infringement and no invalidity of the asserted claims. D.I. 482 at 1. Alternatively, Deere seeks a new trial and dismissal of Precision's invalidity counterclaims. D.I. 482 at 1.

# I. BACKGROUND

## A. The Asserted Claims

The asserted patents are directed to farming equipment and methods for planting seeds. Claim 1 of the #663 patent covers a seeding machine that comprises, among other things, "a seed delivery system." Claim 20 of the #955 patent, which depends from claim 19 and claim 16, covers a "method of delivering seed." The parties referred to the "seed delivery system" and "method of delivering seed" limitations and similar claim limitations in 11 other patents that were originally asserted by Deere in this case as "the seed delivery system" terms. *See* D.I. 173 at 10–11.

## B. The Accused Products

Deere alleged that Precision's use, sale, and manufacturing of its SpeedTube and vSet2 meter infringed both claims asserted at trial. The SpeedTube and the vSet2 meter are used together. The SpeedTube has a flighted belt. Tr. of July 5–8, 2022 trial 856:5 (hereinafter Trial Tr.). The "flighted belt has flights . . . that are equally spaced, and the seeds [are] received in between those flights and . . . carried downward toward the furrow." Trial Tr. 855:22–56:1. The SpeedTube uses a "paddle wheel design" for loading the seeds into the flighted belt. Trial Tr. 866:1–3. Precision at times called the paddle wheels "feeder wheels" or "loading wheels." Trial Tr. 867:7–10. When the seeds "make contact with the feeder wheels," they are "projected and accelerated downward for a distance, eventually

received by the belt," "carried down [in the belt]," and "eventually discharged rearward at the bottom" into a furrow. Trial Tr. 871:5–13.

Deere presented at trial these photos of relevant portions of the SpeedTube:





D.I. 489-2 at A3608. The top image displays the feeder wheels and the top of the flighted belt. The bottom image shows a mid-portion of the flighted belt.

The vSet2 seed meter consists of a rotating plate that takes a seed from a seed reservoir and "drops the seed off" at the SpeedTube's feeder wheels. Trial Tr. 380:8–22. Below is the image of the SpeedTube in combination with the vSet2 meter that Deere's expert showed the jury:




D.I. 486-2 at A1991.

### C. Relevant Pretrial Proceedings

On December 3, 2019, I held a *Markman* hearing to address the parties' disputes about certain claim terms, including the seed delivery system terms. Deere argued that no construction of the seed delivery system terms was necessary. D.I. 173 at 10–11. It argued in the alternative that, "[t]o the extent a construction is necessary," the term "seed delivery system" "should be construed to mean: '[a]ssembly of components that delivers seeds,'" D.I. 173 at 10, and the term "method of delivering seed" "should be construed according to its plain and ordinary meaning," D.I. 173 at 11.

Precision argued in its *Markman* briefing that the terms should be construed as "apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position." D.I. 173 at 10–11. Precision also argued that the patents had a "disclaimer" that "the seed delivery apparatus / system / method does not allow for seeds to drop by gravity between the seed meter and discharge." D.I. 173 at 10. At the *Markman* hearing, Precision again requested that I "give the seed delivery system terms their *construction* . . . which requires that they remove the seed from the seed meter by capturing it" and that I "*further instruct* the jury that Deere has disclaimed systems with [a] gravity drop." Tr. of Dec. 3, 2019 hr'g 150:13–17 (hereinafter *Markman* Tr.) (emphasis added); *see also Markman* Tr. 157:20–23 ("So it would be in addition to the definition you just provided, you would also instruct [the jury] that the patent owner has the claims and the patent claims do not include a gravity drop.").

I concluded at the hearing that "Precision has the better argument in terms of the definition of the seed delivery system in the [#]663 patent" and certain related patents, including the #955 patent, and I held that "it's appropriate therefore *to construe the term for the [#]663 patent [and related patents] to include capturing of the seed and the delivery [to] discharge*." *Markman* Tr. 151:21–22, 152:9–11 (emphasis added); *see also Markman* Tr. 154:15–17 ("I'm going to adopt the

construction proposed by Precision of seed delivery system[.]"); 157:3–6 ("I would say that [for] any patent that shares the written description of the [#]663 patent, which begins with the words, [']the present invention provides for,['] that I have ruled on any patent that is affected by that."). At no point did I say or suggest that I was *construing* the seed delivery system terms to include a disclaimer.

At the conclusion of the *Markman* hearing, I asked Deere to draft for my signature a "proposed order on the terms I ha[d] construed" that day. *Markman* Tr. 215:6–7. On December 16, 2019, Deere submitted what it called a "form of order reflecting the Court's claim construction rulings to date." D.I. 188-1 at 1. Section III of that order reads:

### III. "Seed Delivery System" Terms

| Term | Patent(s) / Claim(s) | Court's Construction |
|---|---|---|
| **"seed delivery system" /**<br><br>**"delivery system" /**<br><br>**"seed delivery apparatus" /**<br><br>**"method of delivering a seed"** | '663 Patent: Claims 1 and 6<br><br>'199 Patent: Claims 1 and 5<br><br>'429 Patent: Claims 19 and 20<br><br>'955 Patent: Claims 19, 20<br><br>'924 Patent: Claims 12, 15<br><br>'906 Patent: Claims 4 and 6<br><br>'031 Patent: Claims 8 and 16<br><br>'173 Patent: Claim 6<br><br>'998 Patent: Claim 3<br><br>'799 Patent: Claim 2<br><br>'502 Patent: Claims 14, 19 and 22 | For '663, '199, '429, '955, '924, '906, '031, '173 patents:<br>**"apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position"**<br><br>No disclaimer of a seed delivery apparatus / system / method that allows for seeds to drop by gravity between the seed meter and discharge.<br><br>For '799, '998, '502 patents:<br>**Plain and ordinary meaning.**<br><br>No disclaimer of a seed delivery apparatus / system / method that includes a belt with flights. |

D.I. 188 (emphasis in the original). To be clear, it was Deere who put in bold font and within quotation marks under the heading "Court's Construction" the very construction I had given to the seed delivery system terms in the #663 and #955 patents at the *Markman* hearing. And it was Deere who did not put in bold font or within quotation marks under the heading "Court's Construction" the phrase "[n]o disclaimer of a seed delivery apparatus / system / method that allows for seeds to drop by gravity between the seed meter and discharge." Thus, the proposed order

Deere submitted shows that Deere understood exactly what I had done at the *Markman* hearing: I had *construed* the seed delivery system terms in the asserted patents to mean "apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position"; and I had *rejected Precision's contention* that the asserted patents disclaimed apparatus, systems, and methods that allow for seeds to drop by gravity between the seed meter and discharge.

On December 17, I signed and entered the order. D.I. 191. The next day, December 18, 2019, the parties filed and I signed a stipulated order to stay the case pending resolution of various inter partes review (IPR) proceedings before the Patent Trial and Appeal Board (PTAB). D.I. 196.

The case remained stayed for almost two years. During the IPR proceedings, Deere told the PTAB that I "ha[d] made the following claim construction[]: . . . 'Seed delivery system' means a 'system that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position.'" D.I. 213-1 at 15. And Deere submitted to the PTAB a declaration in which its expert, Dr. James Glancey, swore under oath that he had "been informed that [I] ha[d] *construed* the term 'seed delivery system' to mean 'system . . . that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position,'" D.I. 213-1 at 118 (emphasis added), and that he "also underst[ood] that

[I] ha[d] *determined* that there is '[n]o disclaimer of a seed delivery apparatus / system / method that allows for seeds to drop by gravity between the seed meter and discharge,'" D.I. 213-1 at 118 (emphasis added; some alterations added).

After the stay was lifted, the parties engaged in discovery and motion practice.

On June 13, 2022, I held a four-and-one-half hour pretrial conference. Notably, Deere never suggested at the pretrial conference or at any time in the more than two years between the *Markman* hearing and trial that my construction of the seed delivery system terms included any language other than "an apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position." Nor did Deere ever ask for clarification of that construction or a construction of any term used in that construction. On the contrary, when Precision sought before trial additional claim construction, Deere *opposed* that request and stated specifically in its opposition that "[n]o further construction of '[seed] delivery system' is required." D.I. 213 at 10.

**D. Deere's Proposed Verdict Form**

The parties submitted before trial competing proposed verdict forms. Deere's verdict form explicitly instructed the jury not to address the validity of any asserted claim unless it had found that Precision infringed that asserted claim. D.I. 532-4 at 7–9. Deere's form used bold font to emphasize this point, as

demonstrated below in images of Deere's proposed infringement and invalidity instructions for claim 1 of the #663 patent:

**I. FINDINGS ON INFRINGEMENT**

**A. U.S. Patent No. 8,813,663 ('663 Patent)**

**Question 1:**

Did Deere prove, by a preponderance of the evidence, that Defendants' Accused Products infringe claim 1 of the '663 Patent?

("YES" is a finding in favor of Deere, and "NO" is a finding in favor of Defendants. *See* Jury Instructions Sections 4.1–4.4.)

| '663 Patent | Infringed? (Answer "YES" or "NO") |
|---|---|
| Claim 1 | YES ______ NO ______ |

Continue to the next question.

**III. FINDINGS ON VALIDITY**

**A. U.S. Patent No. 8,813,663 ('663 Patent)**

Answer this question (Question 5) only if you answered "YES" to Question 1. **Otherwise do not answer the question.**

**Question 5:**

Did Defendants prove, by clear and convincing evidence, that claim 1 of the '663 Patent is invalid?

(If you find the claim invalid for a particular ground, answer "YES," otherwise answer "NO" for that ground. "YES" is a finding in favor of Defendants, and "NO" is a finding in favor of Deere. *See* Jury Instructions Section 5.)

| Invalidity Ground | '663 Patent Claim 1 Invalid? (Answer "YES" or "NO") |
|---|---|
| Obvious in light of the prior art and other evidence of record | YES _____ NO _____ |
| Lack of enablement | YES _____ NO _____ |

Continue to next question.

D.I. 532-4 at 3, 6.

### E. Relevant Trial Issues and Proceedings

#### 1. Deere's "No Disclaimer" Slides, Testimony, and Argument

Trial began on July 5, 2022. The morning of the first day of a trial in any case is always hectic. In this case, it seemed particularly so. As the citizens called for jury duty that morning waited patiently outside the courtroom for the jury selection process to begin, Precision's counsel asked me to resolve a host of issues concerning the slides Deere intended to use during its opening statement.

One of those slides—titled "Court's Definition"—lies at the heart of Deere's pending motion:




D.I. 486-1 at A1935; *see also* Trial Tr. 24:17–25:5 (Precision's objection).

Given the layout of the slide, the two years that had passed between the *Markman* hearing and trial, and the fact that Deere had never sought further construction of the seed delivery system terms, the significance of the slide and why Precision would object to it was not readily apparent to me. I had not seen the *Markman* order since I signed it two years earlier. I had no recollection of the order, and no one offered me a copy of the order that morning. Once I had a chance to briefly review the slide, the following discussion ensued:

> [PRECISION'S COUNSEL]: . . . . So our point here is that the definition of the term is what's in the top of this box. It's a system that removes seed from the seed

meter. The rejection of our disclaimer argument isn't part of the definition of the term. That's just rejecting -- it's the rationale that's rejecting our claim construction argument on the disclaimer issue.

So we don't think that should go to the jury. We think that would confuse the jury.

THE COURT: Well, it's going to confuse them because it's confusing me. I mean, I have to step back, like, ["]no disclaimer of a seed delivery system.["] If I'm on the jury, I'm going to go, ["]what?["]

So let me step back. You don't dispute that the first quotation in the box comes from my construction of the term. So that is properly in front of the jury?

[PRECISION'S COUNSEL]: Absolutely.

THE COURT: And it, in fact, is going to be part of the jury instructions?

[PRECISION'S COUNSEL]: Yes.

THE COURT: All right. Then they're adding gloss to that by saying, essentially, I guess, explicating the claim construction by saying there's no disclaimer of a seed delivery system that allows for seeds to drop by gravity.

[PRECISION'S COUNSEL]: Correct. And that's because we argued based --

THE COURT: Hold on.

Part of me is laughing. Do you think -- [Deere's counsel], do you think a jury is going to even -- what are you going to say? I mean, if I'm a juror, I'm going to go, what are you saying? No disclaimer of a seed delivery system that allows for seeds to drop.

[DEERE'S COUNSEL]: I'm happy to show you how this has come up, Judge.

THE COURT: Well, let me hear from [Deere's counsel], then, because I'm confused anyway.

[DEERE'S COUNSEL]: . . . So just a little bit of background on this, Judge. First of all, at the *Markman* hearing, what they argued to you was they wanted, in addition to the definition that we just looked at, which I think everybody agrees is appropriate, removal by capture, they said, so it would be in addition to the definition you just provided. You would also instruct that the patent owner has the claims and the patent claims -- I'm sorry, do not include a gravity drop. They asked you to find that the claims were narrower than their literal scope.

THE COURT: Okay.

[DEERE'S COUNSEL]: Their literal scope, given that you've rejected their disclaimer, the literal scope of these claims includes gravity drop, free-fall.

Now, I just handed up . . . a marketing slide from Deere that they're going to put up. And they're going to argue in this case, that the claims -- your claim construction excludes free-fall. Because on the bottom right-hand corner it says . . . "Funneled hand off with free-fall to belt." They're going to say that's excluded under your claim construction. We litigated this at [the] *Markman* [hearing], Judge. [Y]ou said gravity drop is in the scope of the claims.

So we're trying to figure out a way, if there's a more plain English way of saying that, and I'm amenable to that, that would be fine. But you have ruled as a matter of claim construction in this case that "gravity drop free-fall" is not excluded from the scope of the claims.

> They are going to argue directly contrary to your claim construction. This issue has been joined now. Or they are going to imply it. One way or the other. [The Deere marketing slide Precision intended to use at trial] makes it plain.

TrialTr. 26:12–29:12.

Precision denied Deere's accusation. Its counsel insisted:

> We are not going to argue contrary to your claim construction. . . . We are not going to argue that the claims exclude a gravity drop between the meter and the belt. This slide isn't arguing that. This is Deere talking about [Precision's] system.
>
> We are going to argue that [the vSet2 and SpeedTube] don't remove by capture, and we'll point to [Deere's] criticism of our system in this slide to show that we don't remove by capture.

Trial Tr. 30:6–16.

I decided to let Deere show the disputed slide to the jury. Truth be told, I thought the slide was a non-issue. It was not inconsistent with my claim construction; and, in any event, I doubted a jury would have any idea what a disclaimer was:

> THE COURT: Look, I'm going to let this in. And the claim does not preclude drop by gravity. You admit that.
>
> [PRECISION'S COUNSEL]: Yes.
>
> THE COURT: You admit that. I ruled that. Who knows if I'm right or wrong. You'll go up to the Federal Circuit, they'll decide. And, frankly, I just think --

> [DEERE'S COUNSEL]: Judge, we are happy to phrase it that way [i.e., that the claim does not preclude drop by gravity].
>
> THE COURT: Listen, if I were you, that's how I would phrase it, because I'm thinking like a juror, not like you. You want to call it no disclaimer seed delivery, go for it. To me, you're going to have to explain it to the jury what it means. And that's how I'd explain it.

Trial Tr. 31:2–16.

At this point, Precision's counsel said, "I'm more concerned about them taking your claim construction, that rationale, and changing it." Trial Tr. 31:18–20. Mindful that the jury pool was waiting outside and that Precision had further issues to resolve before the jury selection process could begin, I responded:

> [W]e'll move on. This is going to depend [on] how it arises in trial. . . . Here's the thing. As the evidence comes in, I can always under *[O]2 Micro[]* decide I misconstrued the claims and reconstrue [the term], right? I can do that at jury instructions, right?[1]
>
> [PRECISION'S COUNSEL]: You can, Your Honor, and --

---

[1] *See In re Papst Licensing Digital Camera Pat. Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015) ("[A] district court may (and sometimes must) revisit, alter, or supplement its claim constructions (subject to controlling appellate mandates) to the extent necessary to ensure that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact.") (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008) and *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir. 2005)).

THE COURT: I guess we'll take that risk. We'll see.

Trial Tr. 31:22–32:19.

When, during his opening, Deere's counsel showed the jury the disputed slide, he stated:

> So you might -- so you might ask yourself, then, . . . what is this case all about?
>
> Well, the Court has provided some guidance as to the meaning of the term "seed delivery system" as it appears in the claim. And as you can see, the Court's definition further specifies that the seed delivery system must be a system that removes seed from the meter by capturing the seed and then delivering it to a discharge position.
>
> *The Court went on to make clear that there is no disclaimer of a seed delivery system that allows the seed to drop by gravity between the seed meter and discharge.*
>
> *We submit, in other words, some influence of gravity or free-fall on the seed is allowed expressly by the claim* so long as the seed is nevertheless removed from the meter by capturing and delivering it to the discharge position.

Trial Tr. 145:9–24 (emphasis added).

There being no contemporaneous objection lodged by Precision, I did not focus on Deere's counsel's wording and failed to appreciate at the time that his statement that "some influence of gravity or free-fall on the seed is allowed expressly by the claims" was not true and could confuse and mislead the jury. In point of fact, neither asserted claim *expressly allows* for "some influence of gravity

Case: 23-1811 Document: 36 Page: 113 Filed: 02/22/2024

or free-fall." And I had never suggested when I rejected Precision's disclaimer argument at the *Markman* hearing that the claims expressly allow for "some influence of gravity or free-fall." Neither claim uses the words gravity or free-fall or synonyms of those words. And neither claim expresses anything about the influence of gravity or free-fall on a seed.

More fundamentally, patent claims do not expressly allow anything. "[P]atents are 'public franchises' that . . . give[] the patent owner 'the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States.'" *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373–74 (2018) (quoting 35 U.S.C. § 154(a)(1)). Patents bar others from practicing an invention without the patent holder's permission or acquiescence. *See Eldred v. Ashcroft*, 537 U.S. 186, 217 (2003) ("The grant of a patent . . . *prevent*[*s*] full use by others of the inventor's knowledge." (emphasis added)). Patent claims *prohibit*—the very antithesis of *allow*. Licenses and permits allow. Patents do not.

Deere's counsel's "allow expressly" language, it turns out, was not accidental. This fundamental mischaracterization of patent claims as affirmatively allowing what they do not exclude permeated Deere's infringement presentation at trial and lies at the heart of Deere's pending motion.

The issue next arose on the second day of trial during the direct examination of Deere's infringement expert, Dr. Glancy, when Deere put in front of the jury a slide that looked very similar to the disputed slide it had used during its opening. Trial Tr. 388:14–89:1. Precision's counsel objected and during an ensuing sidebar conference the following discussion occurred:

> [PRECISION'S COUNSEL]: The objection is that same objection I made.
>
> THE COURT: When you say "same objection," let's be clear. You didn't object -- this slide is not exactly the same. You objected to an opening slide. I said they could use it. I didn't think they should. I didn't think the jury would understand it . . . . I also didn't think it was my claim construction.
>
> So let's concentrate on this slide. You have an objection based on what?
>
> [PRECISION'S COUNSEL]: Fair enough. Based on the bottom portion. That disclaimer language is not part of your claim construction. That's your rationale. The bottom portion is the Judge's rationale for rejecting one of our claim construction arguments. It's not the definition itself.
>
> [DEERE'S COUNSEL]: We disagree. Your order under the heading "Claim Construction" has both parts of that, and that was an agreed order that was submitted. It was argued. You rejected their argument that there was a disclaimer. You asked us to propose an order. We did. We sent it to the other side. They agreed. It said -- I don't have it with me.
>
> THE COURT: Could I quickly see the order? Can you get that?

> [DEERE'S COUNSEL]: I have it.
>
> [PRECISION'S COUNSEL]: Here's the concern.
>
> THE COURT: I don't want the concern; I want to read the order. I am concerned, so I want to read the order.

Trial Tr. 389:14–90:18.

At this point, Deere's counsel handed me a copy of the *Markman* order, and this discussion ensued:

> THE COURT: [Precision's counsel], I have in front of me the order. It was a proposed order given to me by the parties. And under the column heading "Court's Construction," it does have this disclaimer language that you are objecting to. If I had put the order together myself, I don't think I would have put the rationale in the order. The problem is it was submitted by the parties and *it's a fair reading given the way the order is structured to say that the* [*qu*]*ote "no disclaimer" is part of the construction of the term*.
>
> [PRECISION'S COUNSEL]: Your Honor, we never agreed that was part of the definition. We agreed -- [you] rejected our disclaimer argument. They insisted on putting that in. The issue here is, the fact that there is no disclaimer doesn't mean it affirmatively can include a gravity drop. There is an issue here. They are trying to use it to affirmatively suggest something that's beyond your construction.
>
> THE COURT: Unfortunately, the way the order is phrased, I can understand why someone would rely on it. *It's a fair reading of the order which was presented to me. I mean, nobody contested this order.* This is what was given to me.

[PRECISION'S COUNSEL]: Because we didn't contest your rationale for -- well, we didn't contest the fact that you had, in fact, rejected our disclaimer. We never intended it to be part of [the] definition.

THE COURT: You may not have intended, but that is the way the order is fairly read. *I will overrule the objection. And we will spell it out at a break.*

[PRECISION'S COUNSEL]: There's one quick question. They are going to ask Mr. Glancey to now interpret that disclaimer language. I think that would be highly improper. He is -- they are going to ask him to explain that disclaimer. So their expert describing your rationale and the way that -- suggesting the claim affirmatively allows gravity drop. But I think that, at least, will be improper.

THE COURT: So it's funny. Now, I disagree with that. I will allow that line of questioning. *I will say this, though, for the record. I think Deere has overreached. I signed that order. When I signed the order, I did it because, frankly, it was presented to me as a stipulated order. I would have said, had I drafted the order, sua sponte. I would have said my construction is the first paragraph. I would have said the rationale for my rejection of Deere's additional limitation was the "no disclaimer" language. And I think Deere is, frankly -- I think they are taking a risk pursuing this as if it is my construction.*

And don't forget *[O]2 Micro*. I can construe the claim at any point during the proceedings. And I need to rethink that because *I don't think a Court's statement that there is no disclaimer constitutes claim construction.*

*But the problem is it -- is the slide has been shown to the jury already. It is a fair reading of the stipulated order. So I think it would be unfairly prejudicial to Deere right now to say you can't continue with that slide.*

> *However, I think they've gone down a road, I think, they have overreached. I do not think a Court's statement on the record rejecting an argument that there's a disclaimer constitutes claim construction.*
>
> *All right. So you can play it however you want.*
>
> [DEERE'S COUNSEL]: Okay.
>
> [PRECISION'S COUNSEL]: Thank you.
>
> THE COURT: *There is going to be a risk. I will hear further argument on it.* I will have to reread *[O]2 Micro*. I think I am permitted to construe the claim at any point in the process.

Trial Tr. 390:22–93:18 (emphasis added).

After this sidebar, I reread *O2 Micro* and, more importantly, reviewed more carefully the stipulated *Markman* order I had signed. After further considering the order and how the trial was unfolding, I told the parties during a subsequent sidebar that:

> I'm not going to allow Deere to put in front of the jury again that I have construed the claim to say no disclaimer. I've thought a lot about it. I think it was fair for you [Deere] to do what you did in opening, because as I mentioned at sidebar, it was a stipulated order that they signed onto. And you didn't sandbag them when you put it in your opening. It was appropriate. And because it was in the opening, I let you all use it at least one other time.
>
> But the truth of the matter is, and as shown by the quotations, in the box, in the order on Page 3, I construed the term to be "removal by capture" and then "delivery."

That's not verbatim. But that was in quotes. The disclaimer is not in quotes, and I never intended it to be part of a construction.

I think it will confuse the jury for it to be put in front of them again. You are free to argue, and I expect you all will, that where in that claim does it say you can't have any kind of free-fall. And you can show a seed and show that it can be movement, and you can say a prisoner is captured, but he can move within his cell. You can do that. I don't think you need this. I said that at opening. I actually think it's a little bit confusing.

[Deere's counsel], you want to say something on that?

[DEERE'S COUNSEL]: One quick comment about what you [s]aid about the fairness of doing this in opening. I ask that there be no argument made about the fact our slides had it in the opening.

THE COURT: Oh, that's for sure. And unless you [Precision] agree to that, I'm going to let them show the slides.

[PRECISION'S COUNSEL]: That's fine, Your Honor. I agree.

[DEERE'S COUNSEL]: And just for the record, it's in the slides now because we just disclosed the same slide. I'm going to remove it.

THE COURT: I wish you would. I think in fairness, and I'm trying to accomplish fairness.

[DEERE'S COUNSEL]: No problem.

THE COURT: And so, [Deere's counsel], you're not going to be punished for it being in your opening. And [you] can just say -- I mean, if you want to use the word

> "disclaimer," I'm not sure who knows what a disclaimer is on the jury, right? But your point can still be made.
>
> [DEERE'S COUNSEL]: Yes.
>
> THE COURT: Right?
>
> [DEERE'S COUNSEL]: Judge, we're fine with that. Just didn't want to -- we're not trying to do anything improper.
>
> THE COURT: Oh, I know. Believe me, I absolutely believe that.

Trial Tr. 1030:11–32.11.

The issue of whether Deere's "no disclaimer" language should be part of claim construction arose again when the parties discussed with me final jury instructions after the third day of trial. *See Trial* Tr. 1140:13–16. I told Deere's counsel:

> I've already ruled on that, and *you're good to argue [no disclaimer]. You are free to argue it.* And I will say this, I'm going to repeat this, because, you know, the defendants need to be careful what they say on this point, and I am very comfortable that, if a question arose from the jury, you know, asking, for instance, you know, well, is there a disclaimer of a seed-delivery system? If they ask that question, then we're into claim construction, and I [would] feel obligated to answer.

Trial Tr. 1140:17–41:1 (emphasis added). Deere did not object or otherwise respond during this exchange. *See id.* And in his closing argument, Deere's counsel stated, "[T]he Court has made clear that the claim permits -- does not

exclude gravity drop. And you will not hear the defendants' counsel say that it does not include gravity drop." Trial Tr. 1204:12–15.

The final jury instructions given to the jury included these claim constructions:

| CLAIM TERM | DEFINITION |
|---|---|
| "seed delivery system" | "system that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position" |
| "method of delivering a seed" | "method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position" |

D.I. 488-2 at A3126–27 (reproduced). These constructions are identical to the respective constructions of the seed delivery system terms set forth in the *Markman* order. *See* D.I. 191 at 3. The jury never asked for further clarification of these constructions. *See* D.I. 472.

**2. Agreement and Testimony Concerning "Capture"**

In his opening, Deere's counsel made the following statement, which bears directly on Deere's pending motion:

> Let's talk about capture. You will be instructed that the terms in patent claims are to be given their meaning to a person of ordinary skill in the art at the time of the invention.
>
> So what does "capture" mean to a person of ordinary skill in the art? And you're going to hear testimony from witnesses on this. But here are two

> meanings of capture from dictionaries that are relied upon by Deere's witnesses.
>
> First -- the first dictionary defines "capture" as taking into possession or control by force. The second dictionary defines "capture" as taking someone as a prisoner or taking something into your possession.
>
> So the evidence will show that removing a seed from the seed meter by capturing the seed means that the seed delivery system, here SpeedTube, takes the seed from the meter into possession or control by force or takes the seed from the meter as a prisoner.

Trial Tr. 146:5–22. During trial, both parties offered expert testimony on the issue of infringement. Deere's expert, Dr. Glancey, testified first. Over Precision's objection, I permitted Deere to introduce into evidence and ask Dr. Glancey questions about the *Oxford English Dictionary's* definition of "capture" as "take into one's possession or control by force." Trial Tr. 399:14. Based in part on that definition, Dr. Glancey testified that he did not think that an object has "to be in physical contact with something else at all times in order to be captured." Trial Tr. 399:15–19.

Dr. Glancey also provided an example of capture based on the dictionary definition:

> So we have a suspect on the left image being taken into possession and captured by a police officer on the left. So they're taken into custody, in a manner of speaking. The middle image shows they now arrived at the jail, and that individual, the suspect, is being directed into the jail cell.

> The police officer is not physically contacting him, that suspect, but I don't think anyone would dispute he's still captured by the judicial system -- judicial system. Even though that police officer is not literally touching that person, but he's still guiding them in and pushing -- putting them into and directing them to the jail cell itself.
>
> So they're directed into the cell even though the police officer is not literally having him -- not touching him, per se.
>
> The image on the right shows, now, that suspect is in the jail cell. They are locked in with a cell. The door is closed. That individual, I think we would all agree, still remains captured even though the police officer is not there.
>
> I think we would also agree, they're still captured despite the fact that individual can get up and walk around the cell, but they're still captured.

Trial Tr. 400:3–01:1. This definition was not from any source specific to the field of the invention. And, to state the obvious, Dr. Glancey's example of capture had nothing to do with the field of the invention.

Precision's expert, Dr. Fleming, defined "capture" as "controlling all of the aspects of the motion of the seed." Trial Tr. 1001:5–6. During cross-examination, Deere asked Fleming about his use of *Webster's Dictionary for Students*. Trial Tr. 1075:8–11 ("Q: You don't seriously contend that a person with ordinary skill in the art would consult a children's dictionary to understand how a term in the agricultural field would be understood, do you?"). Fleming's report refers to

*Webster's Dictionary for Students*, but he did not discuss the dictionary during direct examination. Fleming explained that he did not see a problem with using this dictionary, and he noted that it was only one of the sources he considered. Trial Tr. 1075:3–7, 12.

Precision later requested a jury instruction "that 'removal by capture' means removal by capture and not capturing after removal." Trial Tr. 1141:6–10. I rejected that request when the jury was not in the courtroom:

> THE COURT: I'm inclined just to leave it as I've constructed, right. But, I mean, here's the key. My construction was: "A system that removes seed from the seed meter by capturing." That's what it says, "and then delivery."
>
> * * * *
>
> . . . I guess you can argue [that capture happens after removal], but you can open some problems it seems to me. If the capture is in the belt, that's not the removal, you know. Removal is occurring when that [seed] is plucked, grabbed, removed, sucked, dislodged, whatever it is, it's from the seed meter, that's the removal.
>
> [DEERE'S COUNSEL]: We have argued consistently that the removal happens at the meter, and it's captured the entire way down.
>
> THE COURT: And that's fair. But just so you know, they could argue it doesn't have to be captured all the way down. And if they do and the jury says -- if the jury came back and says: Does it have to be captured after the removal? I'd say, no. Claim construction, it does not.
>
> [DEERE'S COUNSEL]: And I think there may be dispute about where the removal happens.

Case: 23-1811 Document: 30 Page: 124 Filed: 02/22/2024

> THE COURT: Well, the removal has to happen contemporaneous with the -- and you pick -- the separation from the seed meter. So as soon as it separated from the seed meter, it's removed. . . .
>
> * * * *
>
> THE COURT: My point is just it's the removal from the seed meter.
>
> [DEERE'S COUNSEL]: Yes. We're focusing on [that part of the] system.
>
> THE COURT: Okay. Great.
>
> [DEERE'S COUNSEL]: So just to be clear, Your Honor, you're going to strike this proposal by Precision, then?
>
> THE COURT: Yes. And just to be clear, just to be really clear, if there's a suggestion in Deere's closing that that removal is when the seed is confined within a cell in the belt, I think you're opening up a door for clarification of construction or something.

Trial Tr. 1141:13–43:14. The jury did not hear any of these exchanges or remarks.

At no point during trial did Deere ask for a construction of the term "capture" or a reconstruction of the seed delivery system terms. At no point did Deere ever suggest at trial that the competing experts' testimony raised a claim construction dispute over the meaning of "capture" or the seed delivery system terms. Even when I made the following comment to the attorneys about capturing—again, outside of the jury's purview—Deere did not raise any claim construction concerns:

> The jury is going to grapple with, when those two loading wheels hit that seed, are they capturing it. And, you know, I almost feel like I should instruct . . . them that the capture in that belt, going down to the bottom, is irrelevant. I think . . . the issue is whether it's captured by the loading wheel or the wheels. And it happens in a three-thousandths of a second. And . . . that's what they're going to go back and try to figure out.

Trial Tr. 538:15–23. My comment was followed by a discussion about where capture takes place, but there was no dispute over the meaning of the word "capture" itself. *See* Trial Tr. 539:8–46:4; *see also, e.g.*, Trial Tr. 544:5–8 ("THE COURT: That's when the capture occurs. When he sticks him in the cell [i.e., on the flighted belt], . . . it's irrelevant. He's already removed him by capture."). The jury was not given a construction for the word "capture." *See* D.I. 488-2 at A3126–27.

### 3. The Verdict Form

The infringement and validity sections of the final verdict form I gave to the jury were identical in all material respects to the infringement and validity sections in Deere's proposed verdict form. Thus, for each asserted claim the jury was instructed to "answer" whether an asserted claim was invalid "only if" it had found that the SpeedTube and vSet2 meter infringed that asserted claim, and the jury was warned in bold font: **"Otherwise do not answer the question"** of invalidity. D.I. 466 at 5–6.

### 4. Judgment As a Matter of Law Motions

After Precision's case-in-chief, but before closing arguments, both parties moved for judgment as a matter of law (JMOL). Deere moved for JMOL on the issue of validity:

> [DEERE'S COUNSEL]: The comment I made before was simply I wanted to -- we were intending to move for JMOL on the issue of validity. And so I wanted to resolve that before we know whether we're going to recall Dr. Glancey.
>
> THE COURT: I see. I'm going to let the -- I'm going to let invalidity go to the jury.
>
> [DEERE'S COUNSEL]: Okay. Can we --
>
> THE COURT: I'm going to defer ruling on your motion and --
>
> [DEERE'S COUNSEL]: May we file something on the docket just so we preserve appellate rights?

Case: 24-1811 Document: 30 Page: 127 Filed: 07/22/2024

> THE COURT: If you feel like you have to, you can confer, yes.

Trial Tr. 1108:2–14. Deere never filed anything on the docket.

Precision also moved for JMOL. But unlike Deere, Precision's counsel stated that Precision "intend[ed] to move for JMOL on all -- essentially all of their issues, direct infringement . . . contributory, which is the same intent issue as willfulness, I think, and on damages." Trial Tr. 1108:15–21. And, consistent with that representation, Precision filed on the docket a Rule 50(a) motion for JMOL, arguing that "no reasonable jury could find for [Deere] on any issue." D.I. 465 at 1.

I denied Precision's JMOL on the issue of direct infringement. *See* Trial Tr. 1108:18–19 ("Direct infringement is going to the jury."). Then, the parties presented arguments on whether there was sufficient evidence to let the issue of willful infringement go to the jury. After hearing the parties' arguments, I found that "a rational juror could [not] conclude based on the record evidence, even drawing every inference in favor of Deere, that the defendants willfully infringed these patents. And, specifically, [Deere] can't show that the defendants knew that the patents were being infringed or were willfully blind to infringement." *See* Trial Tr. 1132:10–15; *see also* Trial Tr. 1108:23–37:2. I accordingly granted Precision's motion for JMOL with respect to willful infringement. Trial Tr. 1136:23–37:2.

The next day, I also granted Precision's JMOL with respect to contributory infringement. Trial Tr. 1181:10–23.

## II. LEGAL STANDARDS

### A. Renewed Motion for Judgment as a Matter of Law

Under Rule 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). "The grant or denial of a JMOL motion is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1133 (Fed. Cir. 2004).

The standards that govern a Rule 50(b) motion "vary according to whether the movant has the burden of proof." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976). For the party having the burden of proof, entry of judgment as a matter of law after a jury verdict "is rare[] [and] reserved for extreme circumstances." *Id.* To grant judgment as a matter of law in favor of a party with the burden of proof, the court "must be able to say not only that there is sufficient evidence to support the finding [sought by the moving party] . . . but additionally that there is insufficient evidence for permitting any different finding."

*Id.* (citation omitted); *see also Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1333 (Fed. Cir. 2019) ("[W]here the movant b[ears] the burden of proof on an issue, JMOL is only granted where 'there is insufficient evidence for permitting any different finding.'" (quoting *Fireman's Fund*, 540 F.2d at 1177)).

A party that does not have the burden is entitled to a judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

In reviewing the evidence to resolve a motion for judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**B. Motion for a New Trial**

Rule 59(a) permits a district court judge, "on motion," to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). A district court therefore has the

discretion to order a new trial when the verdict is contrary to the evidence, a miscarriage of justice would result if the jury's verdict were left to stand, or the court believes the verdict resulted from confusion. *See Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992). Granting a "new trial[] because the verdict is against the weight of the evidence [is] proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

## III. DISCUSSION

### A. Relief under Rules 52, 54, and 60

Consistent with the title of its motion, Deere says in the first sentence of its opening brief that it brought the motion "pursuant to Rules 50, 52, 54, and 59." D.I. 483 at 1. That sentence is the only occasion where Deere mentions Rules 52, 54, or 60 in its briefing. It does not otherwise cite, let alone discuss the substance of or standards that govern, those rules. Deere has therefore waived any arguments that it is entitled to relief under Rules 52, 54, or 60. *See Higgins v. Bayada Home Health Care Inc.*, 2023 WL 2518345, at *7 (3d Cir. Mar. 15, 2023) ("[T]he District Court was not required to consider [the Plaintiff's argument] because 'arguments raised in passing (such as, in a footnote), but not squarely argued, are considered [forfeited].'") (quoting *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d

1070, 1076 n.6 (3d Cir. 1997) (some alterations in the original)); *see also id.* ("A passing reference to an issue . . . will not suffice to bring that issue before this court.") (quoting *Laborers' Int'l Union of N. Am. v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (omission in the original)). Accordingly, I will deny the motion insofar as it seeks relief under Rules 52, 54, and 60.

## B. Infringement

### 1. Deere Waived its Right to Seek JMOL of Infringement

Precision argues, and I agree, that Deere failed to make a Rule 50(a) JMOL of infringement motion and therefore has waived its right to seek JMOL of infringement under Rule 50(b). Deere does not dispute that it never made a Rule 50(a) motion for JMOL on the issue of direct infringement. D.I. 517 at 3–4. It argues instead that no formal Rule 50(a) motion was required because I said in denying *Precision's* JMOL motion that "[d]irect infringement is going to the jury." D.I. 517 at 3–4 (quoting Trial Tr. 1108:18–19) (alteration in Deere's brief). According to Deere, "it is not essential that there be a formal motion" under Rule 50(a) because the rule's purpose is to "apprise the trial court of the moving party's position to see if any defects can be corrected before the jury retires." D.I. 517 at 3 (quoting 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2533 (3d ed.)). And Deere insists that "[a]ll were fully apprised of Deere's position that [Precision] failed to rebut infringement." D.I. 517 at 3–4.

Rebutting infringement and proving infringement, however, are two different things. As discussed above, the standards that govern a JMOL motion brought by a party with the burden of proof differ from the standards that govern a JMOL motion brought by a party that does not bear that burden. Whether "formal" or "informal," a Rule 50(a) motion "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). And "[a] post-trial Rule 50 motion can only be made on grounds specifically advanced in a motion for a directed verdict at the end of plaintiff's case." *Kars 4 Kids Inc. v. Am. Can!*, 8 F. 4th 209, 220 (3d Cir. 2021) (citation omitted); *see also Lightning Lube, Inc.*, 4 F.3d at 1172 ("In order to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion."); *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1347 (Fed. Cir. 2010) ("Under Fed. R. Civ. P. 50(b), a party must have first moved for JMOL under Rule 50(a) at the close of all the evidence in order to preserve the right to renew that same JMOL motion after the jury returns its verdict."). Here, Deere never apprised Precision or me that it intended to move for JMOL of infringement as a matter of law until it filed the pending motion weeks after trial. Accordingly, I will deny Deere's motion insofar as it seeks judgment of infringement as a matter of law.

### 2. Deere Would Not Be Entitled to JMOL of Infringement

Even if Deere had not waived its right to seek a judgment of infringement as a matter of law, it would not be entitled to such a judgment. Although Precision did not have the burden of proof, it adduced at trial substantial evidence to show that the SpeedTube and vSet2 meter remove seeds from a seed meter not by capturing them but instead by accelerating and projecting them toward a flighted belt. A reasonable juror could have concluded based on that evidence that the SpeedTube and vSet2 meter do not infringe the asserted claims' seed delivery system limitations, and thus do not infringe the asserted claims. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991) ("[T]he failure to meet a single limitation is sufficient to negate infringement of the claim."). It cannot reasonably be maintained that "there [wa]s insufficient evidence for permitting any different finding" other than infringement. *Fireman's Fund*, 540 F.2d at 1177 (citation omitted).

On the contrary, there was substantial evidence to support a finding of noninfringement. That evidence included a slowed-down video of the SpeedTube and vSet2 in operation. *See* DTX-364. The video was shown to the jury during the direct testimony of Precision's expert, Dr. Mark Fleming. The video showed and Dr. Fleming explained to the jury how the removal of the seed from the vSet2 meter occurs. The removal begins when the paddles of one of the SpeedTube's

rotating feeder wheels make contact with the seed. Trial Tr. 995:13–16. Within a fraction of a second thereafter, the paddles of the second rotating wheel make contact with the seed. Trial Tr. 995:16–17, 996:3–7. The paddles of both wheels then accelerate the seed from about one mile per hour (i.e., the speed with which it is moving on the speed meter) to nine miles per hour, and project it towards a flighted belt which is moving at approximately nine miles per hour. Trial Tr. 999:19–1000:6. The entire acceleration and projection takes between .003 and .006 seconds—"about 100 times faster" than the blink of an eye. Trial Tr. 996:14–25.

Ian Radtke, one of Precision's engineers who worked on the SpeedTube, also explained the reason that the SpeedTube was designed to project and accelerate the seeds to prevent seed jamming and damage:

> Q. Why did you want to accelerate seeds into the belt?
>
> A. The -- so to -- to describe the situation, the seed meter, the vacuum seed meter disk is turning quite slowly relative to the speed of the belt. And so with that wide disparity in speed, because that seed's approaching very slowly, that first initial contact with the belt can be quite violent and erratic. And we learned that if you accelerate the speed prior to that first contact, that's a much more effective way to get the seeds into the belt.
>
> Q. And what did you mean when you say, "violent and erratic?"
>
> A. Well, I guess to use an analogy, if you were to think of cars merging onto the freeway, think about coming

> into the onramp from a dead stop in front of a semi-truck, well, we can picture the outcome of that situation. Wouldn't be very good.

Trial Tr. 856:22–57:12. *See also* Trial Tr. 1001:23–02:2 ("[Precision] wanted to accelerate the seed because the belt was moving so fast and the seed on the meter was moving relatively slow. So [it] wanted to accelerate it to match the speed of the belt.") (Fleming's testimony).

This evidence is more than sufficient to justify a finding of noninfringement. Accordingly, Deere is not entitled to judgment of infringement as a matter of law.

**3. A New Infringement Trial is Not Warranted**

Deere makes four arguments in support of its request for a new trial on infringement: (1) "the Court's addition and removal—during trial—of requirements from its pre-trial construction of the seed delivery system terms created ambiguity and confusion for the jury, to Deere's prejudice," D.I. 483 at 1; (2) "the construction submitted to the jury failed to resolve the parties' dispute about the fundamental meaning of 'capture,' prejudicing Deere," D.I. 483 at 1; (3) Precision "impermissibly argued two claim constructions at trial—one for infringement and one for invalidity," D.I. 483 at 21; and (4) the Court made various erroneous jury instruction and evidentiary rulings, D.I. 483 at 27–32. I address these arguments in turn.

**a. Construction of The Seed Delivery System Terms**

Deere devotes most of its briefing to its argument that a new trial is warranted because I gave during the trial what it calls "iterative, conflicting, confusing, and ambiguous constructions" of the seed delivery system terms. D.I. 483 at 17. In point of fact, I gave only one construction of the seed delivery system terms at trial. And that construction was *verbatim* the construction of the seed delivery system terms I made before trial—i.e., a system or method "that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position." *Compare* D.I. 191 at 3, *with* Trial Tr. 1278:5–7; D.I. 488-2 at A3126–27. At no point during trial did I ever give the jury or discuss in the jury's presence any other construction or potential construction of the seed delivery system terms.

Here is how Deere frames its argument:

> Pre-trial, the Court held that the "seed delivery system" terms (1) mean an "apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position" (the "capture" requirement), and (2) do not preclude "drop by gravity between the seed meter and discharge" (the "no disclaimer" requirement) (together, the "Pre-Trial Construction").
>
> Mid-trial, the Court removed the "no disclaimer" requirement and, at the end of the trial, redefined its construction to require "removing seed from the seed meter by capturing the seed…" using only the loading wheel. (together, the "Trial Construction").

D.I. 483 at 5–6 (citations omitted).

In unpacking the argument, the first thing to notice is Deere's defined term, the "no disclaimer requirement." Deere uses the phrase "'no disclaimer' requirement" 22 times in its briefing. *See* D.I. 483 at 5–6, 9, 12–14, 17, 20; D.I. 517 at 1–2, 6–9. It is the centerpiece of Deere's motion. The phrase is essentially the same sleight of hand that Deere's counsel executed in his opening statement when he told the jury that the asserted claims "allow expressly" some influence of gravity or free-fall on the seed. As noted above, patent claims do not expressly allow. Finding the absence of a disclaimer, similarly, does not create "a requirement." I rejected Precision's argument that the patents disclaimed methods and systems that allow for a drop by gravity of the seed between the seed meter and discharge. I did not create or impose any affirmative requirement. The consequence of my "no disclaimer" ruling is simply that a system or method can fall within the scope of the asserted claims regardless of whether that system or method allows for seeds to drop by gravity between the seed meter and discharge.

Deere's second defined term, the "Pre-Trial Construction," is similarly misleading. As just noted, I never construed the seed delivery system terms to include my rejection of Precision's gravity-drop disclaimer argument. Deere's inter partes review filings show that it understood as much. It told the PTAB that I "ha[d] made the following claim *construction*[]: . . .'Seed delivery system' means a

'system that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position.'" D.I. 213-1 at 15 (emphasis added). And it submitted to the PTAB a sworn declaration in which Dr. Glancey averred that, to his knowledge, I "ha[d] *construed* the term 'seed delivery system' to mean 'system . . . that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position,'" and separately "*determined* that there is '[n]o disclaimer of a seed delivery apparatus / system / method that allows for seeds to drop by gravity between the seed meter and discharge.'" D.I. 213-1 at 118 (emphasis added; some alterations in the original).

The order itself, *which Deere drafted* for my signature, also makes clear that I had construed the seed delivery system terms to mean—and only mean—"apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position." The order's use of bolded language and quotation marks shows that the "no disclaimer" language is not part of the construction. D.I. 191. The construction of the seed delivery system terms is bolded and surrounded by quotation marks: **"apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position."** D.I. 191 at 3. Bold font and quotation marks were used for every other term that I construed in the order. *See generally* D.I. 191. In

contrast, the "no disclaimer" language is neither bolded nor surrounded by quotation marks. *See* D.I. 191 at 3.

Deere argues that I "endorsed" a claim construction of the seed delivery system terms that includes the "'no disclaimer' requirement" when I said at a side bar during Dr. Glancey's direct examination that "it's a fair reading given the way the order is structured to say that the [qu]ote 'no disclaimer' is part of the construction of the term." D.I. 483 at 9–10 (quoting Trial Tr. 391:4–6). But I made that comment outside the jury's presence as I contemporaneously and—because the jury was once again waiting—hurriedly examined the *Markman* order, which I had not seen in more than two years. And I made clear at the time that I was uncomfortable with Deere's reading of the order, that I would entertain further argument on the issue, and that Deere was taking a risk if it continued to assert that my rejection of Precision's disclaimer argument was part of my construction of the seed delivery system terms:

> *I will say this, though, for the record. I think Deere has overreached. I signed that order. When I signed the order, I did it because, frankly, it was presented to me as a stipulated order. I would have said, had I drafted the order, sua sponte. I would have said my construction is the first paragraph. I would have said the rationale for my rejection of Deere's additional limitation was the "no disclaimer" language. And I think Deere is, frankly -- I think they are taking a risk pursuing this as if it is my construction.*

> And don't forget *[O]2 Micro*. I can construe the claim at any point during the proceedings. And I need to rethink that because *I don't think a Court's statement that there is no disclaimer constitutes claim construction.*
>
> *But the problem is it -- is the slide has been shown to the jury already. It is a fair reading of the stipulated order. So I think it would be unfairly prejudicial to Deere right now to say you can't continue with that slide.*
>
> *However, I think they've gone down a road, I think, they have overreached. I do not think a Court's statement on the record rejecting an argument that there's a disclaimer constitutes claim construction.*
>
> *All right. So you can play it however you want.*
>
> [DEERE'S COUNSEL]: Okay.
>
> [PRECISION'S COUNSEL]: Thank you.
>
> THE COURT: *There is going to be a risk. I will hear further argument on it.* I will have to reread *[O]2 Micro*. I think I am permitted to construe the claim at any point in the process.

Trial Tr. 392:11–93:18 (emphasis added).

At a later side bar (again outside the presence of the jury), after having had an opportunity to review the *Markman* order more carefully, I told counsel that "[t]he disclaimer [language in the order] is not in quotes, and I never intended it to be part of the construction" of the seed delivery system terms. Trial Tr. 1030:24–25. Deere insists that I "removed the 'no disclaimer' requirement" at this point. D.I. 483 at 6. But there was never a "'no disclaimer' requirement" to remove. In

any event, I expressly told Deere it was free to argue to the jury that my claim construction did not preclude a free-fall or gravity drop of the seed. Trial Tr. 1031:1–9. And, in fact, Deere made that exact argument to the jury in its closing.

Deere provides no record citations to support its assertion that "at the end of the trial, [I] redefined [my] construction to require 'removing seed from the seed meter by capturing the seed…' using only the loading wheel," D.I. 483 at 6 (ellipses in the original; alterations added); *see also* D.I. 483 at 17 (stating without supporting record citation that "The Trial Construction limited the "remov[al] . . . by captur[e]' operation to only a 'loading wheel'") (alterations and ellipses in the original). That failure is not surprising because the assertion is simply not true. I construed the seed delivery system terms to require removal of the seed from the meter by capture; but I never construed the terms to include a requirement that the removal "us[e] only [a] loading wheel."

In any event, had I added a loading wheel requirement, it would have made no difference. Precision admitted at trial that it is the SpeedTube's loading wheels that remove the seed from the vSet2 meter. *See* Trial Tr. 871:6–10 ("So the seeds approach on the disk and enter the throat region here, again, and then eventually make contact with the feeder wheels where they're projected and accelerated downward for a distance, eventually received by the belt.") (Radtke's testimony). The only infringement dispute at trial was whether the loading wheels capture the

seed when they remove it from the seed meter. *See* Trial Tr. 188:1–7; 1224:8–16. As Deere states in its opening brief:

> There is no factual dispute over how the vSet2 seed meter and Speed Tube "seed delivery system" operate. *SpeedTube includes two "loading wheels" that remove seeds from the vSet2* and insert them into a "flighted belt[.]"

D.I. 483 at 7 (emphasis added and citations omitted).

In sum, my construction of the seed delivery system terms remained consistent throughout trial. Before the jury was called in, I addressed Precision's objections to Deere's inclusion of the disclaimer language in its opening statement demonstratives. I allowed Deere to display a slide that included the disclaimer language, not as a manifestation of my construction, but as an argument that Deere was allowed to make. *See* Trial Tr. 31:2–4. And I emphasized that if an actual claim construction dispute arose during the trial, then I would reconstrue the term, as I could (and was required to) under *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008); *see also* Trial Tr. 32:13–16. I never ended up reconstruing the term because no actual claim construction dispute ever arose. I told Deere that it was "free to *argue*" that the claims did not preclude a free fall or gravity drop of the seed. I precluded Deere only from representing to the jury that the "no disclaimer" language was part of my construction of the seed delivery system terms. I did so because that language was not part of my

construction, and because I thought presenting a "no disclaimer" as part of a claim construction would confuse the jury. Trial Tr. 1031:1–2. Deere responded, "Judge, we're fine with that." Trial Tr. 1032:7.

Finally, even if my construction had not remained fixed, Deere has failed to explain how it suffered prejudice that warrants a new trial. Deere says it was "[p]reclud[ed] . . . from arguing the full claim scope and correct construction[.]" D.I. 517 at 7. But, as just explained, it was not. I expressly allowed (pun intended) Deere to argue that the claims did not disclaim or exclude from their scope a method or system that allows for the seed to drop by gravity between the seed meter and the discharge. *See* Trial Tr. 1031:2–4 ("You are free to argue, and I expect you all will, that where in that claim does it say you can't have any kind of free-fall."). When I told Deere that it could no longer characterize my construction as including a "no disclaimer," Deere asked "that there be no argument made about the fact [that Deere's] slides had it in the opening" but not later in the trial, Trial Tr. 1031:13–14. I agreed, and "to accomplish fairness," precluded Precision from making argument about the disputed slide Deere had used in its opening, and I told Deere it could still argue in its closing that there was no gravity-drop disclaimer in the asserted claims. *See* Trial Tr. 1031:19–32:423. Deere responded, "No problem. . . . Judge, we're fine with that." Trial Tr. 1031:24–32:7. And sure enough, Deere's counsel stated in his closing argument that "the Court has made

clear that the claim permits -- does not exclude gravity drop. And you will not hear the defendants' counsel say that it does not include gravity drop." Trial Tr. 1204:12–15.

**b. There Was No "Capture" Claim Construction Dispute**

Deere next argues that a new trial is warranted because I improperly failed to resolve a fundamental claim construction dispute about the meaning of "capture." D.I. 483 at 8. Specifically, Deere suggests that dueling dictionary definitions of "capture" *that Deere introduced to the jury over Precision's objection* show that an unresolved claim construction dispute improperly went to the jury. D.I. 483 at 8–9.

Under *O2 Micro*, the trial court must resolve any "fundamental dispute regarding the scope of a claim term." 521 F.3d at 1363; *see also Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1373 (Fed. Cir. 2012) (stating that courts "do not ordinarily construe words that are not in claims," but "in those cases in which the correct construction of a claim term necessitates a derivative construction of a non-claim term, a court may perform the derivative construction in order to elucidate the claim's meaning"). But "litigants waive their right to present new claim construction disputes if they are raised for the first time after trial." *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1358–59 (Fed. Cir. 2006); *see also Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314,

1320 (Fed. Cir. 2003) ("[P]arties cannot reserve issues of claim construction for the stage of post-trial motions.").

Deere's actions—at all stages of these proceedings—demonstrate that it did not raise an *O2 Micro* issue regarding the scope of the seed delivery system terms or of "capture." Deere did not propose during the *Markman* hearing that "capture" be construed. It did not ask for any further claim construction of the seed delivery system terms, capture, or any other term after the *Markman* hearing. It *opposed* Precision's motion for additional claim construction and stated in its opposition that "[n]o further construction of '[seed] delivery system' is required." D.I. 213 at 10. It did not ask at trial for further construction of the seed delivery system terms or of "capture" to be included in the jury instructions. And when I discussed the meaning of "capture" with the attorneys during a sidebar, Deere still did not ask for a further construction. *See* Trial Tr. 538:15–23.

Deere's failure to properly preserve its claim construction argument distinguishes this case from *O2 Micro*, where "the parties disagreed *during claim construction* about" the scope of a term. *See Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1325 (Fed. Cir. 2013) (emphasis added); *see also, e.g.*, *GPNE Corp. v. Apple, Inc.*, 108 F. Supp. 3d 839, 851 (N.D. Cal. 2015) ("At the outset, . . . the Court notes that GPNE never requested that the Court provide a more detailed construction of [the derivative claim construction terms] until well into the

trial. . . . This delay significantly diminishes the persuasive value of GPNE's *O2 Micro* argument."). Deere "cannot now . . . [point] to ambiguous statements in the record" to raise a new claim construction argument, *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010), especially since the statements it points to were adduced by Deere itself.

Deere asserts, for example, that Dr. Glancey's and Dr. Fleming's different "capture" interpretations show that a fundamental claim construction dispute went to the jury. And it highlights different dictionary definitions that the two experts considered in reaching their conclusions. D.I. 483 at 8–9. But *it was Deere* who sought to admit into evidence dictionary definitions of "capture" in the first place. Deere moved during Dr. Glancey's direct examination to admit a definition of "capture" from the *Oxford English Dictionary*. Trial Tr. 395:2–5. Precision objected. Trial Tr. 395:23–96:7. Deere responded, "[w]e're just talking about what is the plain and ordinary meaning of 'capture.'" Trial Tr. 396:14–15. Deere then asked Dr. Glancey questions based on this definition. *See* Trial Tr. 399:6–19. And when Deere cross-examined Fleming, it asked Fleming about one of the dictionaries cited in Fleming's expert report. Trial Tr. 1073:7–75:12. Precision had not sought to admit the dictionary and had never discussed the dictionary during Fleming's direct examination.

In sum, to the extent that there is some conceivable claim construction dispute, it is of Deere's own making. Deere, however, cannot manufacture a claim construction argument by asking questions about dictionary definitions, enter them into evidence, lose, and then argue that admitting those very definitions was erroneous.

Even if Deere's *O2 Micro* argument had been properly preserved, it still fails on the merits. As Dr. Glancey's and Dr. Fleming's competing testimony made clear, the parties simply disputed how the construed claims should be applied to the accused devices. To the extent that the experts discussed the meaning of "capture," they were—by Deere's own admission—"just talking about what is the plain and ordinary meaning of 'capture.'" Trial Tr. 396:14–15. That is precisely the type of factual inquiry that is properly left to the jury. *See Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1360 (Fed. Cir. 2017) (holding that it was proper for the jury to evaluate competing expert testimony about if the accused products met the ordinary meaning of the relevant claim limitation).

The Federal Circuit in *PPG Industries v. Guardian Industries Corp.* rejected the very argument that Deere now advances. 156 F.3d 1351 (Fed. Cir. 1998). The patent owner in *PPG Industries* alleged infringement of a patent for a certain type of glass. *Id.* at 1354. The patent included the claim term "consisting essentially of" certain ingredients and characteristics. The district court construed this term as

encompassing glass with other unlisted ingredients "so long as those other unlisted ingredients do not have a material effect on the basic and novel characteristics of the glass." *Id.* After trial, the patentee argued that the meaning of "material effect" was a claim construction issue that should not have gone before the jury. *Id.* The Federal Circuit rejected this argument, holding that while claim construction requires the court to determine the scope of the claim, "after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact." *Id.* at 1354–55; *see also GPNE*, 108 F. Supp. 3d at 852–54 (holding, under *PPG*, that defining "pager," a word that was part of the construction of the claim term "node," was properly left to the jury).

Here, like in *PPG*, the experts disagree about whether Precision's accused products infringe Deere's asserted patents, not whether there is a fundamental dispute about the scope of a claim term. Because no issue of claim scope was submitted to the jury, there is no *O2 Micro* problem. *See Function Media*, 708 F.3d at 1327 ("FM has not persuaded us that any issues of claim scope were submitted to the jury, and we therefore conclude that no *O2 Micro* problems are present in this case.").

### c. Precision Did Not Improperly Argue Two Different Claim Constructions

Precision's expert, Dr. Fleming, testified at trial that the accused products did not infringe the asserted claims under the Court's construction of the seed delivery system terms but that if Deere were permitted to stretch the application of its patent claims to cover the SpeedTube and vSet2 meter, then the asserted claims would be invalid under the prior art. Trial Tr. 971:15–24. Deere did not object to this testimony. Nor did Deere object to the invalidity instruction I gave to the jury. That instruction reads in relevant part:

> [Precision] contends that the Asserted Claims are invalid as obvious under Deere's infringement allegations—in other words, if Deere is correct that the Asserted Claims cover Precision's products, [Precision] contends that the claims also cover the prior art and are invalid.

D.I. 488-2 at A3133–34.

Consistent with that instruction, Precision's counsel stated in his closing argument:

> Now, as we just saw, the evidence showing noninfringement is clear and extensive, but there is another reason to know that Precision doesn't infringe. And that's because if you apply the claims the way Deere is trying to apply the claims, to stretch the claims, to stretch the Court's claim construction to cover Precision's products, then the claims would cover what existed many decades ago.
>
> * * * *

> . . . [F]or its infringement claims against SpeedTube, Deere wants you to believe that the removal by capture method is met when a wheel projects a seed down to a flighted belt. They want you to believe that it's met when a wheel simply knocks the seed off the seed meter by making any contact with the seed regardless of how brief that contact is.
>
> So just like [a] pitching machine. Barely any contact, the ball is projected and accelerated, and they say that constitutes removal by capture.
>
> Now, if they were right about that -- and to be really clear, we don't think that they're right about it -- then their claims would cover what was known in the art long ago.

Trial Tr. 1233:11–34:12. Deere did not object to this argument. Moreover, it was *Deere* who requested that the jury verdict form instruct the jury to make findings on invalidity for each asserted claim "only if" the jury found that Precision had infringed that claim. D.I. 532-4 at 7, 9.

Deere now argues that it is entitled to a new trial because Precision "impermissibly argued at trial two claim constructions—one for infringement and one for invalidity." D.I. 483 at 21. But it has waived that argument by virtue of its failure to object to Dr. Fleming's testimony, the invalidity jury instruction, Precision's closing argument, and the jury verdict form. *See* Fed. R. Evid. 103(a) ("A party may claim error in a ruling to admit or exclude evidence only if that error affects substantial right and: (1) if the ruling admits evidence, a party, on the record: (A) timely objects or moves to strike; and (B) states the specific ground,

unless it was apparent from the context."); Fed. R. Civ. P. 51(c)(1) ("A party who objects to [a jury] instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection."); *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 400 (3d Cir. 2016) ("Where, however, a party failed to object to the admission of evidence before the District Court, we deem that objection waived on appeal."); *Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d 336, 339 (3d Cir. 2005) ("Many cases hold that a proper request for a jury instruction is not alone enough to preserve the right to appeal failure to give the instruction.") (quoting Fed. R. Civ. P. 51 advisory committee notes to 2003 amendment); *Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 200 (3d Cir. 1995) (en banc) ("Finally, where a defendant fails to object to the form and language of special verdict forms or to the jury charges, before closing arguments or at the close of charging before the jury retires to deliberations, and the form had been submitted to counsel, objections are waived."); *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) ("As the district court correctly noted, it is clear that a party who fails to object to errors at trial waives the right to complain about them following trial.") (citing *Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3d Cir.1979) ("Counsel's failure to object precludes him from seeking a new trial on the grounds of the impropriety of opposing counsel's closing remarks.")).

In any event, Precision's conditional validity argument was not erroneous. As the Federal Circuit held in *01 Comunique Laboratory, Inc. v. Citrix Systems, Inc.*, 889 F.3d 735, 742 (2018), nothing in its case law "preclude[s] a litigant from arguing that if a claim term must be broadly interpreted to read on an accused device, then this same broad construction will read on the prior art." That is exactly what Precision argued here.

**d. Alleged Jury Instruction and Evidentiary Errors**

Deere next argues that a new trial is warranted because I erroneously allowed Precision to introduce evidence of its own patents to prove noninfringement and I failed to instruct the jury that the existence of a defendant's patent is not a defense to infringement. D.I. 483 at 27–28. Precision, however, did not rely on its own patents to dispute infringement, but rather to support Precision's invalidity contentions and to rebut Deere's copying allegations. *See, e.g.*, Trial Tr. 856:6–12 ("Q: Why did you decide to use a flighted belt for SpeedTube? A: Well, for one, we already had a patent on it. And additionally, with the flighted belt, given that it only requires a single belt, say, compared to the pinch belt solution, we believed that would be more compact, more efficient, possibly less power consumption.").

Deere also argues I erred in allowing Precision to adduce evidence that it is an "innovative" company. But the admission of that evidence was appropriate to

respond to Deere's assertions in front of the jury that it had a long history of innovation and to rebut Deere's allegations that Precision had willfully infringed the asserted patents. In a similar vein, Deere argues that I erred by not instructing the jury on the irrelevance of comparisons between Precision's accused products and commercial embodiments of Deere's patents. But Precision did not rely on such comparisons to prove noninfringement.

Deere also contends that I erroneously precluded it from cross-examining Mr. Ian Radtke—who worked on the SpeedTube—about U.S. Patent No. 8,985,037 (the #037 patent), a patent that Precision owned. Precision had asked Radtke about patents that Precision owned that related to the SpeedTube. *See, e.g.*, Trial Tr. 853:20–54:6. When Precision asked these questions, Deere did not object. Instead, when cross-examining Radtke, Deere sought to admit evidence relating to the #037 patent. *See* Trial Tr. 897:7–8, 19–20. Before the testimony was offered or mentioned to the jury, Precision objected. Precision argued during a sidebar that #037 patent's design was distinct from the SpeedTube's design, so comparing the designs would be improper. Precision never grounded its objection under a Federal Rule of Evidence. *See* Trial Tr. 897:19–98:2.

Deere offered two responses to Precision's objection. First, Deere attempted to show me a figure in the #037 patent that it argued "looks a lot like SpeedTube." Trial Tr. 901:11–13. I responded:

> Just so the record is clear, [Deere] is showing a figure from the patent at issue. I will not base a ruling in [Deere's] favor on that figure, [because] then we are off to a mini trial about the contents of the patent and whether this figure, in fact, is the commercial embodiment or the accused products.

Trial Tr. 901:16–21. Second, Deere argued that the comparison was proper because Precision "gave [Deere] an interrogatory response that says this patent covers the design for the feeder wheels" in the SpeedTube. Trial Tr. 898:20–22. I also rejected this argument:

> I'm not going to allow you to pursue this line of questioning. The sentence in question cited by Deere says, quote, "Precision Planting obtained patents showing the novel idea for the feeder wheels," unquote.
>
> That's not the same thing as the feeder wheels that are actually used in the accused products, and I'm not going to allow under [Federal] Rule [of Evidence] 403, us to get into a mini trial [about whether] [t]his patent not asserted in this case covers the accused products and uses language that it would be fair to conclude addresses the exact same issues in and language used in the asserted patents.

Trial Tr. 902:2–13.

Now, Deere argues that had it been allowed to question Radtke about a sworn statement that he made to the Patent and Trademark Office that related to the #037 patent, Deere could have powerfully impeached Radtke's direct examination testimony that the SpeedTube's feeder wheels do not remove the seeds from the meter by capturing them. D.I. 483 at 32. But the citations in

Deere's brief show that Precision referred to its prior patents only minimally. And as noted above, the references were properly offered to explain Precision's development process and rebut Deere's copying allegations. *See, e.g.*, Trial Tr. 45:23–46:2 (Precision explaining that it was offering prior patent evidence "to show evidence of our development process, and particularly where they're accusing us of having copied their technology"); *see also* Trial Tr. 856:6–14. Accordingly, I properly sustained Precision's objections to Deere's questioning of Mr. Radtke under Rule 403. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

Even if Deere's evidentiary objections had merit, Deere has not shown that it suffered undue prejudice that would justify upsetting the jury's verdict by granting a new trial. *See Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 85 F. Supp. 3d 768, 775–76 (D. Del. 2015) ("[W]here the ground for a new trial is that the jury's verdict was against the great weight of the evidence, the Court should proceed cautiously, because such a ruling would necessarily substitute the Court's judgment for that of the jury."). Moreover, the jury instructions protected Deere from any potential prejudice. *See, e.g.*, D.I. 488-2 at A3129 (instructing the jury that "[t]o prove that Precision directly infringed any Asserted Claim by literal

infringement, Deere must prove by a preponderance of the evidence, i.e., that it is more likely than not, that (1) each and every element of the Asserted Claim is literally present in the Precision products at issue, and (2) Precision Planting or AGCO made, used, sold, or offered to sell the accused SpeedTube and vSet2 products at issue in the United States. A claim element is literally present if it exists in the products at issue or was performed by the accused method as it is described in the claim language. If an accused product does not possess any one element recited in a claim, then you must find that that particular product does not literally infringe that claim.").

In short, Deere has not demonstrated an erroneous evidentiary ruling or jury instruction that resulted in a miscarriage of justice or shocked the conscience such that a new trial on infringement is warranted.

### C. Invalidity

Deere argues that I should grant JMOL or a new trial with respect to invalidity or alternatively dismiss Precision's invalidity counterclaims with prejudice. D.I. 483 at 21–26. With respect to its JMOL request, because a reasonable juror would follow the verdict form instructions that Deere proposed and I adopted, a reasonable juror would not address the validity of the asserted claims unless it first found that the SpeedTube and vSet2 meter infringed those claims. Accordingly, since Deere did not prevail at trial on its infringement

claims, Deere can only be entitled to a JMOL of no invalidity if it is entitled to a JMOL of infringement. I have already determined, however, that Deere is not entitled to a JMOL of infringement. Therefore, Deere cannot prevail on its request for a judgment of no invalidity as a matter of law.

Deere argues that it is entitled to a new trial on invalidity because I allowed Precision to assert a conditional validity defense and argue two different claim constructions to the jury. I have already rejected these arguments, and therefore I will deny Deere's request for a new trial on invalidity.

Finally, Deere argues that absent my granting a JMOL of no invalidity, I should dismiss with prejudice Precision's invalidity counterclaims. D.I. 483 at 26; D.I. 517 at 11. Deere cites no case law in support of its request. For its part, Precision does "not oppose dismissing its invalidity counterclaims for the asserted claims, provided that any dismissal is conditional on the noninfringement judgment remaining undisturbed." D.I. 513 at 22. I therefore will dismiss Precision's counterclaims without prejudice. *See SSI Techs., LLC v. Dongguan Zhengyang Elect. Mechanical Ltd.*, 59 F.4th 1328, 1338 (Fed. Cir. 2023) ("[W]e have repeatedly held that a district court faced with an invalidity counterclaim challenging a patent that it concludes was not infringed may either hear the claim or dismiss it without prejudice.") (internal quotation marks and citations omitted) (citing *Flexuspine, Inc. v. Globus Med., Inc.*, 879 F.3d 1369, 1376 (Fed. Cir. 2018)

(concluding "that the district court was within its discretion to dismiss [the defendant's] invalidity counterclaims without prejudice" after the jury delivered a verdict of noninfringement); *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1371 (Fed. Cir. 2004) ("A district court judge faced with an invalidity counterclaim challenging a patent that it concludes was not infringed may either hear the claim or dismiss it without prejudice, subject to review only for abuse of discretion.")).

**D. Deere's Remaining Arguments are Moot**

Deere raises a host of objections relating to contributory infringement, willfulness, and damages. *See* D.I. 483 at 33–37. Because I will deny Deere's motion for JMOL of direct infringement and its request for a new trial on direct infringement, I need not address these arguments. "[T]here can be no inducement or contributory infringement without an underlying act of direct infringement." *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012) (citation omitted). And with no verdict of infringement, Deere is entitled to no damages. *See* 35 U.S.C. § 284 ("Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement[.]").

## IV. CONCLUSION

For the reasons discussed above, I find that Deere has forfeited its right to seek relief under Rules 52, 54, and 60 and its right to seek a Rule 50(b) JMOL of infringement. Deere also waived many of the claim construction arguments that it now says justify a new trial. But even if Deere had not waived these arguments, I would deny on the merits Deere's request for JMOL of infringement and its alternative request for a new trial on infringement. My claim construction of the seed delivery system terms never changed. And no fundamental claim construction dispute ever went to the jury. Precision also did not improperly present different claim constructions for infringement and invalidity. And no jury instruction or evidentiary errors justify granting a new trial. Therefore, any remaining disputes about willful or contributory infringement and damages are moot.

Because Deere is not entitled to JMOL of infringement, it is not entitled to JMOL of no invalidity. Nor has Deere demonstrated a miscarriage of justice or other circumstance that would warrant a new trial on invalidity.

Deere has failed to provide legal support to justify its request for dismissal of Precision's invalidity counterclaims with prejudice. I will, however, dismiss those counterclaims without prejudice to refile if the judgment of noninfringement in this case is reversed, vacated, or otherwise modified on appeal.

I will therefore deny Deere's motion in its entirety.

The Court will issue an Order consistent with this Opinion.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEERE & COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>AGCO CORPORATION and PRECISION PLANTING LLC,<br><br>Defendants. | Civil Action No. 18-827-CFC CONSOLIDATED |

**ORDER**

At Wilmington on this Twenty-eighth day of March in 2023:

For the reasons set forth in the Opinion issued this day, **IT IS HEREBY ORDERED** that Plaintiff's Motion Under Rules 50, 52, 54, 59, And 60 For Judgment As A Matter Of Law, For A New Trial, And/Or To Reconsider, Correct, Or Amend Judgment (D.I. 482) is **DENIED**.

It is **FURTHER ORDERED** that Precision's invalidity counterclaims are **DISMISSED WITHOUT PREJUDICE** to refile if the judgment of noninfringement in this case is reversed, vacated, or otherwise modified on appeal.

Colm F. Connolly
CHIEF JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

REDACTED

| | |
|---|---|
| DEERE & COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>AGCO CORPORATION,<br>PRECISION PLANTING, LLC,<br><br>Defendant. | Civil Action No. 18-827-CFC |

## VERDICT FORM

**Instructions:** When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Please refer to the Jury Instructions for guidance on the law applicable to the subject matter covered by each question.

# I. FINDINGS ON INFRINGEMENT

## A. U.S. Patent No. 8,813,663 ('663 Patent)

**Question 1:**

Did Deere prove, by a preponderance of the evidence, that AGCO-Precision's Accused Products (Precision's SpeedTube and vSet2 products, or new AGCO planters that contain the SpeedTube and vSet2), infringe claim 1 of the '663 Patent?

("YES" is a finding in favor of Deere, and "NO" is a finding in favor of AGCO-Precision. *See* Jury Instructions Sections 4.1–4.3.)

| Is '663 Patent Claim 1 Infringed? (Answer "YES" or "NO") |
|---|
| YES ______ NO __X__ |

Continue to the next question.

## B. U.S. Patent No. 9,699,955 ('955 Patent)

**Question 2:**

Did Deere prove, by a preponderance of the evidence, that AGCO-Precision's Accused Products (Precision's SpeedTube and vSet2 products, or new AGCO planters that contain the SpeedTube and vSet2), infringe claim 20 of the '955 Patent?

("YES" is a finding in favor of Deere, and "NO" is a finding in favor of AGCO-Precision. *See* Jury Instructions Sections 4.1–4.3.)

| Is '955 Patent Claim 20 Infringed? (Answer "YES" or "NO") |
|---|
| YES ______ NO __X__ |

Continue to the next question.

## II. FINDINGS ON VALIDITY

### A. U.S. Patent No. 8,813,663 ('663 Patent)

Answer this question (Question 3) only if you answered "YES" to Question 1. **Otherwise do not answer the question.**

**Question 3:**

Did AGCO-Precision prove, by clear and convincing evidence, that claim 1 of the '663 Patent is invalid?

(If you find the claim invalid, answer "YES," otherwise answer "NO". "YES" is a finding in favor of AGCO-Precision, and "NO" is a finding in favor of Deere. *See* Jury Instructions Section 5.1–5.4.)

| Is '663 Patent Claim 1 Invalid? (Answer "YES" or "NO") |
|---|
| YES ______ NO ______ |

Continue to next question.

**B. U.S. Patent No. 9,699,955 ('955 Patent)**

Answer this question (Question 4) only as those claims that you answered "YES" to in Question 2.
**Otherwise do not answer the question.**

**Question 4:**

Did AGCO-Precision prove, by clear and convincing evidence, that claim 20 of the '955 Patent is invalid?

(If you find the claim invalid for a particular ground, answer "YES," otherwise, answer "NO". "YES" is a finding in favor of AGCO-Precision, and 'NO" is a finding in favor of Deere. *See* Jury Instructions Section 5.)

| **Is '955 Patent Claim 20 Invalid? (Answer "YES" or "NO")** |
|---|
| YES ______ NO ______ |

Continue to next question.

## III. DAMAGES

If you found one or more claims of the Asserted Patents to be both infringed and not invalid, please answer Question 5.

**Question 5 (Damages):**

What amount of damages, if any, do you award to compensate Deere for AGCO-Precision's infringement?

(*See* Jury Instructions Section 6.)

| | |
|---|---|
| **Total Damages** | $______________ |

You have now reached the end of the verdict form, and you should review it to ensure that it accurately reflects your unanimous determinations. All jurors should then sign the verdict form in the space below and notify the Court Security Officer that you have reached a verdict. The Foreperson should retain possession of the verdict form and bring it to the courtroom with the jury.

Dated: 7-8-22

Signed:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DEERE & COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 18-827 (CFC) |
| v. | ) | (Consolidated) |
| | ) | |
| AGCO CORPORATION, | ) | |
| PRECISION PLANTING LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**FINAL JURY INSTRUCTIONS**

# TABLE OF CONTENTS

Page

1. GENERAL INSTRUCTIONS ..... 1
   1.1 INTRODUCTION ..... 1
   1.2 JUROR'S DUTIES ..... 1
   1.3 BURDENS OF PROOF ..... 2
   1.4 EVIDENCE DEFINED ..... 4
   1.5 DIRECT AND CIRCUMSTANTIAL EVIDENCE ..... 5
   1.6 CONSIDERATION OF EVIDENCE ..... 5
   1.7 STATEMENTS OF COUNSEL ..... 6
   1.8 CREDIBILITY OF WITNESSES ..... 6
   1.9 NUMBER OF WITNESSES ..... 7
   1.10 EXPERT WITNESSES ..... 8
   1.11 DEPOSITION TESTIMONY ..... 8
   1.12 EXHIBITS ..... 9
2. ISSUES PRESENTED ..... 9
3. PATENT CLAIMS ..... 10
   3.1 THE ROLE OF THE CLAIMS IN A PATENT ..... 10
   3.2 INDEPENDENT AND DEPENDENT CLAIMS ..... 11
   3.3 CONSTRUCTION OF CLAIM TERMS ..... 12
4. INFRINGEMENT ..... 13
   4.1 INFRINGEMENT GENERALLY ..... 13
   4.2 DIRECT INFRINGEMENT ..... 14
5. INVALIDITY ..... 16
   5.1 PERSON OF ORDINARY SKILL IN THE ART ..... 17
   5.2 PRIOR ART ..... 18
   5.3 PRIOR ART CONSIDERED OR NOT CONSIDERED BY THE PTO ..... 19
   5.4 OBVIOUSNESS ..... 19

6. DAMAGES ....................25
 6.1 DAMAGES – GENERALLY ....................25
 6.2 LOST PROFITS ....................26
 6.3 REASONABLE ROYALTY ....................26
7. DELIBERATIONS AND VERDICT ....................28
 7.1 INTRODUCTION ....................28
 7.2 UNANIMOUS VERDICT ....................29
 7.3 DUTY TO DELIBERATE ....................30
 7.4 SOCIAL MEDIA ....................31
 7.5 COURT HAS NO OPINION ....................32

# 1. GENERAL INSTRUCTIONS

## 1.1 INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

I gave you some instructions at the beginning of the case. I will not repeat them now, but they still apply.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence. Then I will explain the positions of the parties and the law you will apply in this case. And last I will explain the rules that you must follow during your deliberations in the jury room and the possible verdicts that you may return.

Please listen very carefully to everything I say.

You will have a written copy of the preliminary instructions and these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

## 1.2 JUROR'S DUTIES

You have two main duties as jurors. The first is to decide what the facts are from the evidence that you saw and heard in court. Deciding what the facts are is

your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide, under the appropriate burden of proof, which party should prevail on each of the claims and defenses presented. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

**1.3 BURDENS OF PROOF**

For each issue in this case, either Plaintiff Deere or Defendants Precision Planting and AGCO, who I refer to together as "AGCO-Precision," bear the burden of proof. The side who bears the burden of proof on an issue bears the burden of persuading you to find in their favor. As I said in the preliminary instructions, in a patent case there are two different burdens of proof. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence."

Deere has the burden of proving by a preponderance of the evidence that AGCO-Precision infringed the Asserted Claims of the Asserted Patents and the amount of damages that Deere should receive to compensate it for any infringement. That means Deere has to produce evidence which, when considered in light of all of the facts, leads you to believe that what Deere claims is more likely true than not. To put it differently, if you were to put the parties' evidence on opposite sides of a scale, the evidence supporting Deere's claims would make the scales tip slightly on Deere's side. If Deere fails to meet this burden, there is no infringement and no damages.

The other burden of proof is "clear and convincing evidence." AGCO-Precision has the burden of proving by clear and convincing evidence that the Asserted Claims of the Asserted Patents are invalid. Clear and convincing evidence means that it is highly probable that a fact is true. Proof by clear and convincing evidence is a higher burden than proof by a preponderance of the evidence.

Some of you may have heard the phrase "beyond a reasonable doubt." That burden of proof applies only in criminal cases, and has nothing to do with a civil case like this one. You should therefore not consider it in this case.

## 1.4 EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath (including deposition testimony that has been presented to you), the exhibits that I allowed into evidence, and any facts that I have instructed you to find. Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. And my comments and questions are not evidence.

During the trial, I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And, sometimes I may have ordered you to disregard things that you saw or heard, or I struck things from the record. You must completely ignore all of these things, which are not evidence.

Do not speculate about what a witness might have said or what an exhibit might have shown. Speculation is not evidence, and you are bound by your oath not to let speculation influence your decision in any way. Do not consider my rulings on whether you can hear certain testimony or see certain exhibits as any indication of my opinion of the case or of what your verdict should be.

You must not conduct any independent research, investigation, or experiments about the case or its subject matter on your own. Make your decision based only on the evidence, as I have defined it here, and nothing else.

**1.5 DIRECT AND CIRCUMSTANTIAL EVIDENCE**

There are two kinds of evidence: “direct evidence” and “circumstantial evidence.” Direct evidence is simply evidence like the testimony of an eyewitness that, if you believe the testimony, directly proves a fact. For example, if a witness testified that she saw it raining outside, and you believed her, that would be direct evidence that it was raining.

Circumstantial evidence is a chain of facts from which you may infer or conclude that other facts exist. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

As a general rule, the law makes no distinction between the weight that you should give to direct or circumstantial evidence, but simply requires that you find facts from all the evidence in the case. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

**1.6 CONSIDERATION OF EVIDENCE**

You should use your common sense in weighing the evidence. Consider the evidence in light of your everyday experience with people and events and give it

whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

### 1.7 STATEMENTS OF COUNSEL

The attorneys' statements and arguments are not evidence. Instead, their statements and arguments are intended to help you review the evidence presented. If you remember the evidence differently from the attorneys, you should rely on your own recollection.

### 1.8 CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility. You should consider: each witness's means of knowledge, strength of memory, and opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all. But if you cannot do this, then it is your duty and privilege to believe the portions of testimony that, in your judgment, are most believable and disregard any testimony that, in your judgment, is not believable.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave at the trial. You have the right to distrust such a witness's testimony in other particulars, and you may reject some or all of the testimony of that witness or give it such weight and credit as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

This instruction applies to all witnesses, including expert witnesses and witnesses who provided testimony by deposition.

### 1.9 NUMBER OF WITNESSES

Sometimes jurors wonder if the number of witnesses who testified makes any difference. Do not make any decisions based on the number of witnesses who testified. What is more important is how believable the witnesses were, and how

much weight you think their testimony deserves. Concentrate on that, not the numbers.

**1.10 EXPERT WITNESSES**

During the trial, you heard testimony from expert witnesses. Expert testimony is testimony from a person who has a special skill or technical knowledge in some science, profession, or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience. However, you are not required to accept any expert's opinion. As with any other witness, it is up to you to judge the credibility of the expert witness and decide whether to rely upon his or her testimony.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony by any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case. You are free to accept or reject some or all of the testimony of experts, just as with any other witness.

**1.11 DEPOSITION TESTIMONY**

During the trial, certain testimony was presented to you through excerpts of a deposition. A deposition is the sworn testimony of a witness taken before trial.

You should not attribute any significance to the fact that the testimony is not live at trial. The deposition testimony may have been edited or cut to exclude irrelevant testimony. You should not attribute any significance to the fact that the deposition excerpts may appear to have been edited. Deposition testimony is entitled to the same consideration you would give if the witness had appeared personally in court.

### 1.12 EXHIBITS

During the course of the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room for your deliberations. Other items (including charts and animations presented by attorneys and witnesses) were offered to help illustrate the testimony of the various witnesses. These illustrations, called "demonstratives," have not been admitted as evidence, are not evidence, and should not be considered as evidence, so you will not have these in the jury room for your deliberations. Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

## 2. ISSUES PRESENTED

I will now summarize the issues that you must decide and for which I will provide instructions to guide your deliberations.

There are two U.S. Patents at issue in this case, which I will refer to as the "Asserted Patents": U.S. Patent No. 8,813,663 (the "'663 patent"); and U.S. Patent No. 9,699,955 (the "'955 patent"). You must decide the following main issues:

- Whether Deere has proven by a preponderance of the evidence that either Precision Planting or AGCO infringed one or more of the Asserted Claims, which are:
    - Claim 1 of the '663 Patent; and
    - Claim 20 of the '955 Patent;
- Whether AGCO-Precision has proven by clear and convincing evidence that one or more of the Asserted Claims are invalid; and
- If any Asserted Claim has been infringed and is not invalid, what amount of damages, if any, Deere has proven by a preponderance of the evidence.

## 3. PATENT CLAIMS

### 3.1 THE ROLE OF THE CLAIMS IN A PATENT

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims." The patent claims are the numbered sentences at the end of each patent.

The claims are important because it is the words of the claims that define what a patent covers. Only the claims of a patent can be infringed. Neither the text

preceding the claims, nor the figures in a patent can be infringed. Only the claims define the extent of the patent's coverage; therefore, what a patent covers depends, in turn, on what its claims cover. Each of the claims must be considered individually.

Both infringement and invalidity must be assessed on a claim-by-claim basis. There may be infringement as to one claim but no infringement as to another. Similarly, one claim may be invalid but another claim may not be.

### 3.2 INDEPENDENT AND DEPENDENT CLAIMS

Claims can be stated in two different ways in a patent. The first way a patent claim can be stated is in the form of an "independent" claim. An "independent" claim does not refer to any other claim of the patent and sets forth all of the requirements that must be met in order for a product or method to be covered by that claim, and thus infringe that claim. An independent claim is read alone to determine its scope.

The second way a claim can be stated is in the form of a "dependent" claim. A dependent claim refers to and incorporates the requirements of another claim and adds its own additional requirements. In this way, the claim "depends" on another claim. To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claim from which it depends. Claim 20

of the '955 Patent is also a dependent claim because it incorporates the requirements of claims 16 and 19.

A product or method can infringe a dependent claim only if the product meets all of the requirements of both the dependent claim and any other claims from which the dependent claim depends.

Likewise, each claim must be separately assessed for validity. For an independent claim, all its requirements must be considered in deciding its validity. For a dependent claim, all its requirements plus the requirements of any claim from which it depends must be considered for that dependent claim's validity.

### 3.3 CONSTRUCTION OF CLAIM TERMS

It is my job as the judge to provide to you the meaning of any claim language that must be interpreted. It is not the job of any witness to provide you with the meaning of the claim language. I have already defined the meaning of some of the words of the Asserted Claims in this case. These definitions, which I will now read to you, are also in your glossary of terms.

| CLAIM TERM | DEFINITION |
|---|---|
| "endless member" | "a continuous conveyor forming a loop, such as a belt or a chain" |
| "seed delivery system" | "system that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position" |

| | |
|---|---|
| "method of delivering a seed" | "method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position" |

You must accept the definitions I give you and use them when you decide whether any claim has been infringed and whether any claim is valid. You must use the same claim meaning for both your decision on infringement and your decision on validity.

Although I have only construed some of the claim terms, it is important to understand that a patent claim is infringed only if the product or method accused of infringement includes each and every element in that patent claim. For any other claim term that I have not provided a definition, you should use its ordinary meaning within the context of the patent in which the claim term is used.

## 4. INFRINGEMENT

### 4.1 INFRINGEMENT GENERALLY

I will now instruct you as to the rules you must follow when deciding whether Deere has proven that AGCO-Precision infringed any of the Asserted Claims of the Asserted Patents.

Patent law gives the owner of a valid patent claim the right to exclude others from making, using, offering to sell, or selling the patented invention within the United States during the term of the patent. Any person or business entity that has

engaged in any of those acts without the patent owner's permission infringes the patent.

In patent law, the requirements of a patent claim are often referred to as "claim elements" or "claim limitations." When a product meets each and every requirement of a claim, the claim is said to "cover" that product, and that product is said to "fall within the scope" of that claim. A device or method infringes a patent claim only if it contains each and every claim element or limitation.

Infringement must be assessed on a claim-by-claim basis. Therefore, there may be infringement as to one claim but no infringement as to another.

A patent claim may be infringed directly or indirectly. As explained further in the following Instructions, direct infringement results if the combination of the SpeedTube and vSet2 product or method at issue is covered by at least one claim of the patent and either Precision Planting or AGCO has committed any infringing act.

**4.2 DIRECT INFRINGEMENT**

Deere alleges direct infringement in the form of literal infringement. Deere alleges that Precision Planting and AGCO literally infringed claim 1 of the '663 Patent and claim 20 of the '955 Patent by making, using, selling, or offering to sell Precision products at issue in the United States.

To prove that Precision directly infringed any Asserted Claim by literal infringement, Deere must prove by a preponderance of the evidence, i.e., that it is more likely than not, that (1) each and every element of the Asserted Claim is literally present in the Precision products at issue, and (2) Precision Planting or AGCO made, used, sold, or offered to sell the accused SpeedTube and vSet2 products at issue in the United States. A claim element is literally present if it exists in the products at issue or was performed by the accused method as it is described in the claim language. If an accused product does not possess any one element recited in a claim, then you must find that that particular product does not literally infringe that claim.

You must determine infringement with respect to each Asserted Claim individually.

The Asserted Claims use the term "comprising." The word "comprising" means "including the following but not excluding others." If you find that the accused products at issue include all of the elements in any Asserted Claim, the fact that it may also include additional elements is irrelevant. The presence of additional unclaimed elements does not mean that SpeedTube or vSet2 or the combination of the SpeedTube and vSet2 do not infringe the Asserted Claims.

The Asserted Claims also use the word "a" or "an" to refer to components of the claimed invention. Use of the word "a" or "an" in a patent claim refers to "one or more."

**5. INVALIDITY**

I will now instruct you on the rules you must follow in deciding whether AGCO-Precision has proven that any of the Asserted Claims are invalid. AGCO-Precision has the burden of proving by clear and convincing evidence that a patent claim is invalid. Clear and convincing evidence is evidence that produces a high probability that a fact is true. This is a higher standard than the "preponderance of the evidence" standard that is used for infringement and lower than the "proof beyond a reasonable doubt standard.

A patent claim can be found invalid for several reasons, including because the claimed invention would have been obvious to a person of ordinary skill in the art at the time the invention was made, or because the written disclosure of the patent does not enable a person of ordinary skill in the art to make and use the full scope of the claimed invention without undue experimentation. Even though the Patent Office examiners have allowed the Asserted Claims, you have the responsibility for deciding whether AGCO-Precision has met its burden of proving by clear and convincing evidence that the Asserted Claims are invalid.

Invalidity must be assessed on a claim-by-claim basis. In other words, you can find that one claim is invalid, but that other claims are valid, even in the same patent. Terms of the patent claims must be interpreted in the same way for both infringement and invalidity.

**5.1 PERSON OF ORDINARY SKILL IN THE ART**

The question of invalidity of a patent claim is determined from the perspective of a person of ordinary skill in the art in the field of the invention at the time the invention was made. In this case, the parties agree that a person of ordinary skill in the art would have an undergraduate degree in mechanical engineering, agricultural engineering, or a closely related field, plus about two years of experience designing agricultural products or related machinery. Alternatively, the parties agree that a person of ordinary skill in the art could have about five years of experience designing agricultural products or related machinery, without a four-year undergraduate engineering degree.

The person of ordinary skill is a hypothetical person who is presumed to know all prior art that you have determined to be reasonably relevant. The person of ordinary skill is also a person of ordinary creativity who can use common sense to solve problems in this field. A person of ordinary skill in the art would be generally familiar with seed planting equipment.

## 5.2 PRIOR ART

One requirement under the patent laws is that the invention claimed in the patent must be new and not obvious in light of what came before. That which came before is referred to as the "prior art." Prior art includes items and products that were publicly known or used or offered for sale in the United States, as well as reference publications, such as published articles, patents, or patent applications, from anywhere in the world, that were made, known, used, published, or patented before the invention was made or more than one year before the effective filing date of the patent application. Prior art can also include United States patents that were filed before the invention was made even if they did not issue until after the invention was made.

Statements in the patent, or made by the applicant during prosecution of the patent, that identifies work of another as prior art is an admission that can be relied upon as prior art.

AGCO-Precision contends that the following is prior art to the Asserted Patents:

1. The Deere 495A Planter; and
2. U.S. Patent No. 4,029,235 to Grataloup.

### 5.3 PRIOR ART CONSIDERED OR NOT CONSIDERED BY THE PTO

A party challenging a patent's validity may rely on prior art that was previously considered by the United States Patent and Trademark Office (or "PTO") as well as prior art that was not previously considered by the PTO. AGCO-Precision must prove by clear and convincing evidence that the challenged Asserted Claims are invalid regardless of whether particular prior art references were considered by the PTO during the prosecution of the application which matured into the Asserted Patents. The invalidity burden of proof on AGCO-Precision never changes regardless of whether the PTO considered the reference.

However, for those obviousness combinations that AGCO-Precision asserts that were not considered by the PTO during prosecution of the application which resulted in the issued patent, such new evidence may be given more weight and may make it easier to satisfy the clear and convincing burden if that evidence is materially different from the evidence that the Patent Examiners did consider when they decided to issue the Deere patents.

### 5.4 OBVIOUSNESS

AGCO-Precision contends that the Asserted Claims are invalid as obvious under Deere's infringement allegations—in other words, if Deere is correct that the

Asserted Claims cover Precision's products, AGCO-Precision contends that the claims also cover the prior art and are invalid.

To prove that a patent claim is obvious, AGCO-Precision must show, by clear and convincing evidence, that the inventions claimed would have been obvious to a person of ordinary skill in the art as of each claim's effective filing date. The issue is not whether the claimed invention would have been obvious to you as a layman, to me as the judge, or to a genius in the field of technology, but whether it would have been obvious to one of ordinary skill in the art at the time the invention was made.

In determining whether a claimed invention would have been obvious, you should not consider what is known today or what was learned from the teachings of the Asserted Patents. Do not use hindsight; you must consider only what was known at the time of the invention. You should not use the patent as a road map for selecting and combining items of prior art. You must put yourself in the place of a person of ordinary skill in the art as of the date of invention.

In determining whether a claimed invention would have been obvious, you must consider:

1. The scope and content of the prior art,
2. The level of ordinary skill in the pertinent art;

3. The differences between the claimed invention and the prior art; and

4. Any objective evidence of nonobviousness.

Each of these factors must be evaluated, although they may be analyzed in any order, and you must perform this separate analysis for each of the claims. I will now explain each of these factors.

To determine the scope and content of the prior art, you must determine whether the prior art that AGCO-Precision identified is reasonably pertinent to the particular problems the inventor(s) of the claimed invention faced. The person of ordinary skill in the art is presumed to be aware of all of the pertinent prior art. I have already instructed you on how you are to determine the level of ordinary skill in the art. Once you have made that determination, you are to apply it in your determination whether the asserted claims would have been obvious.

The next factor that you must consider is the differences, if any, between the prior art and the claimed invention. Importantly, a claim is not proved obvious merely by demonstrating that each of the elements was independently known in the prior art. Most, if not all, inventions rely on building blocks of prior art, and claimed discoveries almost of necessity will likely be combinations of what is already known.

In considering whether a claimed invention is obvious, you may find obviousness if you find that at the time of the claimed invention, a reason existed that would have prompted a person of ordinary skill in the art in the relevant field to combine the known elements in the same way the claimed invention does. The motivation to modify the prior art to arrive at the claimed invention need not be explicitly stated in the prior art to be combined nor be the same motivation that the inventor actually had.

In considering whether a claimed invention is obvious, you should consider whether, as of February 2, 2009—the date on which the application that led to the Asserted Patents was filed—there was a reason or a motivation that would have prompted a person having ordinary skill in the field of the invention to combine the known elements in the prior art in a way the claimed invention does, taking into account such factors as (1) whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s); (2) whether the claimed invention provides an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; (4) whether the prior art teaches away from combining elements in the claimed invention; and (5) whether it would have been obvious to try the combinations of elements, such as

when there is a design incentive or market pressure to solve a problem and there are a finite number of identified, predictable solutions. In determining whether the claimed invention was obvious, consider each claim separately. The motivation to modify the prior art to arrive at the claimed invention need not be explicitly stated in the prior art to be combined nor be the same motivation that the inventor actually had.

In determining whether the claimed invention was obvious, you should take into account any objective evidence that may shed light on whether or not the claimed invention is obvious, such as:

1. Whether the claimed invention was commercially successful as a result of the merits of the claimed invention (rather than the result of design needs or market-pressure, advertising, or similar activities);
2. Whether the claimed invention satisfied a long-felt need that others had been unable to satisfy;
3. Whether others had tried and failed to make the claimed invention;
4. Whether others copied the claimed invention;
5. Whether the claimed invention achieved unexpected results;
6. Whether others in the field praised the claimed invention;
7. Whether persons having ordinary skill in the art of the claimed invention expressed surprise or disbelief regarding whether the claimed invention would work; and

8. Whether others sought or obtained rights to the patent from the patent holder.

However, for objective evidence to be accorded substantial weight, Deere must establish a nexus between the evidence and the merits of the patented invention as recited in the claims. Deere therefore bears the burden of establishing a nexus, or connection, between the patented invention and any evidence of the satisfaction of a long-felt need, failure of others to solve the problem, commercial success, industry praise, or other objective evidence. Such objective evidence is only relevant to obviousness considerations if there is proof that they are a direct result of the unique characteristics of the patented invention recited in the claims. If the claimed invention is only a component of a commercially successful machine or process, the patent holder must show a nexus between the patented feature and the commercial success or industry praise. If the commercial success or industry praise is due to an unclaimed feature of the device, the commercial success is irrelevant. In evaluating whether a nexus has been established, you must consider the patented invention as a whole. A patented invention may be a combination of elements that were known in the prior art, but when put together in the patented invention, may operate in a unique way. If the feature that creates the commercial success was due solely to a feature that has been known in the prior

art, as opposed to the combination of elements, the success is not relevant to invalidity.

In determining obviousness, you must also consider whether the prior art, in view of the knowledge of persons of ordinary skill, would also have revealed that in so making or carrying out, persons of ordinary skill would have had a reasonable expectation of success. That is to say, would the prior art of record, in view of the knowledge of persons of ordinary skill, have provided persons of ordinary skill in the art with a reasonable expectation of making the claimed inventions without the benefit of the Asserted Patents and their disclosures.

## 6. DAMAGES

### 6.1 DAMAGES – GENERALLY

If you find that AGCO-Precision infringed either of the Asserted Claims, and you find those claims to be valid, you must then determine the amount of damages to award to Deere. If you find that neither of the Asserted Claims are infringed or if you find that all of the infringed claims are invalid, then you need not address damages in your deliberation. I will now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win this case, or which should prevail on any issue.

The damages you award must be adequate to compensate Deere for the infringement. They are not meant to punish an infringer. Your damages award, if

you reach this issue, should put Deere in approximately the same financial position that it would have been in had the parties reached an agreement for AGCO-Precision to license the patents before the alleged infringement began.

Deere has the burden to establish the amount of its damages by a preponderance of the evidence. In other words, you should only award those damages that Deere establishes that it more likely than not suffered. While Deere is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.

## 6.2 LOST PROFITS

Deere seeks to recover damages in the form of lost profits for AGCO's sales of new planters that contain the accused SpeedTube and vSet2 products. To recover lost profits, Deere must show a causal relationship between the infringement and its loss of profit.

## 6.3 REASONABLE ROYALTY

For any infringing sales for which you find Deere has not proven lost profits, Deere is entitled to at least a reasonable royalty. If you find that Deere has established infringement of a valid patent claim by a preponderance of the evidence, the patent laws provide that the amount of damages that AGCO-

Precision must pay Deere for infringing the Asserted Claims must be enough to compensate for the infringement, and may not be less than a reasonable for the use of Deere's inventions.

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention. A reasonable royalty is the amount of royalty payment that a patent holder and alleged infringer would have agreed to in a hypothetical negotiation taking place at a time just prior to when the infringement first began. In this case, that hypothetical negotiation would have taken place shortly before the first of the two Asserted Patents issued on August 26, 2014.

In considering this hypothetical negotiation, you should focus on what the expectations of Deere and AGCO-Precision would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believed the patent was valid and infringed and that both parties were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.

A reasonable royalty is typically made up of a royalty base and a royalty rate that is applied to that base. There may be more than one way to calculate a royalty

base and a royalty rate. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.

Evidence of events after infringement first began can be considered in evaluating the reasonable royalty, but only to the extent that the evidence of such later events aids in assessing what royalty would have resulted from a hypothetical negotiation just before the time of infringement.

## 7. DELIBERATIONS AND VERDICT

### 7.1 INTRODUCTION

That concludes the part of my instructions on the law. I will end by explaining some things about how you will conduct your deliberations in the jury room and about your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. Any questions or messages normally should be sent through your foreperson, who by custom of this Court is Juror No. 1.

One more thing about messages. Do not write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be. Your votes should stay secret until you are finished.

**7.2 UNANIMOUS VERDICT**

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without disregarding your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinions, if convinced they are erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.

Remember at all times that you are not partisans. You are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you. I will review it with you in a moment. You will take the form to the jury room, and when you have reached

unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form. You will then return to the courtroom, and my deputy will read aloud your verdict. Do not show the completed verdict form to anyone or share it with anyone until you are in the courtroom.

It is proper to add the caution that nothing said in these instructions, and nothing in the form of a verdict, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. Determining what the verdict shall be is your sole and exclusive duty and responsibility.

**7.3 DUTY TO DELIBERATE**

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly

that—your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds. Listen carefully to what the other jurors have to say, and then decide for yourself.

**7.4 SOCIAL MEDIA**

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, cellphone, smartphone, tablet or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chatroom, blog, website, or app such as Facebook, LinkedIn, Snapchat, YouTube, Twitter, TikTok, or Instagram to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

In other words, you cannot talk to anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

### 7.5 COURT HAS NO OPINION

Let me finish by repeating something I have said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourself based on the evidence presented.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEERE & COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-827 (CFC) |
| | ) | CONSOLIDATED |
| AGCO CORPORATION and | ) | |
| PRECISION PLANTING LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**~~[PROPOSED]~~ CLAIM CONSTRUCTION ORDER**

As set forth by the Court at the claim construction hearing held on December 3, 2019, IT IS HEREBY ORDERED that the claim terms below are construed as follows:

## I. "ENDLESS MEMBER"

| TERM | PATENT(S) / CLAIM(S) | COURT'S CONSTRUCTION |
|---|---|---|
| **"endless member"** | '663 Patent: Claims 1 and 6<br>'199 Patent: Claim 5<br>'955 Patent: Claims 19 and 20<br>'924 Patent: Claims 12 and 15<br>'906 Patent: Claims 4 and 6<br>'031 Patent: Claims 8 and 16<br>'173 Patent: Claim 6<br>'799 Patent: Claim 2<br>'502 Patent: Claim 14 | **"a continuous conveyor forming a loop, such as a belt or a chain"** |

## II. "ENDLESS MEMBER FLEXES TO DISCHARGE SEED"

| TERM | PATENT(S) / CLAIM(S) | COURT'S CONSTRUCTION |
|---|---|---|
| **"endless member flexes to discharge seed"** | '906 Patent: Claim 6 | **Plain and ordinary meaning.** |

## III. "SEED DELIVERY SYSTEM" TERMS

| TERM | PATENT(S) / CLAIM(S) | COURT'S CONSTRUCTION |
|---|---|---|
| **"seed delivery system" /**<br><br>**"delivery system" /**<br><br>**"seed delivery apparatus" /**<br><br>**"method of delivering a seed"** | '663 Patent: Claims 1 and 6<br><br>'199 Patent: Claims 1 and 5<br><br>'429 Patent: Claims 19 and 20<br><br>'955 Patent: Claims 19, 20<br><br>'924 Patent: Claims 12, 15<br><br>'906 Patent: Claims 4 and 6<br><br>'031 Patent: Claims 8 and 16<br><br>'173 Patent: Claim 6<br><br>'998 Patent: Claim 3<br><br>'799 Patent: Claim 2<br><br>'502 Patent: Claims 14, 19 and 22 | <u>For '663, '199, '429, '955, '924, '906, '031, '173 patents:</u><br>**"apparatus / system / method that removes seed from the seed meter by capturing the seed and then delivers it to a discharge position"**<br><br>No disclaimer of a seed delivery apparatus / system / method that allows for seeds to drop by gravity between the seed meter and discharge.<br><br><u>For '799, '998, '502 patents</u>:<br>**Plain and ordinary meaning.**<br><br>No disclaimer of a seed delivery apparatus / system / method that includes a belt with flights. |

## IV. ADDITIONAL "SEED DELIVERY SYSTEM" TERMS

| TERM | PATENT(S) / CLAIM(S) | COURT'S CONSTRUCTION |
|---|---|---|
| **"delivery system which moves the individual seeds in a second path from the release position to a discharge position adjacent a seed furrow formed in soil beneath the seeding machine"** | '199 Patent: Claim 1 | **Court reserves ruling as to this term, subject to additional briefing by parties.** |
| **"seed delivery system operable to take seed from the metering member at the release position and sweep seed in a direction substantially cross-wise to a direction of travel of the seed on the metering member as the metering member rotates and move seed to a discharge location adjacent a seed furrow formed in soil beneath the seeding machine"** | '998 Patent: Claim 3 | **Court reserves ruling as to this term, subject to additional briefing by parties.** |

## V. "CONTROLLING MOVEMENT OF THE SEED WITHIN THE HOUSING"

| TERM | PATENT(S) / CLAIM(S) | COURT'S CONSTRUCTION |
|---|---|---|
| **"controlling movement of the seed within the housing"** | '502 Patent: Claims 14, 19, and 22 | **"holding seeds such that the seeds cannot move relative to other seeds in the housing"** |

## VI. "SIDEWALL HAVING INNER AND OUTER SURFACES"

| TERM | PATENT(S) / CLAIM(S) | COURT'S CONSTRUCTION |
|---|---|---|
| **"sidewall having inner and outer surfaces"** | '998 Patent: Claim 3<br><br>'799 Patent: Claim 2 | **Court reserves ruling as to this term.** |

## VII. AGREED-UPON CONSTRUCTION

| TERM | PATENT(S) / CLAIM(S) | AGREED-UPON CONSTRUCTION |
|---|---|---|
| **"sweep seed in a direction substantially cross-wise to a direction of travel of seed on the metering member as the metering member rotates"** | '998 Patent: Claim 3<br><br>'799 Patent: Claim 2 | **"sweep seed from the release position in a direction that is substantially different from the direction the seed was traveling on the seed meter prior to the release"** |

SO ORDERED this 17th day of December, 2019.

The Honorable Colm F. Connolly
United States District Judge

US008813663B2

(12) **United States Patent**
**Garner et al.**

(10) **Patent No.: US 8,813,663 B2**
(45) **Date of Patent: *Aug. 26, 2014**

(54) **SEEDING MACHINE WITH SEED DELIVERY SYSTEM**

(71) Applicant: **Deere & Company**, Moline, IL (US)

(72) Inventors: **Elijah B. Garner**, Bettendorf, IA (US); **Daniel B. Thiemke**, Sun Prairie, WI (US); **David J. Rylander**, Victoria, IL (US); **Nathan A. Mariman**, Geneseo, IL (US); **Michael E. Friestad**, Rock Island, IL (US)

(73) Assignee: **Deere & Company**, Moline, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/943,561**

(22) Filed: **Jul. 16, 2013**

(65) **Prior Publication Data**

US 2013/0298810 A1 Nov. 14, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 12/364,010, filed on Feb. 2, 2009.

(51) **Int. Cl.**

| | |
|---|---|
| ***A01C 7/04*** | (2006.01) |
| ***A01C 7/12*** | (2006.01) |
| ***A01C 7/16*** | (2006.01) |
| ***A01C 7/20*** | (2006.01) |

(52) **U.S. Cl.**

CPC ... ***A01C 7/20*** (2013.01); ***A01C 7/16*** (2013.01); ***A01C 7/125*** (2013.01); ***A01C 7/127*** (2013.01); ***A01C 7/046*** (2013.01)

USPC .............................. **111/185**; 111/177; 111/11

(58) **Field of Classification Search**

CPC .......... A01C 7/125; A01C 7/123; A01C 7/12; A01C 7/08; A01C 7/127; A01C 7/16; A01C 7/166; A01C 7/20; A01C 7/00; A01C 7/04; A01C 7/046; A01C 7/044; A01C 7/042

USPC ..................... 111/170–172, 177–185, 14, 11

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,552,601 | A | 1/1971 | Hansen et al. |
| 4,023,509 | A | 5/1977 | Hanson |
| 4,193,523 | A | 3/1980 | Koning |
| 4,555,624 | A | 11/1985 | Steffen |
| 4,600,122 | A | 7/1986 | Lundie et al. |
| 4,635,215 | A | 1/1987 | Friend |
| 5,533,458 | A | 7/1996 | Bergland et al. |
| 5,650,609 | A | 7/1997 | Mertins et al. |
| 5,936,234 | A | 8/1999 | Thomas et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 102007031576 | A1 | 1/2009 |
| EP | 0158985 | A2 | 10/1985 |

*Primary Examiner* — Christopher J Novosad

(57) **ABSTRACT**

A seeding machine with a seed meter and a seed delivery system for moving seed from a seed meter to a furrow formed in the soil. The delivery system has an endless member moving in a housing about pulleys to move seed from an upper opening in the housing to a lower discharge opening. In one embodiment, a loading wheel at the upper opening to the housing engages seed on a metering disk to move seed into the housing. The metering disk and housing can be arranged in planes parallel to one another.

**8 Claims, 10 Drawing Sheets**






Plaintiff's Exhibit
Deere & Co. v. AGCO Corp and Precision
PTX-1
C.A. 18-827 (CFC)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,651,570 | B1 | 11/2003 | Thiemke |
| 6,681,706 | B2 | 1/2004 | Sauder et al. |
| 6,913,541 | B2 | 7/2005 | Chen |
| 7,185,596 | B2 | 3/2007 | Theimke et al. |
| 7,343,868 | B2 | 3/2008 | Stephens et al. |
| 7,448,334 | B2 | 11/2008 | Mariman et al. |
| 8,074,586 | B2 | 12/2011 | Garner et al. |
| 8,468,960 | B2 | 6/2013 | Garner et al. |
| 2003/0159631 | A1 | 8/2003 | Sauder et al. |
| 2007/0039528 | A1 | 2/2007 | Sauder et al. |
| 2010/0010667 | A1 | 1/2010 | Sauder |
| 2010/0192821 | A1 | 8/2010 | Garner et al. |




Fig. 1




Fig. 2

Fig. 3


50
56
58
48
28
86
88
90
92
60
51
54
52
66
53
56
64
49
38
68
53b
53a
62
76
94
70
74
82
96
84
56
78




Fig. 4




Fig. 5




Fig. 6

Fig. 7


202
238
226
240
218
240
224
219
220
222
232
8
236
234
246
53
8
228
28


228
224
216
202
64
240
244
218
51
28
49

Fig. 8




Fig. 9




Fig. 10




Fig. 11

# SEEDING MACHINE WITH SEED DELIVERY SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This application is a Continuation of U.S. patent application Ser. No. 12/364,010, filed Feb. 2, 2009.

## FIELD OF THE INVENTION

The invention relates to a seeding machine having a seed metering system and a seed delivery system for delivering seed from the meter to the ground.

## BACKGROUND OF THE INVENTION

An agricultural seeding machine such as a row crop planter or grain drill places seeds at a desired depth within a plurality of parallel seed trenches formed in soil. In the case of a row crop planter, a plurality of row crop units are typically ground driven using wheels, shafts, sprockets, transfer cases, chains and the like or powered by electric or hydraulic motors. Each row crop unit has a frame which is movably coupled with a tool bar. The frame may carry a main seed hopper, herbicide hopper and insecticide hopper. If a herbicide and insecticide are used, the metering mechanisms associated with dispensing the granular product into the seed trench are relatively simple. On the other hand, the mechanisms necessary to properly meter the seeds, and dispense the seeds at predetermined relative locations within the seed trench are relatively complicated.

The mechanisms associated with metering and placing the seeds generally can be divided into a seed metering system and a seed placement system which are in series communication with each other. The seed metering system receives the seeds in a bulk manner from the seed hopper carried by the planter frame or by the row unit. Different types of seed metering systems may be used, such as seed plates, finger plates, seed disks, etc. In the case of a seed disk metering system a seed disk is formed with a plurality of seed cells spaced about the periphery of the disk. Seeds are moved into the seed cells with one or more seeds in each seed cell depending upon the size and configuration of the seed cell. A vacuum or positive air pressure differential may be used in conjunction with the seed disk to assist in movement of the seeds into the seed cell. The seeds are singulated and discharged at a predetermined rate to the seed placement or delivery system.

The most common seed delivery system may be categorized as a gravity drop system. In the case of the gravity drop system, a seed tube has an inlet end which is positioned below the seed metering system. The singulated seeds from the seed metering system merely drop into the seed tube and fall via gravitational force from a discharge end thereof into the seed trench. The seed tube may have a rearward curvature to reduce bouncing of the seed as it strikes the bottom of the seed trench and to impart a horizontal velocity to the seed in order to reduce the relative velocity between the seed and the ground. Undesirable variation in resultant in-ground seed spacing can be attributed to differences in how individual seeds exit the metering system and drop through the seed tube. The spacing variation is exacerbated by higher travel speeds through the field which amplifies the dynamic field conditions. Further seed spacing variations are caused by the inherent relative velocity difference between the seeds and the soil as the seeding machine travels through a field. This relative velocity difference causes individual seeds to bounce and tumble in somewhat random patterns as each seed comes to rest in the trench.



Various attempts have been made to reduce the variation in seed spacing resulting from the gravity drop. U.S. Pat. No. 6,681,706 shows two approaches. One approach uses a belt with flights to transport the seeds from the meter to the ground while the other approach uses two belts to grip the seed and transport it from the meter to the ground. While these approaches control the seed path and reduce variability due to dynamic events, neither approach seeks to deliver the seed with as small as possible horizontal velocity difference relative to the ground. U.S. Pat. Nos. 6,651,570, 7,185,596 and 7,343,868 show a seed delivery system using a brush wheel near the ground to regulate the horizontal velocity and direction of the seed as it exits the seeding machine. However, there is still a gravity drop between the seed meter and the brush wheel which produces variation in seed spacing.

## SUMMARY OF THE INVENTION

The present invention provides a seed delivery system that removes the seed from the seed meter by capturing the seed. The delivery system then moves the seed down to a lower discharge point and accelerates the seed rearward to a horizontal velocity approximately equal to the forward travel speed of the seeding machine such that the seed, when discharged, has a low or zero horizontal velocity relative to the ground. Rolling of the seed in the trench is reduced as a result of the near zero horizontal velocity relative to the ground. Furthermore, as the seed experiences a controlled descent from the point at which it is removed from the meter to a point very near the bottom of the trench, the system becomes nearly impervious to the field dynamics experienced by the row unit. The combination of controlled descent and discharge at a substantially zero horizontal speed relative to the ground reduces seed spacing variability.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a plan view of a planter having the seed delivery system of the present invention;

FIG. **2** is a side view of a row unit of the planter of FIG. **1**;

FIG. **3** is an enlarged side view of the seed delivery system of the present invention;

FIG. **4** is a top view of a planter row unit showing the metering system orientation in one alternative arrangement of the metering system and delivery system of the present invention;

FIG. **5** is a top view similar to FIG. **4** illustrating the delivery system with the meter housing removed;

FIG. **6** is a side view of the row unit of FIG. **4**;

FIG. **7** is a perspective view of the seed disk used in the seed meter shown in FIGS. **4**-**6**;

FIG. **8** is a sectional view along the line **8**-**8** of FIG. **7** illustrating the orientation of the seed disk and brush or the seed delivery system of the present invention;

FIG. **9** is a side view of a row unit showing the orientation of the delivery system of the present invention and a vacuum belt seed meter;

FIG. **10** is a side view of another orientation of the seed delivery system of the invention with a vacuum belt seed meter; and

FIG. **11** is a side view illustrating the orientation of the seed delivery system of the invention with a finger pick-up meter.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference to FIG. **1** an example planter or seeding machine **10** is shown containing the seed delivery system of the present invention. Planter **10** includes a tool bar **12** as part of a planter frame **14**. Mounted to the tool bar are multiple planting row units **16**. Row units **16** are typically identical for a given planter but there may be differences. A row unit **16** is shown in greater detail in FIG. **2**. The row unit **16** is provided with a central frame member **20** having a pair of upwardly extending arms **21** (FIG. **4**) at the forward end thereof. The arms **21** connect to a parallelogram linkage **22** for mounting the row unit **16** to the tool bar **12** for up and down relative movement between the unit **16** and toolbar **12** in a known manner. Seed is stored in seed hopper **24** and provided to a seed meter **26**. Seed meter **26** is of the type that uses a vacuum disk as are well known to meter the seed. Other types of meters can be used as well. From the seed meter **26** the seed is carried by a delivery system **28** into a planting furrow, or trench, formed in the soil by furrow openers **30**. Gauge wheels **32** control the depth of the furrow. Closing wheels **34** close the furrow over the seed. The gauge wheels **32** are mounted to the frame member **20** by arms **36**. The toolbar and row unit are designed to be moved over the ground in a forward working direction identified by the arrow **38**.

The row unit **16** further includes a chemical hopper **40**, a row cleaner attachment **42** and a down force generator **44**. The row unit **16** is shown as an example of the environment in which the delivery system of the present invention is used. The present invention can be used in any of a variety of planting machine types such as, but not limited to, row crop planters, grain drills, air seeders, etc.

With reference to FIG. **3**, the seed delivery system **28** is shown in greater detail. Delivery system **28** includes a housing **48** positioned adjacent the seed disk **50** of the seed meter. The seed disk **50** is a generally flat disk with a plurality of apertures **52** adjacent the periphery of the disk. Seeds **56** are collected on the apertures from a seed pool and adhere to the disk by air pressure differential on the opposite sides of the disk **50** in a known manner. The disk may have a flat surface at the apertures **52** or have seed cells surrounding the apertures **52**. The disk rotates clockwise as viewed in FIG. **3** as shown by the arrow **54**. At the top of FIG. **3**, seeds **56** are shown adhered to the disk.

The seed delivery system housing **48** has spaced apart front and rear walls **49** and **51** and a side wall **53** therebetween. An upper opening **58** in the housing side wall **53** admits the seed from the metering disk **50** into the housing. A pair of pulleys **60**, **62** are mounted inside the housing **48**. The pulleys support a belt **64** for rotation within the housing. One of the pulleys is a drive pulley while the other is an idler pulley. The belt has a base member **66** to engage the pulleys and elongated bristles **70** extending therefrom, The bristles are joined to the base member at proximal, or radially inner, ends of the bristles. Distal, or radially outer, ends **74** of the bristles touch, or are close to touching, the inner surface **76** of the housing side wall **53**. A lower housing opening **78** is formed in the side wall **53** and is positioned as close to the bottom **80** of the seed trench as possible. As shown, the lower opening **78** is near or below the soil surface **82** adjacent the trench. The housing side wall forms an exit ramp **84** at the lower opening **78**.

Returning attention to the upper portion of FIG. **3**, a loading wheel **86** is provided adjacent the upper opening **58**. The loading wheel is positioned on the opposite side of the seeds **56** from the brush **64** such that the path of the seeds on the disk brings the seeds into a nip **88** formed between the loading wheel and the distal ends **74** of the bristles **70**. At the location of the nip **88**, the air pressure differential across the seed disk **50** is terminated, freeing the seed from the apertures **52** in the disk. The bottom surface of the loading wheel, facing the seed disk **50**, has recesses **90** formed therein. The recesses **90** receive seed agitators **92** projecting from the seed disk **50**. The moving agitators, by engagement with the recesses in the loading wheel, drive the loading wheel in a clockwise rotation.

In operation, the belt **64** is rotated in a counterclockwise direction. As the belt curves around the pulleys, the bristles will naturally open, that is, separate from one another as the distal ends of the bristles travel a larger circumferential distance around the pulleys than the inner ends of the bristle at the belt base member. This produces two beneficial effects as described below. The seeds are transferred from the seed meter to the delivery system as the seeds are brought by the disk into the nip **88**. There the seeds are pinched off the seed disk between the loading wheel and the bristles **70** to remove the seed from the seed disk and seed meter. The seeds are captured or entrapped in the bristles by insertion of the seed into the bristles in a radial direction, that is from the ends of the bristles in a direction parallel to the bristle length. This occurs just as the belt path around the pulley **60** ends, when the bristle ends are closing back together upon themselves, allowing the bristles to close upon, and capture the seeds therein. As the belt continues to move, the bristles move or convey the seeds downward to the housing lower opening. The side wall **53** of the housing cooperates with the bristles **70** to hold the seed in the brush bristles as the seed is moved to the lower opening.

The lower opening **78** and the ramp **84** are positioned along the curved belt path around the pulley **62**. The bristle distal ends thus cause the linear speed of the seeds to accelerate relative to the speed of the belt base member **66** and the housing as shown by the two arrows **94** and **96**. The seeds are then propelled by the bristles over the ramp **84** and discharged through the lower opening **78** into the seed trench. The angle of the ramp **84** can be selected to produce the desired relationship between the seed vertical and horizontal speeds at discharge. The forward travel direction of the row unit is to the left in FIG. **3** as shown by the arrow **38**. At the discharge, the horizontal speed of the seed relative to the ground is minimized to reduce roll of the seed in the trench.

The belt shown in FIG. **3** has relatively long bristles. As a result of the long bristles and the seed loading point being at the end of the curved path of the brush around the pulley **60** results in the seeds being loaded into the belt while the bristles have slowed down in speed. The bristle speed at loading is thus slower than the bristle speed at the discharge opening as the belt travels around the pulley **62**. This allows in the seed to be loaded into the belt at a relatively lower speed while the seed is discharged at the lower end at a desired higher speed. As described above, it is preferred that the horizontal velocity of the seed at the discharge be equal to the forward travel speed of the planter but in the rearward direction such that the horizontal velocity of the seed relative to the ground is close to or equal to zero. The long bristles can be used to increase the speed of the seed as it travels around the pulley. However, a short bristle brush can be used as well. With a short bristle brush, there will be little acceleration in the speed of the seed as the seed travels around the pulleys. The belt will have to be driven at a speed to produce the desired horizontal velocity of the seed at the discharge. Even with a short bristle brush, the seed is still accelerated in the horizontal direction. As the belt travels around the pulley, the direction of travel of the seed changes from the predominantly vertical direction, when the

seed is moved downward from the seed meter, to a predominantly horizontal direction at the discharge. This produces an acceleration of the seed velocity in the horizontal direction.

With the delivery system **28**, the seed is captured by the delivery system to remove the seed from the seed meter. The seed is then moved by the delivery system to the seed discharge point where the seed is accelerated in a rearward horizontal direction relative to the housing. From the seed meter to the discharge, the seed travel is controlled by the delivery system, thus maintaining the seed spacing relative to one another.

In the embodiment shown in FIG. **3**, the seed disk and the front and rear walls **49**, **51** of the housing **48** lie in planes that are generally parallel one another. As shown, the plane of the delivery system is generally parallel to the direction of travel of the row unit. Other relationships between the seed meter and delivery system are shown and described below.

As shown in FIG. **3**, the side wall **53** is divided by the upper and lower openings **58**, **78** into two segments, **53***a* and **53***b*. Segment **53***a* is between the upper and lower openings in the direction of belt travel while the segment **53***b* is between the lower and upper openings in the direction of belt travel. It is the gaps in the side wall **53** that form the upper and lower openings. It should be understood, however, that the delivery system will function without the segment **53***b* of the side wall. It is only the segment **53***a* that functions together with the belt bristles to deliver the seed from the meter to the seed trench. Thus, the term "upper opening" shall be construed to mean a open area before the side wall segment **53***a* in the direction of belt travel and the term "lower opening" shall mean an open area after the side wall segment **53***a* in the direction of belt travel.

With reference to FIGS. **4**-**7**, the delivery system **28** is shown in combination with the seed meter and row unit structure in an alternative arrangement of the seed meter and delivery system **28**. The seed meter **200** is shown mounted to the row unit with the seed disk **202** in a vertical orientation but at an angle to the forward travel direction shown by the arrow **38**. FIG. **4** shows of the seed meter orientation in the row unit without the delivery system **28**. The seed meter includes a housing having two halves **204** and **206** releasable joined together in a known manner. The seed meter is driven through a transmission **208** coupled to a drive cable, not shown.

In FIG. **5** only the seed disk **202** of the meter is shown with the seed delivery system **28**. As previously mentioned, the seed disk **202** is in a vertical orientation but it does not lie in a plane parallel to the forward direction **38**. Instead, the meter is oriented such that the disk is at a 60° angle relative to the forward direction when viewed from above. The seed of delivery system **28** is generally identical to that shown in FIG. **3** and is driven by a motor **65**. The delivery system, including of the brush belt **64**, is generally vertical and aligned with the fore and aft direction of the planter such that the angle between the brush and the seed disk is approximately 60°. The angle between the delivery system and a seed disk produces a partial "cross feed" of the seed into the brush. That is, the seed is fed into the brush at an angle to the lengthwise direction of the bristles. This is in contrast to FIG. **3** where the seed enters the brush in a direction substantially parallel to the lengthwise direction of the brush bristles. If the brush and seed disk were oriented at 90° to one another, a total cross feed would be produced with seed entering the brush perpendicular to the bristles.

The seed disk **202** is shown enlarged in FIGS. **7** and **8**. The disk **202** has opposite sides, a vacuum side **216** and seed side **218**. The seed side **218** has a surface **219** near the periphery that defines a reference plane. The reference plane will be



used to describe the features of the disk near the disk periphery. An outer peripheral lip **220** is recessed from the reference plane. The peripheral lip **220** creates a radially outward edge face **222**. A circumferential row of spaced apart apertures **224** is arranged around a circular path radially inward of the edge face **222**. Each aperture extends through the disk between the vacuum side **216** and the seed side **218**. Radially inward of each aperture **224**, there is a radially elongated recess **226**. The recess **226** is recessed axially into the disk from the reference plane. In operation, the disk rotates in a counter-clockwise direction as indicated by the arrow **228**. During rotation, the recesses **226** agitate the seed in the seed pool.

Surrounding each aperture **224** is a tapered recess, or shallow seed cell, **232** that extends axially into the disk from the reference plane. Seed cell **232** begins at a leading edge **234** in the direction of rotation of the disk and is progressively deeper into the seed side **218** to a trailing edge formed by an axially projecting wall **236**. The tapered recess or seed cell **232** reduces the vacuum needed to pick-up and retain seed in the apertures **224**. The seed cell also enables the seed to sit lower relative to the seed side **218** of the disk, allowing the seed to be retained while the seed singulator removes doubles or multiples of seed from the apertures **224**. In addition, the recess wall **236** agitates seed in the seed pool, further aiding in seed pick-up. The wall **236** extends lengthwise in a predominately radial direction as shown by the dashed line **238**. The walls **236**, while predominately radial, are inclined to the radial direction such that the inner end of the wall **236** is leading the outer end of the wall in the direction of rotation. Immediately following each wall **236**, as the disk rotates, is a projection, or upstanding peg **240** extending axially from the disk seed side. The pegs engage seed in the seed pool for agitation to aide in seed pick-up. The pegs **240** are located slightly radially inward of the circular path of apertures **224** to avoid interference with the seed singulator.

With reference to FIG. **8**, the disk **202** is shown in operation and in position relative to the belt **64** in the delivery system **28**. As seeds **244** are carried by the disk **202** into the bristles of the brush **64**, the wall **236** and the pegs **240** act to push the seed **244** into the bristles of the brush **64** and assist in keeping the seed from being knocked off the disk upon the seed's initial contact with the brush bristles. Once the seed is inserted into the brush bristles, the vacuum from the opposite side of the disk is cut-off, allowing the brush to sweep the seed off the disk in a predominately radial direction relative to the disk. An insert **246** overlies the lip **220** at the point of seed release to hold the seed in the brush bristles in the transition between the disk and the side wall **53** (FIG. **3**) of the delivery system housing. The disk **202** is inclined to the length of the brush bristles at approximately a 60 degree angle. This produces the partial cross-feed of the seed into the brush bristles.

FIG. **9** shows the brush belt seed delivery system **28** in combination with a vacuum belt metering system having a metering belt **302**. The vacuum belt meter is fully described in U.S. patent application 7,918,168 incorporated herein by reference. The belt **302** picks-up seed at a pick-up region **304** at a lower, front location of the belt's path and transports it to the delivery system at a release region **306** at an upper, rear location of the belt's path. In this arrangement of the belt meter and the brush delivery system, the delivery system is again partially cross fed with seeds from the meter.

Another arrangement of the delivery system together with a vacuum meter belt is shown in FIG. **10**. The delivery system **28** is in-line with the belt meter **124**. This allows the distal ends of the brush bristles to sweep over the surface of the metering belt **126** to capture the seed therefrom. The meter

belt **126** is wrapped around pulleys **128**. The metering belt **124** is similar and functions as the belt **302** mentioned above.

The delivery system of the present invention can also be used with seed meters other than air pressure differential meters. For example, with reference to FIG. **11**, a finger pick-up meter **130** is shown, such as that described in U.S. Pat. No. 3,552,601 and incorporated herein by reference. Seed is ejected from the meter through an opening **132**. The delivery system **134** has a brush belt **136** wrapped about pulleys **138** and **140**. As shown, the belt pulley **138** shares a common drive shaft with finger pick-up meter **130**. A hub transmission such as a spherical continuously variable transmission or a three speed hub can be used to drive the belt **136** at a different speed from the meter **130**. The delivery system housing includes a side wall **142**. A ramp **146** is formed at the lower end of the wall **142** adjacent the lower opening **148**. At the upper end of the delivery system, the upper opening is formed in the housing rear wall adjacent the opening **132** through which seeds are ejected from the seed meter. The seeds are inserted laterally into the brush bristles in a complete cross-feed. As in the other embodiments, the seed is captured in the brush bristles, moved downward to the lower opening, accelerated rearward and discharged through the lower opening **148**.

The endless member of the delivery system has been described as being a brush belt with bristles. In a broad sense, the bristles form an outer periphery of contiguous disjoint surfaces that engage and grip the seed. While brush bristles are the preferred embodiment, and may be natural or synthetic, other material types can be used to grip the seed such as a foam pad, expanded foam pad, mesh pad or fiber pad.

Having described the preferred embodiment, it will become apparent that various modifications can be made without departing from the scope of the invention as defined in the accompanying claims.

The invention claimed is:

**1**. A seeding machine, comprising:

a seed meter having a metering disk with a plurality of apertures in a circular array adapted to adhere seeds to the metering disk to move the seeds along a seed path as the metering disk rotates;

a seed delivery system associated with said seed meter, said seed delivery system including:

a housing for seed from said metering disk, the housing having a lower opening through which seed is discharged;

a single endless member within said housing disposed around a first drive pulley and a second idler pulley, said endless member engaging seed from the seed meter and moving the seed to said lower opening where seed is discharged from said housing; and

a loading wheel engaging seeds adhered to the metering disk and moving along the seed path and guiding the seed into the single endless member whereby the single endless member moves the seed to the lower opening.



**2**. The seeding machine of claim **1** wherein the metering disk and loading wheel are driven by a common drive.

**3**. The seeding machine of claim **1** wherein the metering disk defines a first plane and the endless member defines a second plane substantially parallel to the first plane and wherein the loading wheel lies substantially in the second plane.

**4**. A seeding machine, comprising:

a seed meter having a metering disk with a plurality of apertures in a circular array adapted to adhere seeds to the metering disk to move the seeds along a seed path as the metering disk rotates;

a seed delivery system associated with said seed meter, said seed delivery system located transversely adjacent the metering disk and including:

a housing for seed from said metering disk, the housing having a lower opening through which seed is discharged;

a single endless member within said housing disposed around a first drive pulley and a second idler pulley, said endless member engaging seed from the seed meter and in cooperation with the housing moving the seed to said lower opening where seed is discharged from said housing; and

a loading wheel adjacent the housing upper opening engaging seeds adhered to the metering disk and moving along the seed path.

**5**. The seeding machine of claim **4** wherein the metering disk defines a first plane and the endless member defines a second plane substantially parallel to the first plane.

**6**. A seeding machine, comprising:

a seed meter having a metering disk with a plurality of apertures in a circular array adapted to adhere seeds to the metering disk to move the seeds along a seed path as the metering disk rotates;

a seed delivery system associated with said seed meter, said seed delivery system including:

a housing for seed from said metering disk, the housing having a lower opening through which seed is discharged;

a single endless member within said housing disposed around a first drive pulley and a second idler pulley, said endless member engaging seed from the seed meter, entrapping the seed between the endless member and the housing, moving the seed to said lower opening as the endless member moves about the first and second pulleys and discharging the seed from said housing through the lower opening; and

a loading wheel adjacent the housing upper opening engaging seeds adhered to the metering disk and moving along the seed path.

**7**. The seeding machine of claim **6** wherein the metering disk defines a first plane and the endless member defines a second plane substantially parallel to the first plane.

**8**. The seeding machine of claim **7** wherein the loading wheel is substantially in the second plane.

* * * * *

US009699955B2

(12) **United States Patent**
**Garner et al.**

(10) **Patent No.: US 9,699,955 B2**
(45) **Date of Patent: *Jul. 11, 2017**

(54) **SEEDING MACHINE WITH SEED DELIVERY SYSTEM**

(71) Applicant: **Deere & Company**, Moline, IL (US)

(72) Inventors: **Elijah B. Garner**, Bettendorf, IA (US); **Daniel B. Thiemke**, Sun Prairie, WI (US); **David J. Rylander**, Victoria, IL (US); **Nathan A. Mariman**, Geneseo, IL (US); **Michael E. Friestad**, Rock Island, IL (US)

(73) Assignee: **Deere & Company**, Moline, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 80 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/704,513**

(22) Filed: **May 5, 2015**

(65) **Prior Publication Data**

US 2015/0230396 A1 Aug. 20, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 14/504,801, filed on Oct. 2, 2014, which is a continuation of application

(Continued)

(51) **Int. Cl.**

***A01C 7/04*** (2006.01)
***A01C 7/12*** (2006.01)

(Continued)

(52) **U.S. Cl.**

CPC ................ ***A01C 7/046*** (2013.01); ***A01C 7/16*** (2013.01); ***A01C 21/00*** (2013.01)

(58) **Field of Classification Search**

CPC .. A01C 7/04; A01C 7/00; A01C 7/046; A01C 7/044; A01C 7/042; A01C 7/125;

(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,141,044 A 12/1938 Rassman
3,122,283 A 2/1964 Walters

(Continued)

FOREIGN PATENT DOCUMENTS

EP 1560157 8/2005
FR 858062 A 11/1940

(Continued)

OTHER PUBLICATIONS

Brazilian Office Action issued in counterpart application No. PI1000127-1, dated Feb. 8, 2017 (8 pages, which includes a Statement of Relevance).

*Primary Examiner* — Christopher J Novosad
(74) *Attorney, Agent, or Firm* — Michael Best & Friedrich LLP

(57) **ABSTRACT**

A seeding machine with a seed meter and a seed delivery system for moving seed from a seed meter to a furrow formed in the soil. The delivery system has an endless member moving in a housing about pulleys to move seed from an upper opening in the housing to a lower discharge opening. In one embodiment, a loading wheel at the upper opening to the housing engages seed on a metering disk to move seed into the housing. The metering disk and housing can be arranged in planes parallel to one another.

**20 Claims, 10 Drawing Sheets**







Plaintiff's Exhibit
Deere & Co. v. AGCO Corp and Precision
PTX-2
C.A. 18-827 (CFC)

**Related U.S. Application Data**

No. 12/364,010, filed on Feb. 2, 2009, now Pat. No. 8,850,995.

(51) **Int. Cl.**

| | |
|---|---|
| ***A01C 7/16*** | (2006.01) |
| ***A01C 7/20*** | (2006.01) |
| ***A01C 21/00*** | (2006.01) |

(58) **Field of Classification Search**

CPC .. A01C 7/123; A01C 7/12; A01C 7/08; A01C 7/16; A01C 7/166; A01C 7/20; A01C 21/00; A01C 7/127

USPC ..... 111/170–172, 177–185, 14, 11, 200, 900

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,176,636 | A | 4/1965 | Wilcox et al. |
| 3,343,507 | A | 9/1967 | Smith |
| 3,552,601 | A | 1/1971 | Hansen et al. |
| 3,913,503 | A | 10/1975 | Becker |
| 4,023,509 | A | 5/1977 | Hanson |
| 4,029,235 | A | 6/1977 | Grataloup |
| 4,193,523 | A | 3/1980 | Koning |
| 4,600,122 | A | 7/1986 | Lundie et al. |
| 4,646,941 | A | 3/1987 | Grosse-Scharmann et al. |
| 5,533,458 | A | 7/1996 | Bergland et al. |
| 5,936,234 | A | 8/1999 | Thomas et al. |
| 6,237,514 | B1 | 5/2001 | Romans |
| 6,651,570 | B1 | 11/2003 | Thiemke |
| 6,681,706 | B2 | 1/2004 | Sauder et al. |
| 7,185,596 | B2 | 3/2007 | Thiemke et al. |
| 7,343,868 | B2 | 3/2008 | Stephens et al. |
| 7,448,334 | B2 | 11/2008 | Mariman et al. |
| 7,631,606 | B2 | 12/2009 | Sauder et al. |
| 7,918,168 | B2 | 4/2011 | Garner et al. |
| 8,074,586 | B2 | 12/2011 | Garner et al. |
| 8,671,856 | B2 | 3/2014 | Garner et al. |
| 8,800,457 | B2 | 8/2014 | Garner et al. |
| 2003/0159631 | A1 * | 8/2003 | Sauder ..................... A01C 7/04 111/171 |
| 2010/0300341 | A1 | 12/2010 | Peterson et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| FR | 1026090 | A | 4/1953 |
| FR | 2210887 | A5 | 7/1974 |
| FR | 2414288 | A1 | 8/1979 |
| FR | 2635432 | A1 | 2/1990 |
| GB | 926217 | A | 5/1963 |

* cited by examiner




Fig. 1




Fig. 2



Fig. 3
50
56
58
48
28
86
88
90
92
60
51
52
54
66
53
56
64
38
49
68
53b
53a
62
76
94
70
82
74
96
84
56
78




Fig. 4




Fig. 5




Fig. 6

Fig. 7


202
238
226
240
218
240
224
219
220
222
232
8
8
236
234
246
53
28
228


228
224
216
202
64
240
244
218
51
28
49

Fig. 8




Fig. 9




Fig. 10




Fig. 11

# SEEDING MACHINE WITH SEED DELIVERY SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This application is a Continuation of U.S. patent application Ser. No. 14/504,801, filed Oct. 2, 2014, which is a Continuation of U.S. patent application Ser. No. 12/364,010, filed Feb. 2, 2009, now U.S. Pat. No. 8,850,995.

## FIELD OF THE INVENTION

The invention relates to a seeding machine having a seed metering system and a seed delivery system for delivering seed from the meter to the ground.

## BACKGROUND OF THE INVENTION

An agricultural seeding machine such as a row crop planter or grain drill places seeds at a desired depth within a plurality of parallel seed trenches formed in soil. In the case of a row crop planter, a plurality of row crop units are typically ground driven using wheels, shafts, sprockets, transfer cases, chains and the like or powered by electric or hydraulic motors. Each row crop unit has a frame which is movably coupled with a tool bar. The frame may carry a main seed hopper, herbicide hopper and insecticide hopper. If a herbicide and insecticide are used, the metering mechanisms associated with dispensing the granular product into the seed trench are relatively simple. On the other hand, the mechanisms necessary to properly meter the seeds, and dispense the seeds at predetermined relative locations within the seed trench are relatively complicated.

The mechanisms associated with metering and placing the seeds generally can be divided into a seed metering system and a seed placement system which are in series communication with each other. The seed metering system receives the seeds in a bulk manner from the seed hopper carried by the planter frame or by the row unit. Different types of seed metering systems may be used, such as seed plates, finger plates, seed disks, etc. In the case of a seed disk metering system a seed disk is formed with a plurality of seed cells spaced about the periphery of the disk. Seeds are moved into the seed cells with one or more seeds in each seed cell depending upon the size and configuration of the seed cell. A vacuum or positive air pressure differential may be used in conjunction with the seed disk to assist in movement of the seeds into the seed cell. The seeds are singulated and discharged at a predetermined rate to the seed placement or delivery system.

The most common seed delivery system may be categorized as a gravity drop system. In the case of the gravity drop system, a seed tube has an inlet end which is positioned below the seed metering system. The singulated seeds from the seed metering system merely drop into the seed tube and fall via gravitational force from a discharge end thereof into the seed trench. The seed tube may have a rearward curvature to reduce bouncing of the seed as it strikes the bottom of the seed trench and to impart a horizontal velocity to the seed in order to reduce the relative velocity between the seed and the ground. Undesirable variation in resultant in-ground seed spacing can be attributed to differences in how individual seeds exit the metering system and drop through the seed tube. The spacing variation is exacerbated by higher travel speeds through the field which amplifies the dynamic field conditions. Further seed spacing variations are caused



by the inherent relative velocity difference between the seeds and the soil as the seeding machine travels through a field. This relative velocity difference causes individual seeds to bounce and tumble in somewhat random patterns as each seed comes to rest in the trench.

Various attempts have been made to reduce the variation in seed spacing resulting from the gravity drop. U.S. Pat. No. 6,681,706 shows two approaches. One approach uses a belt with flights to transport the seeds from the meter to the ground while the other approach uses two belts to grip the seed and transport it from the meter to the ground. While these approaches control the seed path and reduce variability due to dynamic events, neither approach seeks to deliver the seed with as small as possible horizontal velocity difference relative to the ground. U.S. Pat. Nos. 6,651,570, 7,185,596 and 7,343,868 show a seed delivery system using a brush wheel near the ground to regulate the horizontal velocity and direction of the seed as it exits the seeding machine. However, there is still a gravity drop between the seed meter and the brush wheel which produces variation in seed spacing.

## SUMMARY OF THE INVENTION

The present invention provides a seed delivery system that removes the seed from the seed meter by capturing the seed. The delivery system then moves the seed down to a lower discharge point and accelerates the seed rearward to a horizontal velocity approximately equal to the forward travel speed of the seeding machine such that the seed, when discharged, has a low or zero horizontal velocity relative to the ground. Rolling of the seed in the trench is reduced as a result of the near zero horizontal velocity relative to the ground. Furthermore, as the seed experiences a controlled descent from the point at which it is removed from the meter to a point very near the bottom of the trench, the system becomes nearly impervious to the field dynamics experienced by the row unit. The combination of controlled descent and discharge at a substantially zero horizontal speed relative to the ground reduces seed spacing variability.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a plan view of a planter having the seed delivery system of the present invention;

FIG. **2** is a side view of a row unit of the planter of FIG. **1**;

FIG. **3** is an enlarged side view of the seed delivery system of the present invention;

FIG. **4** is a top view of a planter row unit showing the metering system orientation in one alternative arrangement of the metering system and delivery system of the present invention;

FIG. **5** is a top view similar to FIG. **4** illustrating the delivery system with the meter housing removed;

FIG. **6** is a side view of the row unit of FIG. **4**;

FIG. **7** is a perspective view of the seed disk used in the seed meter shown in FIGS. **4-6**;

FIG. **8** is a sectional view along the line **8-8** of FIG. **7** illustrating the orientation of the seed disk and brush or the seed delivery system of the present invention;

FIG. **9** is a side view of a row unit showing the orientation of the delivery system of the present invention and a vacuum belt seed meter;

FIG. **10** is a side view of another orientation of the seed delivery system of the invention with a vacuum belt seed meter; and

FIG. **11** is a side view illustrating the orientation of the seed delivery system of the invention with a finger pick-up meter.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference to FIG. **1** an example planter or seeding machine **10** is shown containing the seed delivery system of the present invention. Planter **10** includes a tool bar **12** as part of a planter frame **14**. Mounted to the tool bar are multiple planting row units **16**. Row units **16** are typically identical for a given planter but there may be differences. A row unit **16** is shown in greater detail in FIG. **2**. The row unit **16** is provided with a central frame member **20** having a pair of upwardly extending arms **21** (FIG. **4**) at the forward end thereof. The arms **21** connect to a parallelogram linkage **22** for mounting the row unit **16** to the tool bar **12** for up and down relative movement between the unit **16** and toolbar **12** in a known manner. Seed is stored in seed hopper **24** and provided to a seed meter **26**. Seed meter **26** is of the type that uses a vacuum disk as are well known to meter the seed. Other types of meters can be used as well. From the seed meter **26** the seed is carried by a delivery system **28** into a planting furrow, or trench, formed in the soil by furrow openers **30**. Gauge wheels **32** control the depth of the furrow. Closing wheels **34** close the furrow over the seed. The gauge wheels **32** are mounted to the frame member **20** by arms **36**. The toolbar and row unit are designed to be moved over the ground in a forward working direction identified by the arrow **38**.

The row unit **16** further includes a chemical hopper **40**, a row cleaner attachment **42** and a down force generator **44**. The row unit **16** is shown as an example of the environment in which the delivery system of the present invention is used. The present invention can be used in any of a variety of planting machine types such as, but not limited to, row crop planters, grain drills, air seeders, etc.

With reference to FIG. **3**, the seed delivery system **28** is shown in greater detail. Delivery system **28** includes a housing **48** positioned adjacent the seed disk **50** of the seed meter. The seed disk **50** is a generally flat disk with a plurality of apertures **52** adjacent the periphery of the disk. Seeds **56** are collected on the apertures from a seed pool and adhere to the disk by air pressure differential on the opposite sides of the disk **50** in a known manner. The disk may have a flat surface at the apertures **52** or have seed cells surrounding the apertures **52**. The disk rotates clockwise as viewed in FIG. **3** as shown by the arrow **54**. At the top of FIG. **3**, seeds **56** are shown adhered to the disk.

The seed delivery system housing **48** has spaced apart front and rear walls **49** and **51** and a side wall **53** therebetween. An upper opening **58** in the housing side wall **53** admits the seed from the metering disk **50** into the housing. A pair of pulleys **60**, **62** are mounted inside the housing **48**. The pulleys support a belt **64** for rotation within the housing. One of the pulleys is a drive pulley while the other is an idler pulley. The belt has a base member **66** to engage the pulleys and elongated bristles **70** extending therefrom, The bristles are joined to the base member at proximal, or radially inner, ends of the bristles. Distal, or radially outer, ends **74** of the bristles touch, or are close to touching, the inner surface **76** of the housing side wall **53**. A lower housing opening **78** is formed in the side wall **53** and is positioned as close to the bottom **80** of the seed trench as possible. As shown, the lower opening **78** is near or below the soil surface **82** adjacent the trench. The housing side wall forms an exit ramp **84** at the lower opening **78**.

Returning attention to the upper portion of FIG. **3**, a loading wheel **86** is provided adjacent the upper opening **58**. The loading wheel is positioned on the opposite side of the seeds **56** from the brush **64** such that the path of the seeds on the disk brings the seeds into a nip **88** formed between the loading wheel and the distal ends **74** of the bristles **70**. At the location of the nip **88**, the air pressure differential across the seed disk **50** is terminated, freeing the seed from the apertures **52** in the disk. The bottom surface of the loading wheel, facing the seed disk **50**, has recesses **90** formed therein. The recesses **90** receive seed agitators **92** projecting from the seed disk **50**. The moving agitators, by engagement with the recesses in the loading wheel, drive the loading wheel in a clockwise rotation.

In operation, the belt **64** is rotated in a counterclockwise direction. As the belt curves around the pulleys, the bristles will naturally open, that is, separate from one another as the distal ends of the bristles travel a larger circumferential distance around the pulleys than the inner ends of the bristle at the belt base member. This produces two beneficial effects as described below. The seeds are transferred from the seed meter to the delivery system as the seeds are brought by the disk into the nip **88**. There the seeds are pinched off the seed disk between the loading wheel and the bristles **70** to remove the seed from the seed disk and seed meter. The seeds are captured or entrapped in the bristles by insertion of the seed into the bristles in a radial direction, that is from the ends of the bristles in a direction parallel to the bristle length. This occurs just as the belt path around the pulley **60** ends, when the bristle ends are closing back together upon themselves, allowing the bristles to close upon, and capture the seeds therein. As the belt continues to move, the bristles move or convey the seeds downward to the housing lower opening. The side wall **53** of the housing cooperates with the bristles **70** to hold the seed in the brush bristles as the seed is moved to the lower opening.

The lower opening **78** and the ramp **84** are positioned along the curved belt path around the pulley **62**. The bristle distal ends thus cause the linear speed of the seeds to accelerate relative to the speed of the belt base member **66** and the housing as shown by the two arrows **94** and **96**. The seeds are then propelled by the bristles over the ramp **84** and discharged through the lower opening **78** into the seed trench. The angle of the ramp **84** can be selected to produce the desired relationship between the seed vertical and horizontal speeds at discharge. The forward travel direction of the row unit is to the left in FIG. **3** as shown by the arrow **38**. At the discharge, the horizontal speed of the seed relative to the ground is minimized to reduce roll of the seed in the trench.

The belt shown in FIG. **3** has relatively long bristles. As a result of the long bristles and the seed loading point being at the end of the curved path of the brush around the pulley **60** results in the seeds being loaded into the belt while the bristles have slowed down in speed. The bristle speed at loading is thus slower than the bristle speed at the discharge opening as the belt travels around the pulley **62**. This allows in the seed to be loaded into the belt at a relatively lower speed while the seed is discharged at the lower end at a desired higher speed. As described above, it is preferred that the horizontal velocity of the seed at the discharge be equal to the forward travel speed of the planter but in the rearward direction such that the horizontal velocity of the seed relative to the ground is close to or equal to zero. The long bristles can be used to increase the speed of the seed as it

travels around the pulley. However, a short bristle brush can be used as well. With a short bristle brush, there will be little acceleration in the speed of the seed as the seed travels around the pulleys. The belt will have to be driven at a speed to produce the desired horizontal velocity of the seed at the discharge. Even with a short bristle brush, the seed is still accelerated in the horizontal direction. As the belt travels around the pulley, the direction of travel of the seed changes from the predominantly vertical direction, when the seed is moved downward from the seed meter, to a predominantly horizontal direction at the discharge. This produces an acceleration of the seed velocity in the horizontal direction.

With the delivery system **28**, the seed is captured by the delivery system to remove the seed from the seed meter. The seed is then moved by the delivery system to the seed discharge point where the seed is accelerated in a rearward horizontal direction relative to the housing. From the seed meter to the discharge, the seed travel is controlled by the delivery system, thus maintaining the seed spacing relative to one another.

In the embodiment shown in FIG. **3**, the seed disk and the front and rear walls **49**, **51** of the housing **48** lie in planes that are generally parallel one another. As shown, the plane of the delivery system is generally parallel to the direction of travel of the row unit. Other relationships between the seed meter and delivery system are shown and described below.

As shown in FIG. **3**, the side wall **53** is divided by the upper and lower openings **58**, **78** into two segments, **53***a* and **53***b*. Segment **53***a* is between the upper and lower openings in the direction of belt travel while the segment **53***b* is between the lower and upper openings in the direction of belt travel. It is the gaps in the side wall **53** that form the upper and lower openings. It should be understood, however, that the delivery system will function without the segment **53***b* of the side wall. It is only the segment **53***a* that functions together with the belt bristles to deliver the seed from the meter to the seed trench. Thus, the term "upper opening" shall be construed to mean a open area before the side wall segment **53***a* in the direction of belt travel and the term "lower opening" shall mean an open area after the side wall segment **53***a* in the direction of belt travel.

With reference to FIGS. **4**-**7**, the delivery system **28** is shown in combination with the seed meter and row unit structure in an alternative arrangement of the seed meter and delivery system **28**. The seed meter **200** is shown mounted to the row unit with the seed disk **202** in a vertical orientation but at an angle to the forward travel direction shown by the arrow **38**. FIG. **4** shows of the seed meter orientation in the row unit without the delivery system **28**. The seed meter includes a housing having two halves **204** and **206** releasable joined together in a known manner. The seed meter is driven through a transmission **208** coupled to a drive cable, not shown.

In FIG. **5** only the seed disk **202** of the meter is shown with the seed delivery system **28**. As previously mentioned, the seed disk **202** is in a vertical orientation but it does not lie in a plane parallel to the forward direction **38**. Instead, the meter is oriented such that the disk is at a 60° angle relative to the forward direction when viewed from above. The seed of delivery system **28** is generally identical to that shown in FIG. **3** and is driven by a motor **65**. The delivery system, including of the brush belt **64**, is generally vertical and aligned with the fore and aft direction of the planter such that the angle between the brush and the seed disk is approximately 60°. The angle between the delivery system and a seed disk produces a partial "cross feed" of the seed into the brush. That is, the seed is fed into the brush at an angle to the lengthwise direction of the bristles. This is in contrast to FIG. **3** where the seed enters the brush in a direction substantially parallel to the lengthwise direction of the brush bristles. If the brush and seed disk were *oriented at* 90° to one another, a total cross feed would be produced with seed entering the brush perpendicular to the bristles.



The seed disk **202** is shown enlarged in FIGS. **7** and **8**. The disk **202** has opposite sides, a vacuum side **216** and seed side **218**. The seed side **218** has a surface **219** near the periphery that defines a reference plane. The reference plane will be used to describe the features of the disk near the disk periphery. An outer peripheral lip **220** is recessed from the reference plane. The peripheral lip **220** creates a radially outward edge face **222**. A circumferential row of spaced apart apertures **224** is arranged around a circular path radially inward of the edge face **222**. Each aperture extends through the disk between the vacuum side **216** and the seed side **218**. Radially inward of each aperture **224**, there is a radially elongated recess **226**. The recess **226** is recessed axially into the disk from the reference plane. In operation, the disk rotates in a counterclockwise direction as indicated by the arrow **228**. During rotation, the recesses **226** agitate the seed in the seed pool.

Surrounding each aperture **224** is a tapered recess, or shallow seed cell, **232** that extends axially into the disk from the reference plane. Seed cell **232** begins at a leading edge **234** in the direction of rotation of the disk and is progressively deeper into the seed side **218** to a trailing edge formed by an axially projecting wall **236**. The tapered recess or seed cell **232** reduces the vacuum needed to pick-up and retain seed in the apertures **224**. The seed cell also enables the seed to sit lower relative to the seed side **218** of the disk, allowing the seed to be retained while the seed singulator removes doubles or multiples of seed from the apertures **224**. In addition, the recess wall **236** agitates seed in the seed pool, further aiding in seed pick-up. The wall **236** extends lengthwise in a predominately radial direction as shown by the dashed line **238**. The walls **236**, while predominately radial, are inclined to the radial direction such that the inner end of the wall **236** is leading the outer end of the wall in the direction of rotation. Immediately following each wall **236**, as the disk rotates, is a projection, or upstanding peg **240** extending axially from the disk seed side. The pegs engage seed in the seed pool for agitation to aide in seed pick-up. The pegs **240** are located slightly radially inward of the circular path of apertures **224** to avoid interference with the seed singulator.

With reference to FIG. **8**, the disk **202** is shown in operation and in position relative to the belt **64** in the delivery system **28**. As seeds **244** are carried by the disk **202** into the bristles of the brush **64**, the wall **236** and the pegs **240** act to push the seed **244** into the bristles of the brush **64** and assist in keeping the seed from being knocked off the disk upon the seed's initial contact with the brush bristles. Once the seed is inserted into the brush bristles, the vacuum from the opposite side of the disk is cut-off, allowing the brush to sweep the seed off the disk in a predominately radial direction relative to the disk. An insert **246** overlies the lip **220** at the point of seed release to hold the seed in the brush bristles in the transition between the disk and the side wall **53** (FIG. **3**) of the delivery system housing. The disk **202** is inclined to the length of the brush bristles at approximately a 60 degree angle. This produces the partial cross-feed of the seed into the brush bristles.

FIG. **9** shows the brush belt seed delivery system **28** in combination with a vacuum belt metering system having a metering belt **302**. The vacuum belt meter is fully described

in U.S. Pat. No. 7,918,168 incorporated herein by reference. The belt **302** picks-up seed at a pick-up region **304** at a lower, front location of the belt's path and transports it to the delivery system at a release region **306** at an upper, rear location of the belt's path. In this arrangement of the belt meter and the brush delivery system, the delivery system is again partially cross fed with seeds from the meter.

Another arrangement of the delivery system together with a vacuum meter belt is shown in FIG. **10**. The delivery system **28** is in-line with the belt meter **124**. This allows the distal ends of the brush bristles to sweep over the surface of the metering belt **126** to capture the seed therefrom. The meter belt **126** is wrapped around pulleys **128**. The metering belt **124** is similar and functions as the belt **302** mentioned above.

The delivery system of the present invention can also be used with seed meters other than air pressure differential meters. For example, with reference to FIG. **11**, a finger pick-up meter **130** is shown, such as that described in U.S. Pat. No. 3,552,601 and incorporated herein by reference. Seed is ejected from the meter through an opening **132**. The delivery system **134** has a brush belt **136** wrapped about pulleys **138** and **140**. As shown, the belt pulley **138** shares a common drive shaft with finger pick-up meter **130**. A hub transmission such as a spherical continuously variable transmission or a three speed hub can be used to drive the belt **136** at a different speed from the meter **130**. The delivery system housing includes a side wall **142**. A ramp **146** is formed at the lower end of the wall **142** adjacent the lower opening **148**. At the upper end of the delivery system, the upper opening is formed in the housing rear wall adjacent the opening **132** through which seeds are ejected from the seed meter. The seeds are inserted laterally into the brush bristles in a complete cross-feed. As in the other embodiments, the seed is captured in the brush bristles, moved downward to the lower opening, accelerated rearward and discharged through the lower opening **148**.

The endless member of the delivery system has been described as being a brush belt with bristles. In a broad sense, the bristles form an outer periphery of contiguous disjoint surfaces that engage and grip the seed. While brush bristles are the preferred embodiment, and may be natural or synthetic, other material types can be used to grip the seed such as a foam pad, expanded foam pad, mesh pad or fiber pad.

Having described the preferred embodiment, it will become apparent that various modifications can be made without departing from the scope of the invention as defined in the accompanying claims.

The invention claimed is:

**1**. A seeding machine for a row unit, the seeding machine comprising:

- a seed delivery apparatus including
  - an elongated housing having a first opening through which seed is received into the seed delivery apparatus, a second opening through which seed exits the seed delivery apparatus, and an elongated interior chamber along which seed is conveyed from the first opening to the second opening, and
  - an endless member positioned within the elongated housing, the endless member movable within the elongated interior chamber of the elongated housing to receive seed from the first opening and convey seed to the second opening;
- a seed meter having a plurality of apertures through which an air pressure differential is applied to retain seed thereon; and
- a nip proximate the first opening and through which seed from the seed meter passes, wherein seed is carried by the seed meter under the air pressure differential at least to the nip.

**2**. The seeding machine of claim **1**, wherein the endless member is movable about at least two rotatable members.

**3**. The seeding machine of claim **1**, wherein the seed meter comprises a disk in which the plurality of apertures is defined.

**4**. The seeding machine of claim **1**, wherein the nip is defined at least in part by the endless member.

**5**. The seeding machine of claim **1**, wherein the nip is defined at least in part by a rotatable wheel proximate the endless member.

**6**. The seeding machine of claim **1**, wherein the air pressure differential retaining a seed within an aperture of the plurality of apertures is cut off at the nip to release the seed from the seed meter.

**7**. The seeding machine of claim **1**, wherein the air pressure differential retaining a seed within an aperture of the plurality of apertures is cut off upon receipt of the seed within the endless member.

**8**. A seeding machine for a row unit, the seeding machine comprising:

- a seed delivery apparatus including
  - an elongated housing having a first opening through which seed is received into the seed delivery apparatus, a second opening through which seed exits the seed delivery apparatus, and an elongated interior chamber along which seed is conveyed from the first opening to the second opening, and
  - an endless member positioned within the elongated housing, the endless member movable within the elongated interior chamber of the elongated housing to receive seed from the first opening and convey seed to the second opening; and
- a seed meter having a plurality of apertures through which an air pressure differential is applied to retain seed thereon, the seed meter carrying seed to a location at which a moving surface removes the seed from the seed meter.

**9**. The seeding machine of claim **8**, wherein the moving surface is a surface of the endless member.

**10**. The seeding machine of claim **8**, further comprising a rotating wheel adjacent the endless member, wherein the moving surface is a surface of the rotating wheel.

**11**. The seeding machine of claim **10**, wherein the endless member cooperates with the rotating wheel to remove the seed from the seed meter.

**12**. The seeding machine of claim **8**, wherein the endless member is movable about at least two rotatable members.

**13**. The seeding machine of claim **8**, wherein the seed meter comprises a disk in which the plurality of apertures is defined.

**14**. The seeding machine of claim **8**, further comprising a nip proximate the first opening and through which seed from the seed meter passes, wherein the air pressure differential retaining a seed within an aperture of the plurality of apertures is cut off at the nip to release the seed from the seed meter.

**15**. The seeding machine of claim **8**, wherein the air pressure differential retaining a seed within an aperture of the plurality of apertures is cut off upon receipt of the seed within the endless member.

**16**. A method of delivering a seed from a seed meter to a furrow, the method comprising:

- applying an air pressure differential across a seed meter;

retaining a seed within an aperture of a plurality of apertures extending through the seed meter by applying the air pressure differential across the seed meter;

carrying the seed retained within the aperture under the air pressure differential to a location;

contacting the seed with a moving surface at the location to dislodge the seed from the aperture; and

conveying the dislodged seed via an endless member to a furrow.

**17**. The method of claim **16**, wherein carrying the seed comprises moving the seed along a circumferential path of a rotating seed disk.

**18**. The method of claim **16**, wherein the moving surface is a surface of the endless member.

**19**. The method of claim **16**, wherein the moving surface is a surface of a rotating wheel adjacent the endless member.

**20**. The method of claim **19**, further comprising moving the seed through a nip defined at least in part by the rotating wheel.

* * * * *

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

This brief complies with the type-volume limitations of the Federal Rules of Appellate Procedure and the Rules of this Court. According to the word processing system used to prepare this document, the brief contains 13,944 words.

*/s/ John C. O'Quinn*